JANET L. CHUBB, ESQ.
Nevada State Bar No. 176
LOUIS M. BUBALA III, ESQ.
Nevada State Bar No. 8974
ARMSTRONG TEASDALE
50 W. Liberty St., Suite 950
Reno, NV 89501
Telephone: (775) 322-7400
Facsimile: (775) 322-9049
Email: jchubb@armstrongteasdale.com
    and  bsalinas@armstrongteasdale.com
    and  lbubala@armstrongteasdale.com

WILLIAM A. BREWER III, ESQ.
Texas State Bar No. 02967035
*Admitted Pro Hac Vice*
MICHAEL J. COLLINS, ESQ.
Texas State Bar No. 00785495
*Admitted Pro Hac Vice*
ROBERT M. MILLIMET, ESQ.
Texas State Bar No. 24025538
*Admitted Pro Hac Vice*
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015
Email: wab@bickelbrewer.com
        mjc@bickelbrewer.com
        rrm@bickelbrewer.com

Attorneys for Plaintiffs

*Electronically Filed on
July 8, 2011*

UNITED STATES DISTRICT COURT

District of Nevada

| | |
|---|---|
| In re: | ) Case No. 2:07-CV-892-RCJ-GWF-BASE |
| | ) and |
| **USA COMMERCIAL MORTGAGE COMPANY,** | ) Case No. 3:07-CV-241-RCJ-GWF |
| **Debtor.** | ) |
| | ) **FINAL JUDGMENT AND ORDER** |
| **3685 SAN FERNANDO LENDERS, LLC, *et al.*,** | ) **AWARDING DECLARATORY RELIEF,** |
| | ) **DAMAGES, ATTORNEYS' FEES, AND** |
| | ) **PREJUDGMENT INTEREST, AND** |
| **Plaintiffs,** | ) **DENYING DEFENDANTS' POST-TRIAL** |
| | ) **MOTIONS FOR JUDGMENT AS A** |
| v. | ) **MATTER OF LAW AND A NEW TRIAL** |
| | ) |
| **COMPASS USA SPE LLC, *et al.*,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

The Court issues its Final Judgment And Order Awarding Declaratory Relief, Damages, Attorneys' Fees, And Prejudgment Interest, And Denying Defendants' Post-Trial Motions For Judgment As A Matter Of Law And A New Trial, as follows:

## I.

## BACKGROUND

USA Commercial Mortgage Company ("USA Commercial") was a licensed Nevada mortgage broker and loan servicer that filed for bankruptcy protection in April 2006.  At an auction held in the USA Commercial bankruptcy proceedings, Compass Partners, LLC and Compass USA SPE, LLC (collectively, "Compass") purchased USA Commercial's interest in thousands of Loan Servicing Agreements ("LSAs").  Those LSAs were contracts between USA Commercial and fractional beneficial interest holders (the "Direct Lenders") in various commercial mortgage investment loans secured by deeds of trust (the "Loans") that were originated and originally serviced by USA Commercial on behalf of the Direct Lenders.

Silar Advisors, LP and Silar Special Opportunities Fund, LP (collectively, "Silar") financed Compass's acquisition of the LSAs, as well as certain fractional beneficial interests in the Loans (the "Purchased Assets").  Silar financed Compass's acquisition of the Purchased Assets pursuant to a certain Master Repurchase Agreement ("MRA") and other related instruments.  Silar subsequently assigned its interests in, and obligations under, the Purchased Assets to Asset Resolution LLC ("Asset Resolution"), an entity created and owned by Silar for this purpose.  Asset Resolution thereafter foreclosed on Compass's interests in the Purchased Assets and purported to assume all the rights and obligations attendant to owning the Purchased Assets.

Certain Direct Lenders formed limited liability companies ("LLCs") and commenced this action against Compass, Silar, and two principals of Compass, seeking declaratory relief in connection with the interpretation of the LSAs and the Loans, as well as damages.  After Silar formed and assigned its interests in the Purchased Assets to Asset Resolution, the Court

acknowledged but did not approve that assignment, and allowed Asset Resolution to appear and assert counterclaims for declaratory relief and damages against approximately 65 individual Direct Lenders (20 of whom were already named as individual plaintiffs).  The Court later allowed another 32 of those individual Direct Lenders to be added as named plaintiffs in this case, permitted all those 52 plaintiffs to add Asset Resolution as a defendant, determined that the LLCs lacked standing to pursue their claims, and denied the request of all the former individual members of the LLCs to be substituted for the LLCs as named plaintiffs.

On October 14, 2009, Asset Resolution filed for bankruptcy protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. On November 24, 2009, that court transferred the bankruptcy case to this District.  This Court subsequently withdrew the reference to the bankruptcy case and converted it to chapter 7, putting Asset Resolution's estate under the exclusive control of an appointed trustee.

On December 14, 2010, a nine-person jury found Silar and/or Asset Resolution liable for breach of contract, breaches of the implied covenant of good faith and fair dealing in contract and in tort, breaches of fiduciary duties, conversion, and civil conspiracy in connection with their servicing of certain Loans pursuant to the LSAs.  As a result of the foregoing and the Court's pretrial determination that Compass, Boris Piskun ("Piskun"), and David Blatt ("Blatt") (collectively, the "Compass Defendants") were in default and, thus, liable as a matter of law, the jury awarded plaintiffs a total of approximately $79,000 in compensatory damages, excluding attorneys' fees and prejudgment interest, and a total of $5.1 million in punitive damages.

On June 9, 2011, the Court heard oral argument on plaintiffs' motions for attorneys' fees and prejudgment interest, and defendants' post-trial motions for judgment as a matter of law and a new trial.

## II.

### DECLARATORY JUDGMENT

The Court now incorporates by reference its prior summary judgment decisions (Doc. ##1489, 1819, 1820, 1855) and makes the following declarations in connection with the LSAs and the Loans:

**A.      The Compensation Owed To Defendants As The Loan Servicers**

Section 5 of the predominant LSAs describes the compensation owed to the loan servicers in the following way:

> Lender authorizes USA [Commercial] to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed one percent (1%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) any default interest collected from the Borrower pursuant to the terms of the Note.

(Doc. #2056, Ex. A, § 5)   Therefore, under the LSAs,[1] the loan servicers are entitled to be paid default interest and late charges as loan servicing compensation only if the Direct Lenders are first repaid the principal amount of the Loans and all due and owing accrued regular interest in full.  That is because the loan servicers have not "collected from the Borrower," and thus cannot "retain," sufficient sums to pay themselves any loan servicing compensation to which they would otherwise be entitled under the LSAs.  Further, because the LSAs dictate the compensation to which the loan servicers would otherwise be entitled, where the Direct Lenders have not been repaid the principal amount of the Loans and all due and owing accrued regular interest in full, allocation-of-payment provisions in the promissory notes for the Loans are irrelevant, especially where 51% of the Direct Lenders in the Loans (calculated by the total beneficial interest in the Loans) have specified a different allocation.

---

[1] All the LSAs contain the "retain monthly" and "collected from the Borrower pursuant to the terms of the Note" language, but some LSAs do not provide for the payment of default interest and/or late charges to the loan servicers.  (Doc. #765, Ex. A at 2-5)

Moreover, because the LSAs permit the loan servicers to "retain monthly" a servicing fee, as well as default interest and/or late charges "collected from the Borrower," the loan servicers are not entitled under the LSAs to collect servicing fees, default interest, or late charges directly from the Direct Lenders, but only from funds collected from the Borrower.

Finally, for defaulted Loans, the loan servicers are entitled to be paid only one accrued annual servicing fee under the LSAs, based on the amount ultimately collected on any given Loan, not based on the principal amount of the Loan. That is because the LSAs provide that the loan servicers are entitled to "retain monthly" only an "annual servicing fee," and almost all the Loans were for an original term of only one year.

**B.      Defendants Were Obligated To Comply With Nevada Law Applicable To Mortgage Brokers, Including The Power Of Attorney Requirement.**

Prior to investing with USA Commercial, each Direct Lender executed one LSA with USA Commercial that governed their relationship, irrespective of the number of Loans in which the Direct Lender ultimately invested. The LSAs were expressly governed by Nevada law and binding on Defendants as successors in interest to USA Commercial, and state unambiguously that "USA [Commercial] is a *mortgage broker* and loan servicer in Clark County, Nevada." (Emphasis added.)

Under Chapter 645B of the Nevada Revised Statutes, a "mortgage broker" is required to obtain a separate valid power of attorney from an investor for each loan for which it purports to act for that investor. *See* NEV. REV. STAT. § 645B.330(1). A power of attorney that fails to comply with the statute is void and unenforceable. *See id.* Because the LSAs are investor-specific, not loan-specific, the LSAs failed to grant either USA Commercial or defendants a valid power of attorney, as required by Nevada law applicable to "mortgage brokers."

Moreover, even if USA Commercial and defendants were not acting as a "mortgage broker" with respect to the Direct Lenders in the colloquial sense of the phrase, but only as a "loan scrvicer," their activities in that capacity were equally covered by the legal definition of "mortgage broker"

under the statute.  Under Chapter 645B, a "mortgage broker" includes not only those who serve as agents to assist others in obtaining loans, which is the most common colloquial usage of the phrase, but also, *inter alia*, those who "[h]old[] [themselves] out for hire to serve as an agent for any person who has money to lend, if the loan is or will be secured by a lien on real property."  NEV. REV. STAT. § 645B.0127(1)(b).  The LSAs indicate that this is precisely the capacity in which USA Commercial was hired by the Direct Lenders:

> B. Lender lends, or wishes to lend, money to various borrowers . . . from time to time, which loans are arranged by USA [Commercial] and are secured by interests in real and/or personal property.
>
> C. Lender wishes to retain the services of USA [Commercial] in connection with making and servicing a loan or Loans . . . .
>
> . . . .
>
> 1. Services in Connection with Arranging the Loans. USA [Commercial] will perform the following services in connection with arranging each loan:
>
> (a) Obtain a promissory note or notes secured by the trust deed
>
> . . . .

Accordingly, the loan servicers in this case were "mortgage brokers" under Nevada law that required a separate valid power of attorney for each Loan, not only for each Direct Lender.  *See* NEV. REV. STAT. § 645B.330.  Defendants lacked such powers of attorney and, therefore, were purporting to act on behalf of the Direct Lenders without legal authority to do so.

**C.     Defendants Acquired Only Those Loan Servicing Rights That USA Commercial Had To Sell.**

In its Confirmation Order related to USA Commercial's chapter 11 plan, the Bankruptcy Court approved the transfer of USA Commercial's loan servicing rights under the LSAs to Compass without modification.  That is, whatever loan servicing rights were afforded to USA Commercial by the terms of the LSAs is what defendants acquired from USA Commercial.  As a corollary, USA Commercial could not sell, and the Bankruptcy Court could not approve the sale of, any property interests that USA Commercial did not own or were owned by the Direct Lenders.

Thus, for example, although the Confirmation Order addressed the propriety of the transfers of the powers of attorney *within* the LSAs and found that they were validly assigned to Compass, those powers of attorney were insufficient under Nevada law to allow defendants to act as the loan servicers for the Direct Lenders.   In other words, the valid transfer of an instrument that is itself legally insufficient in some way does not cure the underlying defect.   Defendants had whatever rights via the powers of attorney that USA Commercial had, and USA Commercial's powers of attorney within the LSAs were insufficient for a mortgage broker, which USA Commercial was under the relevant statutes.

**D.     Under Nevada Law, Because Defendants Owed Fiduciary Duties And Duties Of Good Faith And Fair Dealing To The Direct Lenders, Defendants Could Not Place Their Financial Interests Above Those Of The Direct Lenders .**

The LSAs (as well as the documentation concerning the Loans) were expressly governed by Nevada law.   Thus, defendants were obligated to comply with Nevada law pertaining to the servicing of the Loans.   Nevada law precluded defendants from placing their financial interests above those of the Direct Lenders, for whom defendants were servicing the Loans pursuant to the LSAs.

The LSAs did not create a general fiduciary duty for the loan servicers; rather, the LSAs created a duty to exercise reasonable business judgment.   The LSAs do not describe the relationship between the parties as fiduciary in nature, but instead incorporate a reasonable business person standard.   Where a borrower defaults in making payments under a promissory note, the LSAs provide:

> In the event the Borrower fails to make payment to USA [Commercial] as required by the terms of the note, USA [Commercial] will take steps to collect the payment including, but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA [Commercial] in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

Where, as here, a loan servicer is obligated to perform under a contract using its reasonable business judgment, a fiduciary duty is not created. *See First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Trust Co.*, 919 F.2d 510, 514 (9th Cir 1990) (no fiduciary duty where parties are obligated to make decisions "in good faith and in a reasonable manner" because "these provisions are more indicative of a typical business relationship among equally sophisticated entities dealing at arm's length than of a fiduciary relationship"). An agent must expressly assume fiduciary obligations and such an assumption must be the intent of the parties. *See So. Pac. Thrift & Loan Ass'n v. Sav. Ass'n Mortgage Co.*, 70 Cal. App. 4th 634 (Cal. Ct. App. 1999) (holding that the loan servicer did not act as fiduciary to lenders except where it expressly agreed to assume fiduciary duties to lenders). Thus, because the parties did not express their mutual intent for the loan servicers to assume fiduciary duties, the LSAs imposed on the loan servicers only an agency responsibility to exercise reasonable business judgment on behalf of the Direct Lenders in connection with their servicing of the Loans.

Notwithstanding the foregoing, however, under Nevada law defendants were agents of, and therefore owed fiduciary obligations to, the Direct Lenders when handling funds and taking title to real property received on account of the Direct Lenders. *See, e.g., Young v. Nev. Title Co.*, 744 P.2d 902, 903 (Nev. 1987) (affirming determinations that mortgage broker who failed to give lenders the payoffs from individual borrowers' loans was an agent); *LeMon v. Landers*, 402 P.2d 648, 649 (Nev. 1965) ("An agent . . . owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."); *Jory v. Bennight*, 542 P.2d 1400, 1403 (Nev. 1975) ("[H]is fiduciary duties . . . include obligations of the utmost good faith, diligence, loyalty, fair dealing, and disclosure of material facts."). Indeed, under sections 654A.020 and 645A.041 of the Nevada Revised Statutes, defendants and their contracted sub-servicers were escrow agents under Nevada law that were required to be licensed and bonded thereunder to collect payments on the Loans for the benefit of the Direct Lenders.

Moreover, because defendants had a fiduciary relationship with the Direct Lenders when handling funds and taking title to real property received on account of the Direct Lenders, Nevada law precluded defendants from engaging in grievous and perfidious misconduct pursuant to the implied covenant of good faith and fair dealing in the LSAs.  *See Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324-26 (Nev. 2009) ("A violation of the covenant [the implied covenant of good faith and fair dealing] gives rise to a bad-faith tort claim [against insurers]. . . . This duty to adequately inform an insured arises from the special relationship between the insured and the insurer, which is similar to a fiduciary relationship.  Although this court has refused to adopt a standard where an insurance company must place the insured's interests over the company's interests, the nature of the relationship requires that the insurer adequately protect the insured's interest.  Thus, at a minimum, an insurer must equally consider the insured's interests and its own.") (internal citations omitted); *Ins. Co. of the W. v. Gibson Tile Co.*, 134 P.3d 698, 702-03 (Nev. 2006) ("Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for breach of the covenant arises only 'in rare and exceptional cases' when there is a special relationship between the victim and tortfeasor.  A special relationship is 'characterized by elements of public interest, adhesion, and fiduciary responsibility.' . . . We have recognized that in these situations involving an element of reliance, there is a need to 'protect the weak from the insults of the stronger' that is not adequately met by ordinary contract damages.  In addition, we have extended the tort remedy to certain situations in which one party holds 'vastly superior bargaining power.' . . . The insurer-insured relationship is fiduciary in nature, and a jury's finding of a breach of fiduciary duty may support the finding of bad faith.  Misrepresenting or concealing facts to gain an advantage over the insured constitutes a breach of fiduciary responsibility.") (internal citations omitted); *LeMon*, 402 P.2d at 649 ("The object of the agency is to ensure the transaction of the business of the principal to his best advantage.  An agent will not be permitted to pervert his authority to his own personal gain in severe hostility to the interests of his principal.").

Thus, Nevada law precluded defendants from elevating their interests above the interests of the Direct Lenders for whom defendants were servicing the Loans pursuant to the LSAs. Accordingly, defendants could not seek to retain default interest and late charges as loan servicing compensation from collected funds in derogation of the right of the Direct Lenders to be repaid first their principal and all accrued regular interest due and owing under the Loans.[2]

**E.  Pursuant To The "51% Rule," The Direct Lenders Had An Absolute Right To Terminate Defendants As Their Loan Servicers And To Exercise Management Control Over Their Loans.**

Pursuant to the "51% Rule" set forth in Nevada Administrative Code section 645B.073 and Nevada Revised Statutes section 645B.340(1), the Direct Lenders had an absolute right to replace defendants as their loan servicers for any Loans, provided that 51% of the Direct Lenders in any Loans made the decision to do so.  Nevada Administrative Code section 645B.073 requires – and did so long before Nevada Revised Statutes section 645B.340(1) passed – that any document related to a mortgage loan must contain a provision to allow the holder of 51% or more of the beneficial interests in the loan to act on behalf of all the remaining beneficial interest holders in that loan.

The 51% Rule recognizes that 51% or more of the fractional beneficial interest holders in a loan are entitled to exercise management control over that loan, including designating their loan servicer and deciding whether to foreclose on a loan, to sell foreclosure property, and to agree with borrowers to modify the terms of the loan documents.  *See* NEV. REV. STAT. § 645B.340(1).  The 51% Rule is premised on the fact that the fractional beneficial interest holders are the owners of their loans.  *See id.*  Because Nevada Revised Statutes section 645B.340(1) expressly provides that the 51% Rule operates "regardless of the date the interests were created," it applies to the Loans in which the Direct Lenders invested.  *See id.*

---

[2] On May 26, 2009, the Nevada Legislature enacted a new statute that expressly imposes a "fiduciary obligation" on Nevada licensed mortgage brokers.  *See* NEV. REV. STAT. § 645B.0147.  That statute defines a "fiduciary obligation" to mean "a duty of good faith and fair dealing."  *See id.*, § 645B.0147(3).

Moreover, because the 51% Rule recognizes that the Direct Lenders are entitled to exercise management control over their Loans, they were entitled to instruct defendants whether or not to foreclose on the Loans, to sell foreclosure property, or to agree with borrowers to modify the terms of the Loans. *See id.* The Direct Lenders were also entitled to engage in communications amongst themselves and with defendants as their loan servicers pursuant to their right to exercise management control over the Loans. Thus, defendants wrongly asserted that the Direct Lenders' exercise of management control over their Loans constituted impermissible interference with defendants' servicing of the Loans.

Further, because defendants' fractional beneficial interests in the Loans are subject to the decisions of 51% or more of the Direct Lenders in any Loans, defendants' additional capacity as the loan servicers of any Loans in which they held some fractional beneficial interests works no magic upon the general principle that the owners of 51% of the beneficial interest in a given loan may control the loan. Thus, the Direct Lenders cannot be held liable for allegedly taking actions in connection with the Loans that affected defendants' fractional beneficial interests in the Loans any more than one Direct Lender could be held liable to another Direct Lender simply because the former voted with the majority to change the loan servicer against the latter's vote not to make the change.

**F.    Pursuant To The MRA, Silar Was The Direct Lenders' Actual Loan Servicer And Compass Was Silar's Agent In Connection With The Servicing Of The Loans.**

**1.    Repurchase agreements and agency.**

A repurchase agreement involves two separate but related transactions: (1) a sale of assets by the "repo seller" in exchange for cash; and (2) an agreement by the repo seller to repurchase them or their equivalent for a specified price in the future. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 298 (S.D.N.Y. 1998). A repurchase agreement differs from a loan because, "[u]nlike a lender taking collateral for a secured loan, a repo buyer 'take[s] title to the securities

received and can trade, sell or pledge them.'" *See id.* (quoting *SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir. 1986)).   In other words, a repurchase agreement is "critically different" from a secured loan because the assets subject to the repurchase agreement are held by the repo buyer and are "assets available for satisfaction of its debts and thus could be seized by [its] creditors." *See Drysdale Sec. Corp.*, 785 F.2d at 41-42 (noting that a secured lender "holds pledged collateral for security and may not sell it in the absence of a default," whereas a repo buyer takes title to and "is free to deal the 'collateral.'").

Under New York law (which expressly governs the MRA), the objective intention of the parties, as reflected in their contract language, dictates whether a repurchase agreement is a purchase-and-sale transaction or a collateralized loan.  *See Granite Partners, L.P.*, 17 F. Supp. 2d at 300.  "The mere presence of secured loan characteristics in repo and reverse repo agreements is not enough to negate the parties' voluntary decision to structure the transactions as purchases and sales." *See id.* at 302 (citation omitted).  Moreover, when the repurchase agreement expressly states that the parties' intent is to consummate a purchase and sale transaction, but nevertheless grants a contingent security interest in the event that the parties' agreement is later construed to be a collateralized loan, such a contingent security interest does not transform the sale into a loan.  *See Am. Home Mortgage Inv. Corp. v. Lehman Bros. Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 388 B.R. 69, 90 (Bankr. D. Del. 2008) ("[T]he Court finds that the MRA is a purchase and sale agreement and not a loan. Therefore, this 'contingent' security interests [sic] does not arise in this case, and Article 9 does not apply.  Furthermore, the MRA cannot be simultaneously a purchase and sale agreement and an agreement which creates a security interest. Therefore, the simple existence of a 'contingent' security interest, whether or not the contingency ever occurs, also does not give rise to Article 9 applicability.").

An agency relationship "results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to

act." *See Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7660(DC), 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009) (internal quotation marks and citation omitted) (discussing the requirement that the agent is subject to the principal's "direction and control'" as an "essential characteristic of an agency relationship"); *Mouawad Nat'l Co. v. Lazare Kaplan Int'l, Inc.*, 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007) ("The essence of control in an agency sense is in the *necessity* of the consent of the principal on a given matter.") (emphasis in original) (internal quotation marks and citation omitted).  A party can be a principal's agent with respect to certain transactions, but not as to others.  *See Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 302 (S.D.N.Y. 2005).  An agent's authorized, as well as unauthorized but ratified, acts are imputed to its principal.  *See News Am. Mktg., Inc. v. LePage Bakeries, Inc.*, 791 N.Y.S.2d 80, 82 (N.Y. App. Div. 2005) ("Generally, principals are liable for the acts of their agents performing within the scope of their apparent authority.").

## 2.        The MRA constitutes a purchase-and-sale transaction, not a collateralized loan.

It was the intention of Compass and Silar that the MRA would effectuate a purchase and sale transaction, not a collateralized loan.   Specifically, the MRA's provisions (as well as their contemporaneous "Omnibus Assignment" and "Subservicing Agreement") demonstrate that Silar financed Compass's acquisition of the Purchased Assets in exchange for obtaining legal title to those Purchased Assets pending Compass's future repurchase of them from Silar.

First, Silar was denominated as the "Buyer,'" and Compass was denominated as the "Seller." Second, the parties stated that "Seller [Compass] and Buyer [Silar] intend that the Transactions hereunder be sales to Buyer [Silar] of the Purchased Assets and not loans from Buyer [Silar] to Seller [Compass] secured by the Purchased Assets," which were defined to include any assets that Compass acquired from USA Commercial, including the LSAs, and "sold" to Silar.  Third, the "Transactions" and MRA were expressly intended to be a "repurchase agreement" and a "master netting agreement" as defined in 11 U.S.C. § 101, and a "securities contract" as defined in 11 U.S.C.

§ 741.  Fourth, Compass was expressly granted the right to "repurchase" the Purchased Assets on the "Repurchase Date" for the "Repurchase Price."   Fifth, as a condition precedent to the MRA, Compass assigned to Silar "all of Seller's [Compass's] rights, title and interests in, to and under each of the [Purchased Assets] . . . ."   Sixth, Compass could not assign, transfer, dispose or pledge, hypothecate, or otherwise encumber any of the Purchased Assets or the "Program Documents," but Silar in its sole discretion could engage in repurchase transactions or otherwise assign, transfer, pledge, hypothecate, or convey the Purchased Assets subject to its "obligation to reconvey the Purchased Assets (and not substitutes therefor) on the Repurchase Date," as well as assign its rights and obligations under the MRA and the other Program Documents.   Seventh, all principal and interest collected on the Loans, all loan servicer compensation due under the LSAs, and all sale proceeds in connection with the Loans were deemed to be "the property of the Buyer [Silar]." Eighth, pursuant to the Subservicing Agreement, Compass Financial Partners, LLC was:  (1) notified and acknowledged that Silar owned the "Servicing Rights;" (2) required to deliver the "Servicing Rights" to Silar; and (3) obligated, upon the termination of the Subservicing Agreement, to deliver the "Records" to Silar, and cooperate and assist with the transfer of the "Servicing Responsibilities" to Silar and Silar's third-party designee.

Based on the plain meaning of such contract language, under New York law, the parties' "repurchase agreement constituted a purchase and sale transaction, rather than a collateralized loan, as a matter of law."   *See Granite Partners*, 17 F. Supp. 2d at 302 (finding that because the repurchase agreements explicitly stated that the parties "intend that all Transactions hereunder be sales and purchases and not loans, that intention must be honored" and, thus, they "are to be treated as a matter of law as purchase and sale agreements and not secured loans subject to Article 9 of the UCC") (citations omitted); *In re Am. Home Mortgage Holdings, Inc.*, 388 B.R. at 91 (concluding as a matter of (New York) law that the parties intended to create a purchase and sale transaction, rather than a collateralized loan, based on the four corners of their repurchase agreement, because the

parties expressed their intent "'that all Transactions hereunder be sales and purchases and not loans,'" the parties were denominated as "Buyer" and "Seller" rather than lender and borrower or secured creditor and debtor, the Seller agreed to transfer to the Buyer "Purchased Securities" against the transfer of funds by the Buyer, the transfer of the Purchased Securities by the Seller to the Buyer occurred on the "Purchase Date" for the "Purchase Price," and the transfer of the Purchased Securities by the Buyer to the Seller was to occur in the future on the "Repurchase Date" at the "Repurchase Price").

Moreover, because the MRA grants Silar a contingent perfected security interest in the Purchased Assets only "*in the event* that a court or other forum recharacterizes the Transactions hereunder as other than sales" (emphases added), such contract language does not create an ambiguity regarding whether Silar and Compass intended the MRA to be a purchase and sale transaction. *See In re Am. Home Mortgage Holdings, Inc.*, 388 B.R. at 91 (because the repurchase agreement stated that "in the event any such Transactions are deemed to be loans, Seller shall be deemed . . . to have granted to Buyer a security interest in all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof," the Seller granted the Buyer a security interest in the securities only if the court determined the repurchase agreement was a loan, which the court refused to do in light of "the stated intent of the parties and the operative provisions of the MRA").  Thus, as a matter of law, the MRA constitutes a purchase-and-sale transaction, rather than a collateralized loan, between Silar and Compass.

**3.**  **Silar was the title owner of the Purchased Assets, including the loan servicing rights, and Compass was Silar's loan servicing agent.**

Because Silar financed Compass's acquisition of the Purchased Assets pursuant to a purchase-and-sale transaction under the MRA, Silar, not Compass, was the title owner of the LSAs and the loan servicing rights thereunder as a matter of law.  The LSAs and the loan servicing rights thereunder were included amongst the Purchased Assets subject to the MRA, the Omnibus

Assignment, and the Subservicing Agreement.  Specifically, the MRA required Compass to:  (1) cause Compass Financial Partners, as subservicer, to service the outstanding Loans; (2) deliver to Silar the LSAs purchased by Silar from Compass; and (3) obtain Silar's approval of any subsequent servicer, subservicer, or form of servicing agreement.

The MRA also recognized that Compass was Silar's agent by obligating Compass to:  (1) defend Silar's "right, title and interest" in the Purchased Assets; (2) obtain Silar's prior written consent to "waive any term or condition of, or settle or compromise any claim in respect of, any item of the Purchased Assets, any related rights or any of the Program Documents;" (3) "do all things necessary to preserve the Purchased Assets," and "not allow any default to occur for which Seller [Compass] is responsible under any Purchased Assets or any Program Documents;" and (4) hold all books and records related to the Purchased Assets "in trust" for Silar until Silar no longer had any interest, or lien on, any of the Purchased Assets.  Such obligations demonstrate the measure of control conferred onto Silar in connection with the servicing of the outstanding Loans originated by USA Commercial.  *See Samba Enters.*, 2009 WL 705537, at *7, *Mouwad Nat'l Co.*, 476 F. Supp. 2d at 422.

In addition, Compass assigned its rights, title, and interests in the Purchased Assets to Silar pursuant to the Omnibus Assignment.  *See also Enright v. Mintz*, 457 N.Y.S.2d 180, 181 (N.Y. Civ. Ct. 1982) ("It is hornbook law that an assignee steps into the shoes of the assignor.").  Further, the Subservicing Agreement required Compass Financial Partners to acknowledge that Silar owned the "Servicing Rights," to reflect in its servicing records that Silar was the owner of those Servicing Rights, and to deliver the servicing records to Silar upon the termination of Compass Financial Partners as the subservicer.  Thus, Silar was the title owner of the LSAs and the loan servicing rights thereunder, and Compass and Compass Financial Partners were Silar's servicing agents with respect to the outstanding Loans originated by USA Commercial.

### 4. Under the LSAs, Silar is responsible for the loan servicing actions taken or not taken by Compass within the scope of their agency relationship.

Pursuant to the terms of the predominant LSAs,[3] Silar is responsible for the loan servicing actions taken or not taken by Compass:

> *USA [Commercial's] Right to Delegate.* Notwithstanding anything contained herein, USA [Commercial] may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA [Commercial] *shall remain responsible for all action taken or not taken* by such companies, agents, representatives, and others throughout the term of this Agreement.

(Emphasis added.) In addition, under the LSAs, Silar was the successor in interest to USA Commercial and, therefore, bound by the terms of the LSAs. However, Silar is responsible for only the acts of Compass within the scope of its agency relationship with Silar, not for alleged tort claims unrelated to the Direct Lenders' contractual rights under the LSAs.

### G. The Direct Lenders Are Entitled To Elect Whether To Apply Collected Funds To Principal Or Accrued Regular Interest Under Certain Promissory Notes Related To The Loans.

A majority of the outstanding Loans have a promissory note that enables the Direct Lenders to elect whether to apply collected funds to principal or accrued regular interest. The Direct Lenders' election of application to principal may be implied. In addition, the Direct Lenders were not required to elect the option before payments were applied or forever lose their right to complain about the application. When collected funds are insufficient to cover both accrued regular interest and principal, the Direct Lenders have an ongoing right to elect that the loan payments go first to principal rather than to interest within a reasonable time period after a payment or final principal payment is received.

---

[3] According to the audit undertaken by the Receiver, there were 4,209 predominant LSAs, plus three other types of LSAs that numbered 632 in total.

# III.

## DEFENDANTS' RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW

### A.    Relevant Legal Standard

In reviewing a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), the Court "may not make credibility determinations or weigh the evidence," but "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (internal quotations and citations omitted).  "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *See id.* (internal quotations and citation omitted).  The Court must review the jury's verdict for substantial evidence and uphold it if "evidence adequate to support the jury's conclusion [exists], even if it is also possible to draw a contrary conclusion." *See id.* at 961, 963 (internal quotations and citation omitted).

A renewed motion for judgment as a matter of law under Rule 50(b) "is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *See id.* at 961.  Thus, a Rule 50(b) motion cannot properly raise arguments that were not raised in the pre-verdict Rule 50(a) motion. *See id.*; *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 (9th Cir. 2009) ("[W]e strictly construe the procedural requirement of filing a Rule 50(a) motion before filing a Rule 50(b) motion.") (precluding review of Rule 50(b) motion due to party's failure to file a Rule 50(a) motion; noting trial brief and motion for summary judgment were insufficient to constitute a proper Rule 50(a) motion).

Nevertheless, the Court may review a jury's verdict based on arguments made in a Rule 50(b) motion that were not previously raised in a Rule 50(a) motion for plain error. *See E.E.O.C.*, 581 F.3d at 961.  In that event, reversal is warranted "only if such plain error would result in a manifest miscarriage of justice." *See id.* (internal quotations and citations omitted).  Plain error

review "permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict." *See id.* at 961-62 (internal quotations and citations omitted; emphasis in original).

**B.      Substantial Evidence Supports Defendants' Liability For Conversion.**

Under Nevada law, conversion occurs "when a tortfeasor takes possession, sells the property, and pockets the proceeds of the sale," or makes an unjustified claim of title to property that causes actual interference with the owner's rights of possession therein. *See Scaffidi v. United Nissan*, 425 F. Supp. 2d 1159, 1168 (D. Nev. 2005).   Moreover, "conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *See Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000).   Thus, the mere return of converted property does not eliminate one's liability for conversion. *See id.* at 1049.

Defendants contend that their retention of Loan proceeds that were later determined by the Court to be owed to the Direct Lenders, not defendants as the loan servicers, does not constitute conversion.   Even assuming *arguendo* that defendants have properly characterized the trial evidence in this regard (which they have not, *see infra* section III.C.2), defendants' contention is belied by Nevada law. *See Evans*, 5 P.3d at 1048-49.   Nor is defendants' contention supported by *Wantz v. Redfield*, 326 P.2d 413, 414 (Nev. 1958), on which they rely.   Contrary to their contention, *Wantz* does not stand for the proposition that conversion occurs only upon the taking of "specifically identifiable, hard currency."   Rather, *Wantz* confirms that "no clearer example" of conversion is when one retains the proceeds from the sale of another's property. *See id.*   That is precisely what plaintiffs, by substantial evidence, proved occurred in connection with the Anchor B, Bay Pompano, Shamrock, and Standard Property Loans. *See infra* section III.C.2, D, E, F.1.

The Court also rejects Piskun's and Blatt's contention that they cannot be held liable for conversion merely because they were not specifically named as defendants on that claim in the Second Amended Complaint. *See* FED. R. CIV. P. 54(c) ("Every other final judgment [other than a

default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").[4]   As managing members of Compass, Piskun and Blatt are personally liable for engaging in the conversion that plaintiffs proved was committed by Compass. *See Pocahontas First Corp. v. Venture Planning Group, Inc.*, 572 F. Supp. 503, 508 (D. Nev. 1983) ("There is no doubt that an individual who commits a tort while acting in the capacity of a corporate officer may be held personally liable."); *Marino v. Cross Country Bank*, No. C.A.02-65-GMS, 2003 WL 503257, at *7 (D. Del. Feb. 14, 2003) ("Corporate officers are liable for their tortious conduct even if they were acting officially for the corporation in committing the tort.  A corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant.") (applying Delaware law; internal quotations and citation omitted). Accordingly, the Court denies defendants' Rule 50(b) motions with respect to plaintiffs' conversion claim.

## C.   Substantial Evidence Supports Defendants' Liability For Tortious Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

Defendants argue that they are entitled to judgment as a matter of law on plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing because:  (i) a required "special relationship" did not exist between the parties; and (ii) the "genuine dispute doctrine" applies to defendants' actions.  The Court concludes that defendants' arguments are without merit.

### 1.   A special relationship existed between the parties.

As previously indicated in the Court's declaratory judgment, the LSAs give rise to an implied covenant of good faith and fair dealing in tort.  *See supra* section II.D.  That is because a special relationship existed between the parties, for the following two reasons:  (i) although the loan servicing relationship between the parties generally gave rise to contractual duties, defendants also owed fiduciary duties to the Direct Lenders when handling funds or holding title to real property on

---

[4] Although the Compass Defendants were in default, the Court permitted them to appear at trial and defend against plaintiffs' damages claims.  Thus, the Court is entering a final, not a default, judgment with respect to the Compass Defendants.

their behalf; and (ii) because each of the Loans could have hundreds of different Direct Lenders as investors, defendants were the only ones who could preserve, protect, and collect the Direct Lenders' interests in the Loans and the underlying collateral. *See id.* Thus, just as Nevada law recognizes that a special relationship exists between an insurer and an insured, so too does Nevada law provide that a special relationship existed between defendants, as mortgage brokers and loan servicers, and plaintiffs, as Direct Lenders. *See id.*; *see also supra* section II.B.

### 2. <u>Defendants acted in bad faith.</u>

The Court finds that plaintiffs presented substantial evidence that defendants' actions in connection with the Anchor B, Bay Pompano, Shamrock, and Standard Property Loans were not reasonable, but undertaken in bad faith.[5] Thus, notwithstanding defendants' characterizations of the evidence as not supporting the jury's verdict, the Court denies defendants' Rule 50(b) motions with respect to plaintiffs' claim for violation of the implied covenant of good faith and fair dealing in tort. *See E.E.O.C.*, 581 F.3d at 961, 963; *see also Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956-57 (Nev. 1999) (affirming jury's finding of bad faith because substantial evidence of bad faith was presented to the jury; concluding that the insurer's "absurd interpretation" of the insurance contract was unreasonable and did not shelter it from bad faith liability).

### a. <u>The Anchor B, Bay Pompano, and Shamrock Loans.</u>

Defendants argue that they acted reasonably in relying on the advice of counsel, USA Commercial's chapter 11 plan and "Confirmation Order," the language of the LSAs, and the lack of any challenge to their servicing fee calculations in taking millions of dollars as loan servicing

---

[5] As to the Eagle Meadows and Fox Hills Loans, the jury found Silar and Asset Resolution liable for breach of the implied covenant of good faith and fair dealing both in contract and in tort, as well as for breach of contract, but awarded no damages to plaintiffs. (Doc. #2010 at 2-3, 6) Thus, in their Rule 50(b) motions, as to those two Loans, defendants contend only that plaintiffs' claim for breach of the implied covenant of good faith and fair dealing in tort fails because of a lack of special relationship; defendants do not contend that plaintiffs failed to present substantial evidence to support defendants' liability on those claims. (Doc. #2063 at 16; Doc. #2112 at 5 n.2; Doc. #2118 at 13 n.2)

compensation in connection with the Anchor B, Bay Pompano, and Shamrock Loans.  Defendants' arguments misstate the trial evidence on which the jury awarded damages to plaintiffs.  Specifically:

- plaintiffs proved that Silar and Asset Resolution purported to take all the net sale proceeds from the sale of the Anchor B property as a "base servicing fee" less than two weeks after the Court issued its summary judgment order in which it ruled that the loan servicers under the LSAs could take only a small servicing fee from collected funds (Trial Tr. at 1151:5-1160:25; Trial Exs. 186, 189, 191);

- plaintiffs' Shamrock damages claim was based on the $2.3 million in net sale proceeds – which amount was derived by first deducting the servicing fees and servicer advances actually taken by Compass and Silar – that were not properly accounted for and paid to the Direct Lenders, including plaintiffs (Trial Tr. at 367:10-370:16; Trial Exs. 171, 302A, 2759); and

- plaintiffs' Bay Pompano damages claim was based on Compass's failure, in early April 2007, to disclose to the Direct Lenders, including plaintiffs, and accept the borrower's proposal to repay the unpaid principal balance and all due and owing accrued regular interest because that offer waived the repayment of substantial default interest and late fees, as a result of which plaintiffs were damaged in the amount of their fractional share of the servicing fee and servicer advances that Compass thereafter purported to accrue (Trial Tr. at 728:15-751:18; Trial Exs. 85, 94, 149, 168, 286, 287).

Thus, the Court finds that plaintiffs presented substantial evidence of defendants' bad faith in taking the Anchor B and Shamrock sale proceeds, and in not resolving the Bay Pompano Loan in April 2007.

b.    **The Standard Property Loan.**

Defendants maintain that they acted reasonably in taking over $870,000 as default interest and late fees from the borrower's payoff of the Standard Property Loan because:  (i) the Court did not decide until trial that all due and owing accrued regular interest (as well as the unpaid principal balance) had to be repaid first before defendants could collect default interest and late fees; and (ii) Compass and Silar relied on the advice of counsel in taking default interest and late fees in priority to the repayment of the Direct Lenders' unpaid principal balance and due and owing accrued regular interest.  Plaintiffs, however, proved at trial that defendants failed to disclose to plaintiffs that:

- the Standard Property borrower was initially willing to repay 100% of the unpaid principal balance of the Loan, even though Compass sought the Direct Lenders' consent to accept a discounted payoff of only 90% of the unpaid principal balance;

- the Standard Property borrower later agreed to repay 100% of the unpaid principal balance of the Loan, plus an additional $870,000 in purported default interest and late fees; and

- the Standard Property borrower would pay an additional $870,000 to resolve the Loan, even though Compass agreed as a Standard Property Direct Lender to accept repayment of only 100% of the unpaid principal balance and to waive repayment of any due and owing regular accrued interest.

(Trial Tr. at 1232:6-1267:25, 1283:7-1286:8, 1312:21-1315:6, 1649:2-1653:2; Trial Exs. 42, 70, 73, 76, 77, 145, 160, 232)

Plaintiffs also proved at trial that Compass and Silar acted contrary to the terms of the Standard Property promissory note, which first required the repayment of all due and owing accrued regular interest absent the Direct Lenders' informed consent to allocate the borrower's payments to the unpaid principal balance.  (Trial Tr. at 1218:15-1219:15, 1448:6-1449:4; Trial Ex. 27)  *See also*

*supra* section II.A.  Thus, plaintiffs presented substantial evidence of defendants' bad faith failure to disclose material information to plaintiffs in connection with the Standard Property Loan.  It is, therefore, irrelevant whether defendants otherwise purported to act reasonably in taking default interest and late fees in priority to the repayment of due and owing accrued regular interest in March 2007.  Accordingly, the Court denies defendants' Rule 50(b) motions with respect to plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing.

### D.    Substantial Evidence Supports Defendants' Liability For Breaching Their Fiduciary Duties.

The Court rejects defendants' contention that they are entitled to judgment as a matter of law on plaintiffs' breach of fiduciary duty claim based on their purported good faith in taking certain Loan proceeds as default interest, late fees, and servicing fees.  As previously discussed, plaintiffs presented substantial evidence of defendants' failure to make material disclosures and proper accountings to the Direct Lenders in connection with the Anchor B, Bay Pompano, Shamrock, and Standard Property Loans.  *See supra* section III.C.2.  The Court finds that those failures were not a "good faith allocation of amounts collected from a borrower," as defendants improperly contend.  Rather, as the jury was justifiably permitted to conclude, they constituted reprehensible breaches of fiduciary duties by defendants.  *See LeMon*, 402 P.2d at 649 ("An agent . . . owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."); *Jory*, 542 P.2d at 1403 ("[H]is fiduciary duties . . . include obligations of the utmost good faith, diligence, loyalty, fair dealing, and disclosure of material facts.").[6]

The Court also rejects Piskun's and Blatt's contention that they are entitled to judgment as a matter of law on plaintiffs' breach of fiduciary duty claim because plaintiffs purportedly failed to prove that Piskun and Blatt misappropriated Loan proceeds in their individual capacities, as opposed to in their capacities as agents for Compass.  As previously indicated, Piskun and Blatt, as managing

---

[6] The jury also found Silar, and thus the Compass Defendants, liable for breaching their fiduciary duties to plaintiffs with respect to the Gess and Gramercy Loans, but awarded no damages to plaintiffs for that misconduct.  (Doc. #2010 at 2, 5)

members of Compass, are personally liable for engaging in Compass's breaches of fiduciary duties, regardless of whether they actually realized any personal gain from their misconduct. *See Jory*, 542 P.2d at 1403 ("He remained a real estate broker, although licensed to serve clients on behalf of a corporation.  Like any broker, Jory had fiduciary duties to those he had undertaken to serve in a professional capacity . . . . Therefore if Jory, through his own professional misconduct or neglect, breached fiduciary obligations owed to Bennight, he is personally responsible for consequent harm, and operating in the corporate form does not insulate him from such liability."); *Pocahontas First Corp.*, 572 F. Supp. at 508; *Marino*, 2003 WL 503257, at *7.  The Court finds that plaintiffs presented substantial evidence of Piskun's and Blatt's involvement in Compass's failure to:  (i) account for and pay significant proceeds from the Shamrock and Standard Property Loans to plaintiffs; and (ii) disclose the Bay Pompano borrower's settlement proposal in April 2007.  (Trial Tr. at 367:10-370:16, 728:15-751:18, 1232:6-1267:25, 1283:7-1286:8, 1312:21-1315:6, 1649:2-1653:2, 2127:2-2129:7, 2661:2-2676:2, 2699:10-2670:12, 2937:2-23; Trial Exs. 42, 70, 73, 76, 77, 85, 94, 103, 145, 149, 160, 168, 171, 232, 286, 287, 302A, 2759, 2760)  Indeed, the Compass Defendants do not dispute that such substantial evidence exists with respect to Compass's breaches of fiduciary duties.  (Doc. #2045 at 9-14)  Accordingly, the Court denies defendants' Rule 50(b) motions with respect to plaintiffs' breach of fiduciary duty claim.

**E.    Substantial Evidence Supports The Compass Defendants' And Silar's Liability For Civil Conspiracy.**

The Court finds that plaintiffs presented substantial evidence of the Compass Defendants' and Silar's business plan, pursuant to which the jury was entitled to conclude that they engaged in a civil conspiracy to further their economic interests in connection with the Loans to the financial detriment of the Direct Lenders.  Specifically, plaintiffs presented substantial evidence of the remarkable financial motivations that drove the Compass Defendants and Silar to conspire to place their interests in the proceeds from the Loans in priority to those of the Direct Lenders – *i.e.*,

Compass's burden to repay significant interest to Silar, Piskun's and Blatt's profit participation compensation method, and Silar's burden to repay considerable interest to its investors.  (Trial Tr. at 2701:21-2710:22, 2729:21-2730:19, 2734:14-2741:1, 2745:17-2748:21, 2761:15-2763:20, 2765:5-2774:24, 2933:12-2936:24; Trial Exs. 63, 326, 327, 328, 329, 330)  Under Nevada law, a conspiracy claim is cognizable when, as here, corporate employees or agents act as individuals for their individual advantage, not merely in their official capacities on behalf of the corporation.  *See Collins v. Union Fed. Sav. & Loan Ass'n*, 622 P.2d 610, 622 (Nev. 1983); *see also Pocahontas First Corp.*, 572 F. Supp. at 508; *Jory*, 542 P.2d at 1403; *Marino*, 2003 WL 503257, at *7.  Accordingly, the Court denies the Compass Defendants' and Silar's Rule 50(b) motions with respect to plaintiffs' civil conspiracy claim.

**F.    Substantial Evidence Supports Defendants' Liability For Punitive Damages.**

  **1.    Plaintiffs proved their entitlement to an award of punitive damages.**

   Under Nevada law, punitive damages may be awarded upon clear and convincing evidence of fraud, oppression, or malice, express or implied.  *See* NEV. REV. STAT. § 42.005(1).  For punitive damages purposes, Nevada law defines:  (i) "oppression" means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person; (ii) "fraud" to be an intentional misrepresentation or concealment of a material fact with the intent to deprive another person of his or her rights or property; (iii) "malice, express or implied" to be despicable conduct which is engaged in with a conscious disregard of the rights or safety of others; and (iv) "conscious disregard" to mean knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences.  *See* NEV. REV. STAT. § 42.001.  Nevada law permits vicarious liability for punitive damages when a principal adopts or ratifies its agent's wrongful act for which punitive damages are awarded, or is personally guilty of fraud, oppression, or malice, express or implied.  *See* NEV. REV. STAT. § 42.007(1); *Smith's Food &*

*Drug Ctrs., Inc. v. Bellegarde*, 958 P.2d 1208, 1214 (Nev. 1998), *overruled in part by Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252-58 (Nev. 2008).

The Court finds that the jury was entitled to conclude that, by clear and convincing evidence, defendants were liable for punitive damages.  Specifically, plaintiffs presented substantial evidence of defendants' intentional misrepresentations and concealment of material information to deprive plaintiffs of their property, as well as their despicable conduct with conscious disregard of plaintiffs' property rights.  *See* NEV. REV. STAT. §§ 42.001, 42.005(1).  Among other clear and convincing evidence, plaintiffs proved that:

- with respect to the Standard Property Loan, Compass and Silar wrongly retained over $870,000 in Loan proceeds pursuant to a secret side deal with the borrower that they did not disclose to plaintiffs (Trial Tr. at 1256:11-1267:25, 1283:7-1286:8, 1312:21-1315:6, 1649:2-1653:2; Trial Exs. 73, 76, 77, 103);

- with respect to the Shamrock Loan, Compass (i) facilitated a "friendly" third party's purchase of substantially discounted fractional beneficial loan interests even though Compass knew that the collateral securing the Loan was worth millions of dollars more than the Loan's unpaid principal balance, (ii) initiated foreclosure proceedings on the other Tracy Suttles loans – Anchor B, Gess, and Gramercy – in an effort to acquire title to the valuable Shamrock property, and (iii) failed to account for and improperly retained millions of dollars in proceeds from the sale of the Shamrock property (Trial Tr. at 340:10-342:10, 348:22-357:20, 367:10-370:16, 405:22-414:15, 1315:16-1317:7, 2779:18-2791:25; Trial Exs. 81, 97, 103, 148, 171, 302A, 314, 2759);

- with respect to Bay Pompano Loan, Compass failed, in early April 2007, to disclose to the Direct Lenders and accept the borrower's proposal to repay the

unpaid principal balance and all accrued regular interest because that offer waived the repayment of substantial default interest and late fees, causing plaintiffs to be damaged in the amount of their fractional share of the servicing fee and servicer advances that Compass thereafter purported to accrue (Trial Tr. at 728:15-751:18; Trial Exs. 85, 94, 149, 168, 286, 287); and

- with respect to the Anchor B Loan, Silar and Asset Resolution paid over $374,000 of the net sale proceeds to its litigation counsel, Greenberg Traurig, LLP, without disclosure to the Direct Lenders and less than two weeks after the Court issued its summary judgment order in which it ruled that the loan servicers under the LSAs were entitled to only a small servicing fee from collected funds (Trial Tr. at 1151:5-1164:20, 1202:9-24; Trial Exs. 180, 186, 189, 191, 202).

Further, in addition to the evidence of defendants' business plan pursuant to which the foregoing wrongful acts were undertaken, *see supra* section III.E, plaintiffs also proved that defendants specifically intended to deprive the Direct Lenders of their property:

- Abel Godines and Carol Kesler both testified about an overheard courthouse conversation between Piskun and Blatt in which they discussed those very intentions in quite vulgar terms (Trial Tr. at 181:16-183:8, 314:25-315:13);

- Ms. Kesler, Daniel Newman, Christina Knoles, and Ms. Cangelosi each testified regarding the repeated statements separately made to them by Len Mezei, the principal of Compass, including that he purchased "a bag of money" and "a stolen wallet," that he was taking only a little money ($5,000 - $10,000) from each of the Direct Lenders but it was substantial money to him because of the enormous number of Direct Lenders, and that he did not need to alter his perspective on what he was entitled to from the Loans because he

had superior litigation funding and better lawyers and the Direct Lenders were unorganized and individually "weak" (Trial Tr. at 331:10-334:6, 1317:10-1320:20, 1623:6-1624:23, 1924:8-1935:6); and

- Terry Helms testified that Robert Leeds, the principal of Silar, stated that he intended to spend millions of dollars to "bury" Ms. Cangelosi and her family and to put them "out on the street and homeless" because her efforts to organize the Direct Lenders had stopped him from realizing tens of millions of dollars from the Loans (Trial Tr. at 1489:17-1491:9, 1515:16-1516:10).

Thus, plaintiffs presented substantial evidence of defendants' liability for punitive damages.

## 2. The jury verdict form was not plainly erroneous.

Defendants also raise in their Rule 50(b) motions the following two issues with respect to the jury verdict form:  (i) plaintiffs "invited error" because the form purportedly "prepared by the Plaintiffs" included the Court's directed verdicts that Silar and Asset Resolution engaged in "perfidious misconduct" with respect to the Anchor B and Standard Property Loans; and (ii) the jury's punitive damages awards are unconstitutionally vague.  Neither of those issues were raised by defendants in their Rule 50(a) motions or at trial.  (Doc. ##1982, 1983)  Therefore, the Court reviews them for plain error resulting in a miscarriage of justice.  *See E.E.O.C.*, 581 F.3d at 961; *see also* FED. R. CIV. P. 51(d).

### a. The inclusion of the Court's direct verdicts on the jury verdict form was not plainly erroneous.

The Court rejects defendants' contention that plaintiffs "invited error" with respect to the jury verdict form because, contrary to that contention, the Court, not plaintiffs, prepared the jury verdict form, with input from counsel.  (Trial Tr. at 2232:24-2233:5)

In addition, notwithstanding the Court's inclusion of its directed verdicts on the jury verdict form, the jury separately found that Silar and/or Asset Resolution breached their fiduciary duties,

engaged in a civil conspiracy, and converted plaintiffs' property with respect to the Anchor B, Bay Pompano, Shamrock, and Standard Property Loans.  (Doc. #2010 at 3-4)  Any of those findings were independently sufficient to support the jury's further finding that defendants were liable for punitive damages.  *See Clark v. Lubritz*, 944 P.2d 861, 867 (Nev. 1997) ("[W]e conclude that the breach of fiduciary duty arising from the partnership agreement is a separate tort upon which punitive damages may be based."); *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 604-05 (Nev. 1998) (punitive damages awarded for tortious breach of the implied covenant of good faith and fair dealing); *Andrews v. Raphaelson*, 346 Fed. Appx. 198, 199-200 (9th Cir. 2009) (punitive damages awarded on conversion claim under Nevada law); *El Ranco, Inc. v. First Nat'l Bank of Nev.*, 406 F.2d 1205, 1218-19 (9th Cir. 1968) (punitive damages awarded on civil conspiracy claim under Nevada law).

Moreover, notwithstanding the Court's inclusion of its directed verdicts on the jury verdict form, the jury found that defendants were not liable and/or did not owe any damages on several of plaintiffs' claims.  (Doc. #2010)  Thus, the Court finds that the question on the jury verdict form concerning plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing was not plainly erroneous resulting in a manifest miscarriage of justice.

### b.    The jury's punitive damages awards are not unconstitutionally vague.

The Court denies defendants' argument that the jury's punitive damages awards are unconstitutionally vague.  Defendants cite no authority in support of their assertion that the jury's purportedly unconstitutionally vague punitive damages awards constitute plain error resulting in a miscarriage of justice.  (Doc. #2045 at 15 n.13; Doc. #2057 at 8)  Defendants' contention is also inconsistent with their assertion that the constitutionality of the ratio between the jury's compensatory and punitive damages awards should be assessed by comparing the aggregate amounts of those awards.  (Doc. #2045 at 16-20; Doc. #2057 at 5, 7; Doc. #2063 at 26-27)

Moreover, defendants' misconduct with respect to each of the four Loans for which the jury awarded compensatory damages was independently sufficient to justify the jury's punitive damages

awards, *see supra* section III.F.1, and Nevada law allows punitive damages to be awarded for each of the tort claims for which defendants were found liable by the jury, *see supra* section III.F.2.a.   In addition, the jury was properly entitled to assess lump sum punitive damages by defendant, rather than by Loan and/or by plaintiff.   *See infra* section IV.D.3.c.   Thus, the Court finds that the jury's lump sum punitive damages awards by defendant are not plainly erroneous resulting in a manifest miscarriage of justice.

## G.   **Defendants' Other Contentions Are Without Merit.**

In their Rule 50(b) motions, defendants raise the following two additional contentions:   (i) Silar and Asset Resolution are entitled to an award of attorneys' fees because they are prevailing parties with respect to both the LLCs and those claims, Loans, and plaintiffs for which the jury did not find liability and/or awarded no damages; and (ii) all Direct Lenders represented by Bickel & Brewer should be included in the Court's final judgment.   The Court rejects each of those contentions.

### 1.   **Silar and Asset Resolution are not entitled to an award of attorneys' fees.**

As explained *supra* in the Court's declaratory judgment (section II) and *infra* in the Court's award of attorneys' fees, costs, and expenses (section IV.C), the prevailing parties in this matter are plaintiffs, not defendants.   The Court is, therefore, not entering any judgment – monetary or otherwise – in favor of defendants, thereby precluding them from recovering an award of attorneys' fees under either the LSAs or Nevada law.   *See* Nev. Rev. Stat. § 18.010(4) ("Subsections 2 and 3 do not apply to any action arising out of a written instrument or agreement which entitles the prevailing party to an award of reasonable attorney's fees."); Nev. Rev. Stat. § 18.010(2)(a) (permitting "an allowance of attorney's fees to a prevailing party . . . [w]hen the prevailing party has not recovered more than $20,000."); *Thomas v. City of N. Las Vegas*, 127 P.3d 1057, 1060 (Nev. 2006) ("[U]nder NRS 18.010(2)(a), it is well settled that a money judgment is a prerequisite to recovery of attorney fees").

Moreover, the Court denied standing to the LLCs; it did not decide the merits of the LLCs' claims in favor of defendants.  In addition, even though the jury did not award damages to all plaintiffs, on all their claims, and for all Loans, all plaintiffs still prevailed against all defendants in connection with the substantial declaratory relief issued by the Court.  *See supra* section II.A-E, G.  Indeed, pursuant to that declaratory relief, the Direct Lenders do not owe tens of millions of dollars to defendants in claimed loan servicing compensation that was purportedly due to the loan servicers under the LSAs in connection with the Loans.  *See id.*  Thus, the Court finds that Silar and Asset Resolution are not entitled to an award of attorneys' fees, costs, or expenses.

2.    **The Court's final judgment *in personam* includes only the 52 named plaintiffs and the seven named defendants.**

The Court denies Silar's request to include all the Bickel & Brewer Direct Lenders in the final judgment *in personam*.[7]  It was Silar that, prior to trial, successfully:  (i) first moved to dismiss the LLCs for lack of standing; and (ii) then opposed plaintiffs' motion to substitute all the former individual members of the LLCs as named plaintiffs in this matter.  (Doc. ##1712, 1870)  Silar, however, is now improperly asking, post-trial, to set aside those rulings of the Court that it sought and obtained to take advantage of the jury's inability to award larger compensatory and punitive damages awards given the absence of those additional Bickel & Brewer Direct Lenders at trial.  Indeed, Silar asks the Court to allocate the jury's $3 million punitive damages award against it to all the Bickel & Brewer Direct Lenders.

The Court also rejects the additional premise for Silar's requested relief that the Court's final judgment will be binding on the other Bickel & Brewer Direct Lenders.  To the contrary, the Court's final judgment *in personam* is binding on defendants, but is not binding on those Bickel & Brewer Direct Lenders who are not one of the 52 named plaintiffs.  The doctrine of *res judicata* provides

---

[7] In addition to exercising *in personam* jurisdiction over the parties and their damages claims in this case, the Court also granted defendants' request to, and did, exercise *in rem* jurisdiction over all the LSAs, Loans, and conveyances of title with respect to the collateral securing the Loans.  (Doc. #199, ¶ 15; Doc. #908; Doc. #1076)  Thus, the Court's declaratory judgment is based on both *in personam* and *in rem* jurisdiction.  *See supra* section II.

that "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action."  *See Montana v. United States*, 440 U.S. 147, 153 (1979).  That is because of "the deep-rooted historic tradition that everyone should have his own day in court . . . . [W]e have often repeated the general rule that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *See Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) (internal quotations and citations omitted).  Although the doctrine of privity extends the conclusive effect of a prior judgment to nonparties who are in privity with parties in an earlier action, *see United States v. Schimmels (In re Schimmels)*, 127 F.3d 875, 881 (9th Cir. 1997), the doctrine of "virtual representation" does not exist, *see Taylor*, 553 U.S. at 904.

In this case, only 52 Bickel & Brewer Direct Lenders were named plaintiffs (because of Silar's successful pre-trial efforts), only those Direct Lenders' LSAs and fractional beneficial interests in the Loans were admitted into evidence and tried to the jury, and no evidence was adduced at or after trial that the other Bickel & Brewer Direct Lenders controlled the prosecution of the trial by and for those 52 named plaintiffs.  Indeed, the trial evidence indicated that Donna Cangelosi, one of the 52 named plaintiffs, assumed a leadership role with and amongst the Bickel & Brewer Direct Lenders.  *See United States v. Bhatia*, 545 F.3d 757, 759-60 (9th Cir. 2008) (privity exists when a nonparty assumes control over the litigation in which the judgment was rendered).  Thus, the Court's final judgment *in personam* includes and is binding on only the 52 named plaintiffs and the seven named defendants, and excludes and is not binding on the other Bickel & Brewer Direct Lenders who are not named plaintiffs herein.

# IV.

## DAMAGES AWARDS

The Court has ordered that plaintiffs recover from defendants the amounts listed below, plus postjudgment interest at the rate of ___%, along with costs.  This action was tried by a jury with Judge Robert C. Jones presiding, and the jury has rendered a verdict.

**A.**   **Compensatory Damages**

**1.**   **Anchor B**

The jury found Silar and Asset Resolution jointly and severally liable for damages in connection with the Anchor B Loan in the total amount of $26,935.37.  Based on plaintiffs' fractional beneficial interests in the Anchor B Loan, the jury's damages award is allocated to plaintiffs, as follows:

| Plaintiff | Amount |
|---|---|
| Robert J. & Ruth A. Kehl (Robert J. Kehl & Ruth Ann Kehl, husband & wife, as joint tenants with right of survivorship) | $16,011.58 |
| Arthur Kriss (First Savings Bank FBO Arthur I Kriss) | $7,706.51 |
| Richard Tracy (Richard R. Tracy Trustee of the Reno Aeronautical Corporation Defined Benefit Retirement Plan) | $3,217.28 |
| **TOTAL:** | **$26,935.37** |

**2.**   **Bay Pompano**

The jury found Silar and the Compass Defendants jointly and severally liable for damages in connection with the Bay Pompano Loan in the total amount of $2,103.81.  Based on plaintiffs' fractional beneficial interests in the Bay Pompano Loan, the jury's damages award is allocated to plaintiffs, as follows:

| Plaintiff | Amount |
|---|---|
| Kevin Kehl (Kevin Kehl, a married man dealing with his sole & separate property) | $168.57 |
| Kevin Kehl (Andrew) (Kevin Kehl Custodian For Andrew R. Kehl UNVUTMA) | $11.24 |

| | |
|---|---|
| Kevin Kehl (Susan) (Kevin Kehl Custodian For Susan L. Kehl UIAUTMA) | $11.24 |
| Robert A. & Tina M. Kehl (Robert A. Kehl & Tina M. Kehl, husband & wife, as joint tenants with right of survivorship) | $449.53 |
| Patrick Anglin (Patrick J. Anglin, an unmarried man) | $56.19 |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $224.77 |
| Tony Chaudhry (Joy Investment, a Nevada Corporation) | $132.61 |
| Kevin Olsen (Universal Management, a Nevada Corporation) | $83.16 |
| Robin Graham (Robin B. Graham & Celia Allen-Graham Trustees of the Graham Family Trust dated 10/26/78) | $168.57 |
| Ed Schoonover (Edward L. Schoonover & Susan A. Schoonover Co-Trustees of The Schoonover Family Trust dated 2/23/04) | $67.43 |
| Cyril Tammadge (Preswick Corp., a Nevada Corporation) | $449.54 |
| Christina M. Kehl (Christina M. Kehl, an unmarried woman) | $224.77 |
| Stan Tara (Sovereign Capital Advisors, LLC, a Nevada limited liability company) | $56.19 |
| **TOTAL:** | **$2,103.81** |

### 3.   Shamrock

The jury found Silar and the Compass Defendants jointly and severally liable for damages in connection with the Shamrock Loan in the total amount of $23,169.67.   Based on plaintiffs' fractional beneficial interests in the Shamrock Loan, the jury's damages award is allocated to plaintiffs, as follows:

| Plaintiff | Amount |
|---|---|
| Carol Kesler (Carol Mortensen Trustee of the Carol Mortensen Family Trust dated 9/9/90) | $11,569.84 |
| Stan Tara (Sovereign Capital Advisors, LLC, a Nevada limited liability company) | $11,569.83 |
| **TOTAL:** | **$23,169.67** |

### 4.   Standard Property

The jury found Silar, Asset Resolution, and the Compass Defendants jointly and severally liable for damages in connection with the Standard Property Loan in the total amount of $27,291.54. Based on plaintiffs' fractional beneficial interests in the Standard Property Loan, the jury's damages award is allocated to plaintiffs, as follows:

| Plaintiff | Amount |
|---|---|
| Death Valley Acquisitions LLC (Mojave Canyon, Inc., A Nevada Corporation, J.B. Partain, President) | $9,097.18 |
| Christina Knoles (G. Robert Knoles and Christina G. Knoles husband and wife as joint tenants with the rights of survivorship) | $3,638.87 |
| Daniel Newman (Daniel D. Newman Trustee of the Daniel D. Newman Trust dated 11/1/92) | $3,638.88 |
| Ken Zawacki (Zawacki, a California LLC) | $3,638.87 |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $7,277.74 |
| **TOTAL:** | **$27,291.54** |

**B.**     **Prejudgment Interest**

     **1.**      **Relevant legal standard.**

Because this action was commenced based on diversity jurisdiction, Nevada's prejudgment interest rates apply.  *See D.E. Shaw Laminar Portfolios, LLC v. Archon Corp.,* No. 2:07-CV-01146-PMP-LRL, 2010 WL 5178005, at *5 (D. Nev. Dec. 22, 2010) ("In diversity actions, the award of prejudgment interest is governed by state law.") (citing *In re Cardelucci,* 285 F.3d 1231, 1235 (9th Cir. 2002)).   In Nevada, "[t]hree items must be determined to enable the trial court to make an appropriate award of interest:  (1) the rate of interest; (2) the time when it commences to run; and (3) the amount of money to which the rate of interest must be applied."  *See id.* (quoting *Kerala Props., Inc. v. Familian*, 137 P.3d 1146, 1149 (Nev. 2006)).

Under Nevada law, in the absence of an agreed term in a contract fixing a different rate of interest, the rate of prejudgment interest is the prime rate at the largest bank in Nevada on January 1 or July 1 immediately preceding the date of the transaction, plus two percent.  *See* NEV. REV. STAT. § 99.040(1); *D.E. Shaw Laminar Portfolios*, 2010 WL 5178005, at *5-6.  Interest runs from the time the cause of action accrues, with a biannual adjustment based on the prime interest rate, and accrues until the date of judgment.   *See Ramada Inns, Inc. v. Sharp*, 711 P.2d 1, 2 (Nev. 1985) ("Prejudgment interest is viewed as compensation for use by defendant of money to which plaintiff

is entitled from the time the cause of action accrues until the time of judgment; it is not designed as a penalty.").

**2.** **Plaintiffs are entitled to an award of prejudgment interest.**

The Court concludes that plaintiffs are entitled to an award of prejudgment interest with respect to the four Loans for which the jury awarded compensatory damages.  The rate of interest is determined by Nevada state law, the time when prejudgment interest commences to run is based on the dates that the four Loans at issue were resolved – Anchor B:   September 30, 2009; Bay Pompano:  August 28, 2008; Shamrock:  March 12, 2008; and Standard Property:  March 20, 2007 – and is not in dispute, and the amount of money to which the rate of interest applies was determined by the jury.  Accordingly, plaintiffs are entitled to the following amounts of prejudgment interest:

**a.** **Anchor B**

| Plaintiff | Amount |
|---|---|
| Robert J. & Ruth A. Kehl (Robert J. Kehl & Ruth Ann Kehl, husband & wife, as joint tenants with right of survivorship) | $1,312.25 through 6/30/2011, and $1.426 daily from 7/1/2011-entry of judgment |
| Arthur Kriss (First Savings Bank FBO Arthur I Kriss) | $631.60 through 6/30/2011, and $0.686 daily from 7/1/2011-entry of judgment |
| Richard Tracy (Richard R. Tracy Trustee of the Reno Aeronautical Corporation Defined Benefit Retirement Plan) | $263.68 through 6/30/2011, and $0.286 daily from 7/1/2011-entry of judgment |
| **SUBTOTAL:** | $2,207.53 through 6/30/2011, and $2.398 daily from 7/1/2011-entry of judgment |

**b.** **Bay Pompano**

| Plaintiff | Amount |
|---|---|
| Kevin Kehl (Kevin Kehl, a married man dealing with his sole & separate property) | $24.47 through 6/30/2011, and $0.015 daily from 7/1/2011-entry of judgment |
| Kevin Kehl (Andrew) (Kevin Kehl Custodian For Andrew R. Kehl UNVUTMA) | $1.63 through 6/30/2011, and $0.001 daily from 7/1/2011-entry of judgment |

| Kevin Kehl (Susan) (Kevin Kehl Custodian For Susan L. Kehl UIAUTMA) | $1.63 through 6/30/2011, and $0.001 daily from 7/1/2011-entry of judgment |
|---|---|
| Robert A. & Tina M. Kehl (Robert A. Kehl & Tina M. Kehl, husband & wife, as joint tenants with right of survivorship) | $65.24 through 6/30/2011, and $0.040 daily from 7/1/2011-entry of judgment |
| Patrick Anglin (Patrick J. Anglin, an unmarried man) | $8.16 through 6/30/2011, and $0.005 daily from 7/1/2011-entry of judgment |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $32.62 through 6/30/2011, and $0.020 daily from 7/1/2011-entry of judgment |
| Tony Chaudhry (Joy Investment, a Nevada Corporation) | $19.25 through 6/30/2011, and $0.012 daily from 7/1/2011-entry of judgment |
| Kevin Olsen (Universal Management, a Nevada Corporation) | $12.07 through 6/30/2011, and $0.007 daily from 7/1/2011-entry of judgment |
| Robin Graham (Robin B. Graham & Celia Allen-Graham Trustees of the Graham Family Trust dated 10/26/78) | $24.47 through 6/30/2011, and $0.015 daily from 7/1/2011-entry of judgment |
| Ed Schoonover (Edward L. Schoonover & Susan A. Schoonover Co-Trustees of The Schoonover Family Trust dated 2/23/04) | $9.79 through 6/30/2011, and $0.006 daily from 7/1/2011-entry of judgment |
| Cyril Tammadge (Preswick Corp., a Nevada Corporation) | $65.24 through 6/30/2011, and $0.040 daily from 7/1/2011-entry of judgment |
| Christina M. Kehl (Christina M. Kehl, an unmarried woman) | $32.62 through 6/30/2011, and $0.020 daily from 7/1/2011-entry of judgment |
| Stan Tara (Sovereign Capital Advisors, LLC, a Nevada limited liability company) | $8.16 through 6/30/2011, and $0.005 daily from 7/1/2011-entry of judgment |
| **SUBTOTAL:** | $305.35 through 6/30/2011, and $0.187 daily from 7/1/2011-entry of judgment |

c.      **Shamrock**

| Plaintiff | Amount |
|---|---|
| Carol Kesler (Carol Mortensen Trustee of the Carol Mortensen Family Trust dated 9/9/90) | $2,133.37 through 6/30/2011, and $1.030 daily from 7/1/2011-entry of judgment |
| Stan Tara (Sovereign Capital Advisors, LLC, a Nevada limited liability company) | $2,133.36 through 6/30/2011, and $1.030 daily from 7/1/2011-entry of judgment |

| | |
|---|---|
| **SUBTOTAL:** | $4,266.74 through 6/30/2011, and $2.060 daily from 7/1/2011-entry of judgment |

### d.   Standard Property

| Plaintiff | Amount |
|---|---|
| Death Valley Acquisitions LLC (Mojave Canyon, Inc., A Nevada Corporation, J.B. Partain, President) | $2,574.32 through 6/30/2011, and $0.810 daily from 7/1/2011-entry of judgment |
| Christina Knoles (G. Robert Knoles and Christina G. Knoles husband and wife as joint tenants with the rights of survivorship) | $1,029.73 through 6/30/2011, and $0.324 daily from 7/1/2011-entry of judgment |
| Daniel Newman (Daniel D. Newman Trustee of the Daniel D. Newman Trust dated 11/1/92) | $1,029.73 through 6/30/2011, and $0.324 daily from 7/1/2011-entry of judgment |
| Ken Zawacki (Zawacki, a California LLC) | $1,029.73 through 6/30/2011, and $0.324 daily from 7/1/2011-entry of judgment |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $2,059.45 through 6/30/2011, and $0.648 daily from 7/1/2011-entry of judgment |
| **SUBTOTAL:** | $7,722.95 through 6/30/2011, and $2.430 daily from 7/1/2011-entry of judgment |
| **TOTAL:** | $14,502.57 through 6/30/2011, and $7.075 daily from 7/1/2011-entry of judgment |

### C.   Attorneys' Fees, Costs, And Expenses

For the following reasons, the Court awards attorneys' fees, costs, and expenses to plaintiffs in the total amount of $2,476,925.08 ($2,464,052.94 in attorneys' fees, costs, and expenses + $12,872.14 in federal trial procedure costs).  As further discussed *infra*, other than plaintiffs' and Ms. Cangelosi's recovery of federal trial procedure costs in the total amount of $12,872.14, the Court's award of attorneys' fees, costs, and expenses is made in gross to plaintiffs as additional compensatory damages.

1       **1.      Relevant legal standard.**

2            **a.      Nevada law**

3       Because this action was commenced based on diversity jurisdiction, the Court applies

4  Nevada law to determine whether an award of attorneys' fees is allowed.  *See GCM Air Group, LLC*

5  *v. Chevron U.S.A., Inc.*, No. 3:07-cv-00168-BES-RAM, 2009 WL 1810743, at *1 (D. Nev. June 24,

6  2009) (citing *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 847 (9th Cir. 2009)).  Nevada law

7  permits attorneys' fees to be awarded if authorized by statute, rule, or contract.  *See id.* (citing *Frank*

8  *Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.*, 197 P.3d 1051, 1059 (Nev. 2008)).   Under

9  Nevada law, "[a] plaintiff may be considered the prevailing party for attorney's fee purposes if it

10  succeeds on any significant issue in litigation which achieves some of the benefit [it] sought in

11  bringing the suit."  *See Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 464 (Nev. 1993) (internal quotations

12  and citations omitted).

13      Once a party establishes its entitlement to an attorneys' fees award, the Court must determine

14  the reasonableness of such an award.  *See GCM Air Group, LLC*, 2009 WL 1810743, at *4.  In the

15  Ninth Circuit, attorneys' fees are calculated using the "lodestar" method, which requires the

16  multiplication of the number of hours reasonably expended by a reasonable hourly rate.  *See id.*  The

17  factors set forth in Local Rule 54-16 guide the analysis of the lodestar amount.  *See id.*  Those

18  factors include:  (i) the results obtained and the amounts involved; (ii) the time and labor required;

19  (iii) the novelty and difficulty of the questions involved; (iv) the skill required to perform the legal

20  services properly; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) the

21  experience, reputation, and ability of the attorneys; and (viii) the undesirability of the case, if any.

22  *See* LR 54-16(b)(3).  A reasonable hourly rate is determined by considering the skill, experience, and

23  reputation of the attorneys requesting fees, and should reflect prevailing market rates in the

24  community in which the Court sits.  *See GCM Air Group, LLC*, 2009 WL 1810743, at *4 & n.3.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Moreover, a prevailing party is entitled to recover its reasonable federal trial procedure costs. *See* FED. R. CIV. P. 54(d)(1) ("Unless a federal statute, these rules, or a court order provides otherwise, costs – other that attorney's fees – should be allowed to the prevailing party."); LR 54-1– LR 54-15.  Nevada law also entitles a prevailing party, as a matter of right, to recover its costs in an action in which damages in excess of $2,500 are sought.  *See* NEV. REV. STAT. § 18.020(3) ("Costs must be allowed of course to the prevailing party against any adverse party against whom judgment is rendered . . . in an action for the recovery of money or damages, where the plaintiff seeks to recover more than $2,500."); *Coker Equip. Co. v. Wittig*, 366 Fed. Appx. 729, 733 (9th Cir. 2010) (discussing same).   Those recoverable costs include, among other things, reasonable costs for telecopies, photocopies, long distance telephone calls, postage, "travel and lodging incurred taking depositions and conducting discovery," and "[a]ny other reasonable and necessary expense incurred in connection with the action, including reasonable and necessary expenses for computerized services for legal research."  *See* NEV. REV. STAT. § 18.005 (defining the term "costs" for purposes of NEV. REV. STAT. § 18.020).  Further, the Local Rules for the District of Nevada permit an award of attorneys' fees to include costs and expenses that are not otherwise taxable pursuant to Rule 54(d).  *See* LR 54-16(b)(2) ("Unless otherwise ordered by the court, a motion for attorney's fees must, in addition to those matters required by Fed. R. Civ. P. 54(d)(2)(B), include . . . [a]n itemization of all costs sought to be charged as part of the fee award and not otherwise taxable pursuant to LR 54-1 through 54-15 . . . .").

### b. **Federal law**

The Federal Declaratory Judgment Act governs the declaratory relief remedies to be afforded to plaintiffs in this diversity action.  *See Krave Entm't, LLC v. Liberty Mut. Ins. Co.*, 667 F. Supp. 2d 1232, 1237 (D. Nev. 2009) (holding that the Federal, not the Nevada, Declaratory Judgment Act applies in diversity actions and "provides an additional procedural remedy to the court.").  Attorneys' fees may be awarded as damages pursuant to a declaratory judgment, even if those fees

are not otherwise recoverable under state law.  *See* 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."); *Gant v. Grant Lodge of Tex.*, 12 F.3d 998, 1003 (10th Cir. 1993) ("[A] court has the power in a diversity case to award fees as damages under section 2202 even though they are not recoverable under state law.").

> **2.** **Plaintiffs are entitled to an award of attorneys' fees pursuant to the LSAs and section 2202.**

The predominant LSAs expressly authorize an award of attorneys' fees, costs, and expenses to the prevailing party in an action to enforce any provisions therein:

> Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal, [sic]

(Doc. #2056, Ex. A, § 15)  The Court finds that of the 52 named plaintiffs, 47 have an LSA containing the foregoing attorneys' fees provision, and that all 23 plaintiffs awarded damages by the jury have such an LSA.  (*Id.*, Exs. A-B)  All plaintiffs' LSAs also provide that they are governed by Nevada law, and are "binding upon and shall inure to the benefit of the parties' respective successors and assigns."  (*Id.*)

The Court finds that the LSAs include the following three provisions that were successfully enforced by plaintiffs in this action:  (i) the "Compensation [owed] to USA [Commercial] for Loan Servicing," which purported to entitle defendants as the loan servicers to servicing fees, default interest, and/or late charges as compensation;[8] (ii) the "Rights of [Direct] Lender if USA [Commercial] Fails to Act," or the "51% Rule," which entitled 51% or more of the Direct Lenders in a defaulted Loan to act on behalf of the remaining Direct Lenders in the Loan, including designating

---

[8] The LSAs with attorneys' fees provisions purported to entitle defendants as the loan servicers to servicing fees, default interest, and late charges, whereas the other LSAs purported to entitle defendants as the loan servicers to servicing fees and late charges, but not default interest.  (Doc. #2056, Exs. A-B)

a new servicing agent; and (iii) the "Limited Power of Attorney," which obligated defendants as the loan servicers "to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan." (*Id.*)  Thus, pursuant to the LSAs, Nevada law authorizes the Court to award attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 to those 47 plaintiffs and jointly and severally against Compass, Silar, and Asset Resolution. *See GCM Air Group, LLC*, 2009 WL 1810743, at *1; *Chowdhry*, 851 P.2d at 464.

    In addition, the Court determines that, pursuant to section 2202, even though five plaintiffs, Piskun, and Blatt are not parties to LSAs containing the foregoing attorneys' fees provision, those plaintiffs are nevertheless entitled to share in, and Piskun and Blatt are jointly and severally liable with the other defendants for, the Court's award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94.  *See* 28 U.S.C. § 2202; *Gant*, 12 F.3d at 1003.  The Court finds that an award of such damages pursuant to the Court's declaratory judgment, *see supra* section II, is warranted under the circumstances because:  (i) all plaintiffs similarly pursued and obtained the Court's declaratory relief, and all plaintiffs were similarly sued for millions of dollars in damages by Asset Resolution; (ii) given their willingness to challenge defendants despite the litigation liability risks, plaintiffs should be compensated for undertaking the effort to obtain declaratory relief that is applicable to and benefits all Direct Lenders regardless of whether they are plaintiffs herein or represented by Bickel & Brewer; (iii) Piskun and Blatt, as managing members of Compass, are bound by the Court's declaratory relief in connection with the LSAs and the Loans, and are also personally liable for the tortious actions undertaken by Compass against plaintiffs, *see supra* section III.B, D; and (iv) all plaintiffs' attorneys' fees, costs, and expenses incurred in connection with the loan servicing compensation and termination issues, the interlocutory appeal of those issues, and the parties' pursuit of damages (discovery, motion practice, mediation, and the jury trial) are inextricably intertwined with, and common to, all defendants, all plaintiffs' LSAs, all Loans, and all

causes of action that were asserted in this action and, therefore, cannot be apportioned among plaintiffs.

Accordingly, the Court's award of attorneys' fees, costs, and expenses is made in gross and without allocation to all plaintiffs, and all defendants are jointly and severally liable for payment of that award.

### 3.      Plaintiffs' requested attorneys' fees were reasonable and necessary.

The Court finds that plaintiffs' requested attorneys' fees were reasonable and necessary because:  (i) the hourly rates for plaintiffs' counsel are reasonable; (ii) the hours expended by plaintiffs' counsel were reasonable and necessary under the circumstances; and (iii) the requested attorneys' fees are warranted based on the efficacy and able presentation of plaintiffs' counsel, the complexity of the case, the substantial risk of non-collection of contingency fees, and the Court's disinclination toward plaintiffs' position when plaintiffs' counsel made their appearances in the case.

### a.      The hourly rates for plaintiffs' counsel are reasonable.

The Court previously determined in connection with the sanctions award imposed in the chapter 7 cases of Asset Resolution and fourteen related special purpose entities that the hourly rates for Janet Chubb and her firm's attorneys of between $170 and $420, the hourly rate of Lisa Rasmussen of $300, and Mr. Duncan's estimated hourly rate of $400 were reasonable.  The Court also determined that Bickel & Brewer's applicable hourly rates of between $275 and $775 were high when compared to prevailing market rates in Nevada, the hourly rates for Ms. Chubb and attorneys at her firm, and Mr. Duncan's estimated hourly rate.

Based on that determination, Bickel & Brewer substantially and appropriately lowered its proposed hourly rates for purposes of plaintiffs' request for an award of attorneys' fees in this action to between $350 (as a blended rate of various Bickel & Brewer professionals whose usual hourly rates are between $240 and $700) and $600.  The Court finds that those suggested hourly rates are reasonable in comparison to prevailing market rates for complex commercial litigation in Nevada of

between $350 and $775 an hour, the hourly rates for Ms. Chubb and attorneys at her firm, the hourly rate for Ms. Rasmussen, and Mr. Duncan's estimated hourly rate.

### b.   The results obtained and the amount involved were significant.

Plaintiffs prevailed on the three issues on which this action was based:  (i) the amount of compensation owed to defendants as the loan servicers under the LSAs, including whether such compensation was to be paid in priority to the repayment of the Direct Lenders' unpaid principal balance and due and owing accrued regular interest in connection with the Loans; (ii) the termination of defendants as the loan servicers under the LSAs without cause; and (iii) the damages resulting from defendants' breaches of various duties arising from the LSAs.  Specifically, Compass and Asset Resolution erroneously claimed to be entitled to tens of millions of dollars in loan servicing compensation in priority to the Direct Lenders.  Indeed, based on the Court's rulings, Asset Resolution was paid the total amount of only $94,000 as its loan servicing compensation in connection with the sale of the property securing the Gess Loan, even though it claimed to be entitled under the LSAs to loan servicing compensation totaling more than $11 million (which was well in excess of the net sale proceeds of $6.5 million).  The Court also granted substantial declaratory relief to plaintiffs, including that:  (i) defendants, as mortgage brokers and loan servicers under Nevada law, cannot place their financial interests above those of the Direct Lenders, for whom defendants were servicing the Loans; and (ii) the purported cause requirement set forth in the LSAs in connection with the 51% Rule was unenforceable under Nevada law.  Finally, a jury awarded plaintiffs a total of approximately $79,000 in compensatory damages and a total of $5.1 million in punitive damages.

### c.   The substantial time and labor required.

Plaintiffs' counsel were required to expend substantial time and labor to prosecute this action, given the breadth of novel and difficult issues, the number of parties, and the quantity of outstanding Loans (not to mention the chapter 11 bankruptcy filings in the United States District

Court for the Southern District of New York on October 14, 2009).  Plaintiffs' counsel expended a total of 5,686.60 hours, as follows:  (i) 838 total hours in connection with the loan servicing compensation issue, including in connection with the sale of the property securing the Gess Loan; (ii) 356.6 total hours in connection with the termination issue, including the designation of defendants as mortgage brokers and fiduciaries under Nevada law; (iii) 4,246.40 total hours in connection with the parties' preparation for and pursuit of trial, including discovery, motion practice, mediation, and jury trial; and (iv) 245.6 total hours in connection with Silar's and Asset Resolution's consolidated interlocutory appeals.  Indeed, the Court held numerous hearings in connection with the substantial motion practice involved in this case.  The Court also presided over a jury trial that spanned a total of five weeks and involved the claims of 37 plaintiffs, against seven defendants, with respect to ten separate Loans.

The Court also notes that plaintiffs' requested attorneys' fees are eminently reasonable when compared to those incurred by Greenberg Traurig on behalf of Silar and Asset Resolution between only May 18, 2009 (the date that Greenberg Traurig made its appearance for those defendants in this case), and October 14, 2009 (Asset Resolution's chapter 11 petition date).  Whereas plaintiffs are seeking an award of attorneys' fees and costs in the total amount of $2,464,052.94 ($2,306,332.50 + $157,720.44) for services rendered from January 2009, through December 31, 2010, Silar and Asset Resolution paid at least $802,952.18 in attorneys' fees and costs to Greenberg Traurig prior to October 14, 2009 (Doc. #8 in Case No. 09-32824 at 12, 28) (reflecting payments of $302,952.18 on July 31, 2009, $125,897.57 on October 1, 2009, and $374,102.43 on October 1, 2009), and were liable for an additional $1.45 million in attorneys' fees to Greenberg Traurig as of October 14, 2009 (Doc. #7 in Case No. 09-32824 at 8), for a total amount of $2,252,952.18.  That amount is only approximately $211,000 less than plaintiffs' requested fees and costs, even though Greenberg Traurig's attorneys' fees and costs were incurred over only six months and plaintiffs' requested fees and costs were incurred over 24 months.  In addition, the amount of Greenberg Traurig's attorneys'

fees and costs does not include the additional attorneys' fees and costs incurred on behalf of Silar and Asset Resolution in this case by Sonnenschein, Nath & Rosenthal and its local counsel from January 2009, through May 18, 2009, or by the Majorie Firm, Ltd. and its local counsel from October 14, 2009, through December 31, 2010.

### d.   The questions involved were novel and complex, requiring plaintiffs' counsel to have wide-ranging skills.

This case involved the resolution of novel questions of Nevada law regarding the rights and duties of mortgage brokers and loan servicers, including:  (i) the determination that mortgage brokers and loan servicers have a fiduciary duty when handling funds and taking title to real property received on account of fractional beneficial interest holders, as well as a duty not to engage in grievous and perfidious misconduct pursuant to the implied covenant of good faith and fair dealing in tort; (ii) the interpretation and application of the 51% Rule set forth in Nevada Administrative Code § 645B.073 and Nevada Revised Statutes § 645B.340(1); and (iii) the application of Chapter 645B of the Nevada Revised Statutes governing mortgage brokers to loan servicers such as defendants.  The Court also interpreted Silar's and Compass's complex repurchase agreement and related instruments and concluded that Silar was the title owner of the LSAs and Compass was Silar's servicing agent.  Thus, plaintiffs' counsel required extensive complex commercial litigation and real estate skills to successfully address all those novel and complex questions.

### e.   Bickel & Brewer represented plaintiffs on a full contingency fee basis.

The customary hourly billing rates for the Bickel & Brewer attorneys that primarily worked on this case are between $500 and $775, and Mr. Duncan's estimated hourly rate is $400.  Yet, Bickel & Brewer and Mr. Duncan agreed to work, and have worked since March 2009, on behalf of plaintiffs (and 1,500 other Direct Lenders) on a full contingency fee basis.  Bickel & Brewer and Mr. Duncan also agreed to cover all expenses incurred during the course of this litigation.  As a result,

plaintiffs were not obligated to pay Bickel & Brewer or Mr. Duncan unless they prevailed in this litigation, and then only from collected funds.

### f.   The experience, reputation, and ability of plaintiffs' counsel substantially contributed to plaintiffs' success in this case.

The Court has commented on more than one occasion that both plaintiffs and defendants were ably represented in this case by their respective counsel.  The Court is also well aware of Ms. Chubb's experience, reputation, and ability, given her extensive years of practice before it.   In addition, although this case had been pending for almost two years prior to Bickel & Brewer's, Mr. Duncan's, and Ms. Rasmussen's involvement, during which time plaintiffs were represented by two other law firms (the Law Offices of Alan R. Smith and Fulbright & Jaworski, LLP), it was not until after they appeared in this action as counsel for plaintiffs that plaintiffs obtained any of the relief on which the Court's award of attorneys' fees is based.  Indeed, the Court has previously remarked that Bickel & Brewer and Mr. Duncan appeared in this case, on a full contingency fee basis, at a time when the vast majority of the Court's rulings were protective of defendants' interests, not plaintiffs' interests.

### g.   This case was undesirable under the circumstances, including plaintiffs' inability to pay for legal services.

The Court finds that, but for Bickel & Brewer's and Mr. Duncan's agreement to represent plaintiffs solely on a contingency fee basis, plaintiffs would have been unable to retain them as their counsel.  Indeed, the Court's Receiver, Tom Grimmett, recommended in his report to the Direct Lenders in the Summer of 2008 that they should accept Silar's proposed class action settlement – in which the Direct Lenders would agree to pay Silar tens of millions of dollars – because they would be unlikely to find counsel and prevail against defendants:

> The foreclosure by Silar of virtually all of Compass' assets makes much of the tort analysis an academic exercise.  Regardless of the strength of these claims, the DLs will be extremely hard pressed to find any law firm to pursue those claims on a contingency fee when they are virtually guaranteed no recovery given Compass' insolvent

status.  It would be impossible as a practical matter to hire any law firm to pursue claims on any other financial basis.

\*\*\*

As our analysis has shown, DLs would likely win some battles and lose some battles with Compass.  The waterfall flows both ways, depending on the language of the LSAs and Notes. . . . It appears that the DLs *may* be able to succeed on the following [damages] claims against Compass . . . .  Nevertheless, it is important to understand that litigation entails tremendous time, money, and emotional stress.  Over this entire process, the DLs can see that few rulings in the Court have "gone their way" thus far, creating uncertainty as to any outcome.  The case is factually complex, which will result in an enormously costly process.  The opposition has proved ready, willing, and able to fight to the end on the seemingly smallest of details and shows no sign of changing that disposition should this matter proceed to litigation. . . . Law firms have thus far expended approximately $5 Million defending the DLs and not all parties have even answered the complaints yet.  The DLs can expect that number to double or triple if this matter were to go to trial or to appeal.  **(If the DLs are able to find a firm willing to take the case).**  Litigation would likely consume years and years of time.

(Doc. #765, Ex. A at 1, 46-50) (emphasis in original)  Instead, the jury awarded millions of dollars of compensatory and punitive damages to only 23 plaintiffs.

4.    **Defendants improperly conflate the attorneys' fees award to which plaintiffs are entitled as compensatory damages with the attorneys' fees that plaintiffs owe to their counsel.**

Defendants contend that the Court may not award attorneys' fees to plaintiffs because the Court cannot determine what fees were incurred, and must be reimbursed, by which plaintiffs pursuant to their contingency fee agreement with Bickel & Brewer and Mr. Duncan.  Defendants, however, are improperly conflating the attorneys' fees to be awarded to plaintiffs as compensatory damages with those fees that plaintiffs are obligated to pay to their counsel under the terms of their contingency fee agreement.

Initially, under Ninth Circuit precedent and Nevada law, the Court is permitted to, and does, calculate plaintiffs' award of attorneys' fees based on the lodestar approach, even though they have a contingency fee agreement with some of their counsel (Bickel & Brewer and Mr. Duncan, but not

Ms. Chubb or Ms. Rasmussen).  *See Vacation Village, Inc. v. Clark County, Nev.*, 24 Fed. Appx. 785, 788 (9th Cir. 2007) (affirming calculation of attorneys' fees award under the lodestar approach, rather than pursuant to the terms of a contingency fee agreement, when federal statute authorized a prevailing plaintiff to recover an award of attorneys' fees); *Shuette v. Beazer Homes Holdings Corp.*, 124 P.3d 530, 549 (Nev. 2005) (under Nevada law, a court may award attorneys' fees using either a lodestar approach or a contingency fee).

Moreover, the Court cannot use plaintiffs' contingency fee agreement to increase or decrease what it concludes is a reasonable attorneys' fee under the lodestar approach.  *See Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1048 (9th Cir. 2000) ("A district court may not rely on a contingency agreement to increase or decrease what it determines to be a reasonable attorney's fee."); *Quesada v. Thomason*, 850 F.2d 537, 543 (9th Cir. 1988) ("We therefore reject the claim that a contingent-fee agreement can justify lowering an otherwise reasonable lodestar fee.").  In other words, because the Court finds that its award of attorneys' fees to plaintiffs as a measure of compensatory damages is reasonable under the lodestar approach, the Court need not and will not undertake the arduous task of calculating the actual contingency fee that plaintiffs may ultimately owe to Bickel & Brewer and Mr. Duncan.  *See Hasbrouck v. Texaco, Inc.*, 879 F.2d 632, 639 (9th Cir. 1989) ("The presence of a fee agreement is simply one of many factors to be considered in the determination of a reasonable fee, and '[s]hould a fee agreement provide less than a reasonable fee ..., the defendant should nevertheless be required to pay the higher amount.'") (quoting *Blanchard v. Bergeron*, 489 U.S. 87 (1989)).  Thus, the Court rejects defendants' contention that its attorneys' fees award to plaintiffs must be based on the contingency fee agreement with their counsel.

**5.    Plaintiffs are also entitled to an award of costs and expenses, which were reasonable and necessary.**

The Court finds that plaintiffs, as prevailing parties, are also entitled to recover their reasonable and necessary costs and expenses in the total amount of $170,303.58.  In this diversity

action, plaintiffs' recovery of federal trial procedure costs in the total amount of $12,583.14 is governed by federal law, and their recovery of an additional $157,720.44 in travel-related expenses, hearing transcript charges, legal research expenses, and office expenses is governed by Nevada law and the LSAs.  *See Krave Entm't, LLC*, 667 F. Supp. 2d at 1237 ("A federal court exercising diversity jurisdiction applies state substantive law and federal procedural law."); *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1064-66 (9th Cir. 2003) (affirming award of expert witness fees to prevailing plaintiffs because Oregon's Oil Spill Act provided that a prevailing plaintiff was entitled to an award of attorneys' fees and costs as a measure of damages, which is a matter of state substantive law, not a federal cost provision); LR 54-16(b)(2).  The Court finds that plaintiffs' requested costs and expenses were reasonable and necessary and are to be allowed under federal and Nevada law and pursuant to the LSAs.  *See* FED. R. CIV. P. 54(d)(1); LR 54-1–LR 54-15; NEV. REV. STAT. §§ 18.020(3), 18.005; *Coker Equip. Co.*, 366 Fed. Appx. at 733.  Thus, plaintiffs are entitled to recover from all defendants their costs and expenses in the total amount of $170,303.58 ($12,583.14 + $157,720.44), of which $157,720.44 is awarded to plaintiffs as compensatory damages under Nevada law and pursuant to the LSAs.

### 6.   Donna Cangelosi is entitled to a separate award of costs, which were reasonable and necessary.

In addition to the attorneys' fees, costs, and expenses awarded to all plaintiffs, the Court also makes a separate award of reasonable and necessary federal trial procedure costs to Ms. Cangelosi in the total amount of $289.00.  Those costs were incurred by Ms. Cangelosi in connection with her successful defense of the trustee's claim for damages for civil contempt.

At the close of the evidence presented at trial, the trustee withdrew his request to present his claim for damages for civil contempt to the jury for consideration.  (Trial Tr. 3042-3053)  Further, based on that withdrawal and the evidence presented at trial, and pursuant to the motion of counsel for Ms. Cangelosi, the Court struck its prior order of civil contempt against Ms. Cangelosi.  (*Id.*)

Thus, Ms. Cangelosi was a prevailing party entitled to recover her federal trial procedure costs.  *See* FED. R. CIV. P. 54(d)(1); LR 54-1–LR 54-15.

However, the Court finds that Ms. Cangelosi is not entitled to an additional award of attorneys' fees or other costs incurred in connection with her successful defense of the trustee's claim for damages for civil contempt.  Although the Court sympathizes with Ms. Cangelosi's request for attorneys' fees and costs, no federal statute or rule applies to negate the effect of the American Rule under the circumstances.

## D.   <u>Punitive Damages</u>

The Court finds that the jury's punitive damages awards are constitutional, and denies defendants' requests for a new trial or remittitur, because:  (i) defendants' conduct was despicable and reprehensible; (ii) the ratio of the jury's compensatory damages awards plus the Court's post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses, on the one hand, to the jury's punitive damages awards, on the other, comports with due process; and (iii) the jury's punitive damages awards are consistent with the civil penalties permitted by Nevada law for defendants' misconduct.

### 1.   <u>Relevant legal standards.</u>

The Court may grant a new trial under Federal Rule of Civil Procedure 59(a) only if the jury's verdict is against the clear weight of the evidence, the jury's verdict is based on false or perjurious evidence, the damages are excessive, or to prevent a miscarriage of justice.  *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).  Defendants move for a new trial based solely on the ground that the jury's punitive damages awards are excessive.

The United States Supreme Court has held that punitive damages can be imposed to further "legitimate interests in punishing unlawful conduct and deterring its repetition."  *See BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996).  The Due Process Clause, however, "prohibits the imposition of grossly excessive and arbitrary punishments."  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538

U.S. 408, 416 (2003).  The Supreme Court has instructed that three "guideposts" are to be used to determine whether a punitive damages award is unconstitutionally excessive:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *See id.* at 416-17.

## 2.    Defendants' tortious actions were reprehensible.

In *State Farm*, the Supreme Court stated that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," which is evaluated by considering whether:

> [i] the harm caused was physical as opposed to economic; [ii] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [iii] the target of the conduct had financial vulnerability; [iv] the conduct involved repeated actions or was an isolated incident; and [v] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*See id.* at 419.  The Supreme Court subsequently recognized that "misconduct engaged in to obtain financial gain or augment profit was highly culpable deserving greater punishment."  *See Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168, 1185 (D. Nev. 2008) (citing *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2622 (2008)).   Based on those considerations, the Court finds that defendants' tortious actions were reprehensible.  Defendants have an extreme level of culpability given their cavalier attitude to the injuries that they maliciously inflicted on the Direct Lenders and, therefore, punitive damages are to be awarded to plaintiffs at a very high level.  Defendants' misconduct shocked the conscience of the Court.

First, defendants engaged in their tortious conduct to further their financial gain to the detriment of the Direct Lenders.  *See supra* section III.C.2, D, E, F.1.  Indeed, the jury heard considerable evidence of defendants' business strategy to pursue the collection of their "bag of

money" and "stolen wallet."  *See id.*  Defendants' business strategy was to take small amounts of money ($5,000 - $10,000) from each of the Direct Lenders, which amounted to substantial sums for defendants.  *See id.*

Second, defendants' tortious conduct was not an isolated incident, and involved intentional malice, trickery, or deceit, as opposed to mere accident.  Defendants repeated their tortious actions throughout their pre-petition tenure as the loan servicers under the LSAs, beginning with the Standard Property Loan in early March 2007, concluding with the Anchor B Loan in early October 2009, and continuing in the interim with the Shamrock, Bay Pompano, Eagle Meadows, Fox Hills, Gess, and Gramercy Loans.  *See id.*  In undertaking those tortious actions, defendants intentionally deceived the Direct Lenders to maximize their financial gain to the detriment of the Direct Lenders. *See id.*

Third, defendants' misconduct was targeted at the Direct Lenders, who were financially vulnerable, as the unrebutted trial testimony established:

> Mr. Bickel, that was really the first time I had truly seen the face of the direct lenders. . . . [P]eople were coming in on walkers, with oxygen, they were – they were old and they were scared. . . . I was stunned actually at the . . . demographics of the USA Capital investor. . . . I mean, many of them had assistance coming into the theater, and that was the first time I ever saw the face of these people. . . . Q I'm asking about those people you visited with at the University of Nevada Reno theater [in June 2006], and did you develop an impression from speaking with people as to what their station in life was?  A Yes, I did develop an impression. Clearly, they were at the stage in life that they were very retired, not just retired, newly retired, but many of them had been retired for some period of time. Some of them had failing health, some of them were vital, but, for the most part, this was their retirement income. This was their life savings.

(Trial Tr. at 1806:6-1808:19)   Plaintiffs also presented unrebutted testimony of defendants' intentions to take advantage of both the disparate and unorganized Direct Lenders, especially since many were elderly, as well as defendants' superior resources to pursue their business strategy to gain financially at the expense of the Direct Lenders.  *See supra* section III.E, F.1.  The Court can and

does take into consideration the financial vulnerability of Direct Lenders other than plaintiffs when assessing the reprehensibility of defendants' actions.  *See Action Marine, Inc. v. Continental Carbon Inc.*, 481 F.3d 1302, 1320 (11th Cir. 2007) ("While punitive damages may not be awarded to punish for harm inflicted on nonparties, we may consider the risk of harm to others as part of the reprehensibility analysis.") (citing *Philip Morris U.S.A. v. Williams,* 127 S.Ct. 1057, 1063-64 (2007)); *Merrick*, 594 F. Supp. 2d at 1187 ("*In re Exxon* [*Valdez*, 490 F.3d 1066 (9th Cir. 2007),] again teaches that when assessing reprehensibility the Court can also consider the risk of harm to others when the conduct at issue was putting them at risk too. There is little doubt that Defendants' conduct directed at others was directed at the financially vulnerable.").

Fourth, although the harm caused by defendants' misconduct was largely economic, substantial punitive damages can nevertheless be awarded because defendants intentionally inflicted economic injury on plaintiffs in furtherance of their own financial gain.  *See BMW*, 517 U.S. at 576 (holding that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, . . . can warrant a substantial [punitive damages] penalty."); *see supra* section III.C.2, D, E, F.1.  Moreover, defendants' tortious actions not only resulted in economic harm to plaintiffs, but they also deprived plaintiffs of their bargained for consideration, *i.e.*, peace of mind. Because each of the Loans could have hundreds of different Direct Lenders as investors, defendants were the only ones who could preserve, protect, and collect the Direct Lenders' interests in the Loans and the underlying collateral.  *See Merrick*, 594 F. Supp. 2d at 1186 ("Nevada law also recognizes that the tort of insurance bad faith goes beyond a mere economic offense because it deprives the insured of the bargained for consideration, peace of mind.").

Finally, defendants' tortious conduct evinced a plain indifference to the health, safety, and financial circumstances of the Direct Lenders.  Specifically, Ms. Kesler, Ms. Knoles, Ms. Cangelosi, and Mr. Helms testified regarding defendants' unabashed pursuit of their financial interests in the Loans, without regard to the plight or interests of the Direct Lenders – many of whom were elderly,

had invested their life savings with USA Commercial, and were already experiencing financial hardships (including the loss of their homes and their inability to buy their medicines) as a result of the loss of their monthly income from the Loans.  (Trial Tr. at 331:17-333:20, 1492:12-21, 1623:6-1624:23, 1630:10-1631:23, 1934:3-1935:6)   Accordingly, the Court finds that defendants' misconduct was particularly egregious and reprehensible and, therefore, warrants substantial punitive damages.

   **3.** **The ratio of the actual and potential harm suffered by plaintiffs to the jury's punitive damages awards is not unconstitutional.**

   **a.** **Applicable legal standard.**

   Although the Supreme Court has never imposed a bright-line ratio that a punitive damages award cannot exceed, it has indicated that "[s]ingle-digit multipliers are more likely to comport with due process . . . ."  *See State Farm*, 538 U.S. at 425.  At the same time, however, the Supreme Court has rejected a constitutional limit to punitive damages based on a simple mathematical comparison of actual and potential damages to the punitive damages award.  *See BMW*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and *potential* damages to the punitive award.") (emphasis in original).

   Moreover, "ratios greater than those [the Supreme Court has] previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages."  *See State Farm*, 538 U.S. at 425 (internal quotations and citation omitted).   In such circumstances, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards," and the determination of whether a punitive damages award is grossly excessive may include a consideration of not just the damages that a plaintiff actually suffered, but also the amount of potential damage that could have resulted from the defendant's reprehensible conduct.  *See id.; see also BMW*, 517 U.S. at 582; *Planned Parenthood of the Columbia/Williamette*

*Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005) ("[I]n cases where there are insignificant economic damages but the behavior was particularly egregious, the single-digit ratio may not be a good proxy for constitutionality."); *Swinton v. Potomac Corp.*, 270 F.3d 794, 818-19 (9th Cir. 2001) (affirming constitutionality of 28:1 ratio when compensatory damages were "necessarily low" because plaintiff's back pay damages were measured by his $8.50 hourly wage). Indeed, under such circumstances, a higher ratio of punitive damages is warranted to ensure that the traditional purposes of punishment and deterrence are served. *See BMW*, 517 U.S. at 568.

### b. Plaintiffs' actual and potential harm includes the jury's compensatory damages awards and the Court's post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses.

In calculating the ratio between plaintiffs' actual or potential harm and the jury's punitive damages awards, the Court includes the jury's compensatory damages awards, as well as the Court's post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses.[9] *See Coker Equip. Co.*, 366 Fed. Appx. at 733; *Bongiovi v. Sullivan*, 138 P.3d 433, 451-52 (Nev. 2006); *Action Marine, Inc.*, 481 F.3d at 1321 (including "compensatory in nature" attorneys' fees awarded under Georgia statute in tort cases involving bad faith "as part of the measure of actual damages for the necessary comparison" of whether a punitive damages award is unconstitutionally excessive). The Court does so because, pursuant to the LSAs and under Nevada and federal law, those post-trial awards constitute additional compensation to plaintiffs. *See Ramada Inns, Inc.*, 711 P.2d at 2 (prejudgment interest "is viewed as compensation" and "is not designed as a penalty"); *GCM Air Group, LLC*, 2009 WL 1810743, at *1 (Nevada law permits attorneys' fees to be awarded if authorized by contract); Nev. Rev. Stat. §§ 18.010(4), 18.020(3) (discussing entitlement of "prevailing party" to awards of attorneys' fees and costs); *Gant*, 12 F.3d at 1003 (stating attorneys' fees may be awarded

---

[9] The Court, however, does not include its award of federal trial procedure costs to plaintiffs and Ms. Cangelosi in the total amount of $12,872.14 ($12,583.14 +$289.00) in the calculation of the ratio. *See supra* section IV.C.5-6.

1    "as damages" under section 2202).  Indeed, the LSAs provide that the prevailing party is entitled to

2    "reimbursement" of its attorneys' fees, costs, and expenses.  (Doc. #2056, Ex. A, § 15)

3                    **c.    Based on plaintiffs' total actual and potential harm, the jury's punitive**

4                            **damages awards are not grossly excessive.**

5            The Court assesses the constitutionality of the jury's separate punitive damages awards in

6    gross and without allocation to plaintiffs.  It does so because:  (i) the jury made lump sum joint and

7    several compensatory damages awards by Loan, not by plaintiff; (ii) the jury made lump sum

8    punitive damages awards by defendant, not by Loan or by plaintiff; and (iii) defendants' misconduct

9    was undertaken in gross against the Direct Lenders, resulting in both the Court awarding attorneys'

10   fees, costs, and expenses in gross and without allocation to plaintiffs, and defendants being jointly

11   and severally liable for those attorneys' fees, costs, and expenses.  *See Merrick*, 594 F. Supp. 2d at

12   1190-91 ("[T]he ratio needs to be calculated with respect to each Defendant separately. . . .

13   Defendants were jointly and severally liable without apportionment for the underlying harm their

14   conduct caused . . . . It is inappropriate to apportion the harm between the two Defendants. . . . [T]hat

15   is Nevada law.") (citing *BMW*, 517 U.S. at 575, and *Albert H. Wohlers & Co.*, 969 P.2d at 961-62);

16   *cf. Planned Parenthood*, 422 F.3d at 962 ("[A]rriving at the ratio on a plaintiff-by-plaintiff,

17   defendant-by-defendant basis respects the jury's verdict. The jury awarded punitive damages to each

18   plaintiff from each defendant; it did not award punitive damages against each defendant as one lump

19   sum.").  The Court also notes that defendants argued in favor of the Court's approach in their Rule

20   59 motions.  (Doc. #2045 at 16-20; Doc. #2057 at 5, 7; Doc. #2063 at 26-27)  Indeed, the Court has

21   a "general obligation to preserve lawful jury awards when possible."  *See Passantino v. Johnson &*

22   *Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 (9th Cir. 2000).

23           Thus, the Court finds that the following ratios apply to the jury's punitive damages awards:

| Defendant | Actual Or Potential Harm | Punitive Damages | Ratio |
|---|---|---|---|
| Silar | $2,558,025.90[10] | $3,000,000 | 1.2:1 |
| Asset Resolution | $2,528,210.33[11] | $1,250,000 | 0.5:1 |
| Compass | $2,528,883.00[12] | $750,000 | 0.3:1 |
| Piskun | $2,528,883.00[13] | $50,000 | 0.02:1 |
| Blatt | $2,528,883.00[14] | $50,000 | 0.02:1 |
| **TOTAL:** | $2,558,025.90[15] | $5,100,000 | 2:1 |

Accordingly, because all those ratios are 2 to 1 or less, the jury's punitive damages awards are not unconstitutional. *See Planned Parenthood*, 422 F.3d at 963 ("We agree with the district court that ACLA's conduct is particularly reprehensible. . . . In these circumstances, a substantial award of punitive damages in relation to the actual harm caused will reasonably serve the interests of punishment and deterrence. Our constitutional sensibilities are not offended by a 9 to 1 ratio.").[16]

---

[10] This figure is derived by adding:  (i) the jury's compensatory damages award in the total amount of $79,470.39; (ii) plaintiffs' prejudgment interest award in the total amount of $14,502.57 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,925.08 - $12,872.14).

[11] This figure is derived by adding:  (i) the jury's compensatory damages award in the total amount of $54,226.91; (ii) plaintiffs' prejudgment interest award in the total amount of $9,930.48 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,925.08 - $12,872.14).

[12] This figure is derived by adding:  (i) the jury's compensatory damages award in the total amount of $52,535.02; (ii) plaintiffs' prejudgment interest award in the total amount of $12,295.04 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,925.08 - $12,872.14).

[13] This figure is derived by adding:  (i) the jury's compensatory damages award in the total amount of $52,535.02; (ii) plaintiffs' prejudgment interest award in the total amount of $12,295.04 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,925.08 - $12,872.14).

[14] This figure is derived by adding:  (i) the jury's compensatory damages award in the total amount of $52,535.02; (ii) plaintiffs' prejudgment interest award in the total amount of $12,295.04 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,925.08 - $12,872.14).

[15] This figure is derived by adding:  (i) the jury's compensatory damages award in the total amount of $79,470.39; (ii) plaintiffs' prejudgment interest award in the total amount of $14,502.57 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,925.08 - $12,872.14).

[16] Defendants wrongly assert that, based on *Exxon Shipping Co.*, only a 1 to 1 ratio is constitutional. In *Exxon Shipping Co.*, the Supreme Court did not address what ratio between compensatory and punitive damages awards violates the Due Process Clause.  Rather, the Supreme Court expressly limited its discussion to what ratio is appropriate for purposes of federal maritime common law. *See*

**4.      The jury's punitive damages awards are analogous to the civil penalties authorized by Nevada law for comparable cases.**

The Court finds that defendants were on fair notice that their misconduct could subject them to the size of the jury's punitive damages awards.  *See State Farm*, 538 U.S. at 416-17; *BMW*, 517 U.S. at 583 ("[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.") (internal quotations and citation omitted).  Specifically, Nevada law authorizes an award of punitive damages of:  (i) three times the amount of compensatory damages, if that amount exceeds $100,000; or (ii) $300,000, if the amount of compensatory damages is less than $100,000.  *See* NEV. REV. STAT. § 42.005(1).  Nevada law also permits clients (*i.e.*, the Direct Lenders) of mortgage brokers (*i.e.*, defendants) to sue for "punitive damages . . . subject to the provisions of NRS 42.005" (as well as for actual and compensatory damages and reasonable attorneys' fees and costs) for violations of NEV. REV. STAT. §§ 645B.900 and 645B.910, which make it unlawful to perform the services of a mortgage broker or mortgage agent without a Nevada license (which defendants indisputably lacked).  *See* NEV. REV. STAT. § 645B.930.  Nevada's punitive damages caps are "analogous sanctions in determining the constitutionality of a punitive damages award."  *See Swinton*, 270 F.3d at 820 (citing *BMW*, 517 U.S. at 583-85).  Thus, the jury's punitive damages awards are constitutional because they comport with Nevada's statutory caps in that plaintiffs' total compensatory damages are greater than $100,000 and the jury's punitive damages awards are less than three times those compensatory damages.  *See supra* section IV.D.3.  Accordingly, the Court denies defendants' request for a new trial or remittitur with respect to the jury's punitive damages awards.

---

554 U.S. at 501-02  ("Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard.").

**5.** **The trustee is not entitled to include the jury's punitive damages award against Asset Resolution in the punitive damages award against Silar.**

The Court rejects the trustee's contention that the jury's punitive damages award against Asset Resolution should be included in the award against Silar because, otherwise, Silar would be punished twice.  Because the trustee did not raise this contention prior to or at trial, the Court's review is only for plain error affecting substantial rights.  *See* FED. R. CIV. P. 51(d).  The Court finds no plain error because the parties and the jury treated Silar and Asset Resolution as separate entities liable for different claims and damages and, in any event, the aggregation of the jury's punitive damages awards against Silar and Asset Resolution would result in a constitutional ratio of 1.7 to 1.[17]

**IT IS THEREFORE ORDERED** that plaintiffs' request for declaratory relief (Doc. #1499) is granted as provided herein.

**IT IS FURTHER ORDERED** that plaintiffs' motion for an award of prejudgment interest (Doc. #2050) is granted.

**IT IS FURTHER ORDERED** that plaintiffs' motion for an award of attorneys' fees, costs, and expenses (Doc. ##2047, 2051) is granted.

**IT IS FURTHER ORDERED** that the Court's order of civil contempt against Ms. Cangelosi (Doc. #198) is stricken and expunged.

**IT IS FURTHER ORDERED** that Donna Cangelosi's motion for an award of costs (Doc. #2060) is granted.

**IT IS FURTHER ORDERED** that Donna Cangelosi's motion for an award of attorneys' fees and costs (Doc. ##2059, 2062) is denied.

---

[17] The ratio is derived by dividing Silar's and Asset Resolution's total punitive damages liability of $4,250,000 by plaintiffs' total actual or potential harm of $2,558,025.90.

1    **IT IS FURTHER ORDERED** that defendants' Rule 50(b) and Rule 59 motions (Doc.

2  ##2045, 2057, 2063) are denied.

3

4  DATED: _ 07-14-2011.

5

6  _____

7  UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28