JANET L. CHUBB, ESQ.
Nevada State Bar No. 176
LOUIS M. BUBALA III, ESQ.
Nevada State Bar No. 8974
ARMSTRONG TEASDALE
50 W. Liberty St., Suite 950
Reno, NV 89501
Telephone:  (775) 322-7400
Facsimile: (775) 322-9049
Email:   jchubb@armstrongteasdale.com
    and  bsalinas@armstrongteasdale.com
    and   lbubala@armstrongteasdale.com

WILLIAM A. BREWER III, ESQ.
Texas State Bar No. 02967035
*Admitted Pro Hac Vice*
MICHAEL J. COLLINS, ESQ.
Texas State Bar No. 00785495
*Admitted Pro Hac Vice*
ROBERT M. MILLIMET, ESQ.
Texas State Bar No. 24025538
*Admitted Pro Hac Vice*
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015
Email:  wab@bickelbrewer.com
        mjc@bickelbrewer.com
        rrm@bickelbrewer.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

### District of Nevada

| | |
|---|---|
| In re: | Case No. 2:07-CV-892-RCJ-GWF-BASE and Case No. 3:07-CV-241-RCJ-GWF |
| USA COMMERCIAL MORTGAGE COMPANY, | |
| Debtor. | |
| 3685 SAN FERNANDO LENDERS, LLC, *et al.*, | **MEMORANDUM OPINION AND ORDER REGARDING COMPASS PARTNERS, LLC, COMPASS USA SPE, LLC, AND DAVID BLATT PURSUANT TO FED. R. CIV. P. 54(b)** |
| Plaintiffs, | |
| v. | |
| COMPASS USA SPE LLC, *et al.*, | |
| Defendants. | |

1   On September 6, 2012, the Court entered its Agreed Order Regarding Settlement And
2   Related Relief (the "Settlement Order").  (*See* Docket No. 1915 in Bankruptcy Case No. 09-32824-
3   RCJ)  Pursuant to the Settlement Order, the claims that were or could be asserted between and
4   among Plaintiffs (and the other "B&B DL Settling Clients," as defined in the Settlement Order), on
5   the one hand, and Defendants Silar Advisors, LP, Silar Special Opportunities Fund, LP, and Asset
6   Resolution LLC solely in its capacity as debtor ("Asset Resolution") (together, "Silar"), the chapter
7   7 bankruptcy estate of Asset Resolution LLC (the "Estate"), and Boris Piskun ("Piskun"), on the
8   other (collectively, the "Parties"), were settled (the "Settlement").  (*See id.*)  The Settlement Order
9   contemplates that a severed final judgment shall be entered in this action as to and among the
10  Parties.  (*See, e.g., id.*, ¶ 122)  The Court entered that severed final judgment as to and among the
11  Parties on October 31, 2012.  (*See* 892 Doc. 2308)

12  In addition, the Court now enters the severed rulings included herein (the "Order") against
13  the remaining defendants in this action – Compass Partners, LLC and Compass USA SPE, LLC
14  (jointly and severally, "Compass") and David Blatt ("Blatt").  The Court enters the Order against
15  Compass and Blatt pursuant to Federal Rule of Civil Procedure 54(b) after finding that good cause
16  exists based on applicable law, and the pleadings, the evidence admitted at trial, and the orders and
17  other records entered in this case, in the "Asset Resolution Bankruptcy Cases" (jointly administered
18  in this Court as BK-S-09-32824-RCJ), and in numerous related proceedings (over all of which this
19  Court takes judicial notice).

20  BASED UPON THE FOREGOING, THE COURT NOW HEREBY ENTERS THIS
21  ORDER AND MAKES THE FOLLOWING FINDINGS OF FACT, LEGAL CONCLUSIONS,
22  AND DECLARATIONS:

**I.**

**RULE 54(B) CERTIFICATION**

25  1.   The findings of fact, legal conclusions, and declarations in this Order are final as to
26  Compass and Blatt.

27
28

2.     There is no just reason for delay in entry of this Order as to Compass and Blatt in light of, among other things, the merits, the interests of judicial administration, the equities, possible future developments in this case, delay, and expense.

## II.

## BACKGROUND

3.     This case arises out of a series of related proceedings.

4.     The first set of proceedings were chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court") bearing primary Case No. BK-S-06-10725-LBR (the "USACM Bankruptcy Cases"). The USACM Bankruptcy Cases were prompted by the liquidity problems created by a massive, interstate ponzi-scheme in which insider managers and brokers of USA Commercial Mortgage Company and its affiliates ("USACM") fraudulently induced thousands of persons across the United States ("Direct Lenders") to invest hundreds of millions of dollars in fractionalized "direct lender" beneficial interests ("DL Interests") in what were falsely represented to be fully-secured, short-term commercial real estate loans to independent borrowers and guarantors (the "USACM Loans").

5.     The proceedings mushroomed from the Nevada Bankruptcy Court to civil litigation in this Court as a result of the sale to Compass of, among other things, loan servicing agreements (the "LSAs") and/or DL Interests held by USACM in sixty-five USACM Loans and/or related collateral properties over the objections of certain other Direct Lenders. Silar, acting for itself and/or as investment manager and as lead lender for certain investors and participants, advanced over $50 million to Compass under a Master Repurchase Agreement ("MRA") which Compass used to engage in the purchase and sale transaction with USACM. The civil litigation involved a series of actions ultimately consolidated in this action (the "892 Case"), including without limitation an action bearing Case No. 3-07-CV-241-RCJ-GWF (the "241 Case").

6.     The proceedings also included the Asset Resolution Bankruptcy Cases. Those cases were originally filed in New York, were transferred to Nevada, were fully withdrawn to this Court, and are now pending before this Article III Court.

7.      In 2007, in this 892 Case, this Court exercised *in rem* jurisdiction over the USACM Loans and the loan servicing relationship created by the LSAs, entered a Preliminary Injunction (the "Preliminary Injunction") (892 Doc. 199), and issued a series of interlocutory declarations concerning the rights, obligations, fees, and alleged wrongful conduct of the post-USACM servicers with respect to fifty two of the USACM Loans from February 16, 2007, through January 19, 2010 (the "Post-USACM/Pre-Termination Servicing Period").

8.      In that connection, in 2007, all persons or entities who were known to own or were believed to own beneficial or DL Interests – *i.e.*, the Direct Lenders – in the fifty-two USACM Loans which were the subject of this action were served a copy of the Preliminary Injunction and notified of their right to appear herein.  The Direct Lenders were also later served a copy of the motion which led to the entry of the Settlement Order.  The DL Interests in all of the USACM Loans belong to one or more than one natural person within the meaning of Nev. Rev. Stat. 645B.340 et al. The holders of more than fifty-one percent of the DL Interests in all of the USACM Loans except the "Marlton I" loan consented to the terms of the Settlement Order in writing with respect to those loans.  This Order partially implements those terms.  All Direct Lenders and their successors-in-interest are therefore bound by the Court's rulings in this Order based upon this Court's *in rem*, bankruptcy, diversity, and supplemental subject matter jurisdiction, and Nevada law.

9.      On December 14, 2010, in this 892 Case, a nine-person jury awarded plaintiffs, and against Compass and Blatt, a total of $52,565.02 in compensatory damages, excluding attorneys' fees and prejudgment interest.  The jury also awarded plaintiffs a total of $750,000 in punitive damages from Compass, and a total of $50,000 in punitive damages from Blatt.  The jury's damages awards were based on:  (i) its findings of liability for breach of contract, breaches of the implied covenant of good faith and fair dealing in contract and in tort, breaches of fiduciary duties, conversion, and civil conspiracy in connection with their servicing of certain USACM Loans pursuant to the LSAs; and (ii) the Court's pretrial determination that Compass and Blatt were in default and, thus, liable as a matter of law based on those findings of liability.

10.      On June 9, 2011, the Court heard oral argument on plaintiffs' motions for attorneys' fees and prejudgment interest, and defendants' post-trial motions for judgment as a matter of law and

1   a new trial.  This Order with respect to Compass and Blatt contains the Court's rulings as to those

2   matters.

3   **II.**

4   **MATTERS RELATING TO LOAN COLLECTIONS/WATERFALL**

5   11.    The Court has entered a series of orders in this 892 Case and also in the Asset

6   Resolution Bankruptcy Cases which recognized that the Estate's servicing rights and duties under

7   the LSAs were terminated as of January 19, 2010, and recognized the assumption of servicing duties

8   by others.  The Court also entered a series of orders mandating a procedure for resolving claims for

9   payment by persons or entities who provided goods or services in connection with the servicing of

10  the USACM Loans during the Post-USACM/Pre-termination Servicing Period.  (*See* 892 Case Doc.

11  1630; AR Bk Doc. Nos. 356, 387, & 989; AR Bk January 19, 2010 Transcript at 57)

12  **A.    Claims And Parties**

13  12.    On August 29, 2007, this Court affirmed the Nevada Bankruptcy Court's order

14  confirming the USACM Plan under chapter 11 of the Bankruptcy Code over the objections of certain

15  Direct Lenders.  In that decision, among other things, this Court ruled that the "Bankruptcy Court's

16  confirmation order does not purport to interpret the LSAs to define Compass' contractual rights, or

17  lack thereof . . . [under the LSAs]," and that "[r]esolution of potential, future disputes regarding

18  Compass' rights under the LSAs are a matter of contract interpretation . . . ."  (Doc. 160 (Opinion) at

19  27/lines 3-8)  Compass received notice of the appeal and opted not to appear and assert a position

20  contrary to the ruling ultimately entered by this Court.  This 892 Case is the "future dispute"

21  anticipated by the Court's opinion.

22  13.    Among other things, Plaintiffs in the 892 Case sought to terminate Compass (and

23  later Asset Resolution) as servicers for the USACM Loans, sought declarations concerning the

24  measurement, timing, and amount of default-fee compensation that was due to be paid to those

25  servicers under the LSAs, and sought an accounting of loan collections and damages for "loan

26  servicer misconduct" based on those declarations.

27  14.    The original plaintiffs in the 892 Case were limited liability companies ("Plaintiff

28  LLCs") representing greater than 51 percent of the DL Interests in fifty two of the USACM Loans

- 5 -

which were the subject of USACM's sale to Compass.  The remaining purchased USACM Loans were either owned entirely by USACM (and then Compass) or were resolved without controversy. Although the Plaintiff LLCs were eventually dismissed from the 892 Case, the case continued to be prosecuted by and against several "loan captains" and "key people" associated with the fifty-two USACM Loans at issue in the litigation.  (832 Doc. 7 at 13-15; 09-15632 Transcript at 11/line 4)

15.    This Court has recognized that the LSAs and the Nevada statutes and regulations governing the LSAs created co-ownership interests in the same subject matter and a substantial identity, community, or mutuality of interests among all of the Direct Lenders and between the Direct Lenders and their servicers under the LSAs with respect to each USACM Loan which was the subject of the USACM sale.  (892 Doc. 1599 (Order) at 6)  The LSAs at issue in this 892 Case, and the legal and factual issues involving collections and the measurement and timing of payment of base servicing and other fees and servicer advances thereunder, were and are common to all Direct Lenders.

16.    The claims and defenses asserted with respect to the issues under the LSAs in this 892 Case were and are typical of those which would be asserted by all Direct Lenders.

17.    The Direct Lenders vigorously presented the issues in connection with the interpretation of the LSAs in this 892 Case.  The loan servicers under the LSAs also acted or refused to act on grounds that applied generally to all of the Direct Lenders in the USACM Loans.

18.    Inconsistent or varying adjudications with respect to the interpretation of the LSAs would establish incompatible standards of conduct for the loan servicers under the LSAs with respect to the same USACM Loan.

19.    For these reasons and others, the Court protected the interests of all parties to all of the LSAs by entering the Preliminary Injunction (which, as has been noted, was the result of a consolidation of various pending cases, including a core adversary proceeding brought by Compass to enforce the USACM Plan and related orders for which the automatic reference was withdrawn to this Court).

**B.    Preliminary Injunction/*In Rem* Jurisdiction**

20.    The Preliminary Injunction preserved the *status quo* pending adjudication of the issues raised in this consolidated 892 Case and applied to all Direct Lenders through the Court's exercise of *in rem* jurisdiction "over the [USACM] Loans and LSAs relating thereto."  (892 Doc. 199)  *See Morgan Stanley Mortgage Capital, Inc. v. Ins. Commission of State of Cal.*, 18 F.3d 790 (9th Cir. 1984).

21.    Paragraph 14 of the Preliminary Injunction expressly required service of the Preliminary Injunction on all Direct Lenders in the USACM Loans by mail and further provided that any Direct Lender who was not a named plaintiff in the 892 Case "must file a written objection with this Court stating the specific basis for such objection within fifteen (15) days of the date hereof, or such Direct Lender shall otherwise be bound by the terms hereof . . . ."  (892 Doc. 199 at 12, ¶ 14)

22.    As noted above, the Preliminary Injunction was mailed to all Direct Lenders in the USACM Loans.  No Direct Lenders filed an objection to the relief set forth in the Preliminary Injunction.  Nor did any named party in the 892 Case or any other Direct Lenders appeal issuance of the Preliminary Injunction.

23.    The Ninth Circuit Court of Appeals has affirmed this Court's amendment of the Preliminary Injunction to add Asset Resolution as the replacement servicer to Compass.  (892 Doc. 1877)  *See Cangelosi v. Silar Advisors, LP (In re USA Commer. Mortg. Co.)*, 397 F. App'x 300, 306 (9th Cir. 2010) (unpublished).

24.    The Ninth Circuit Court of Appeals has also affirmed this Court's application of the termination provision in the Preliminary Injunction as of January 10, 2010 to all of the LSAs purchased by Compass as to all Direct Lenders.  *See 3685 San Fernando Lenders LLC v. Cross Equities Partners, LLC, et al.*, No. 09-16897, Doc 88-1 at 10-13 (9/19/11).

25.    The Ninth Circuit has also ruled that, "to the extent any party would argue that the Preliminary Injunction improperly affected their underlying rights in the LSAs, . . . such argument [w]as waived because no party . . . appealed the entry of the original preliminary injunction."  *See 3685 San Fernando Lenders LLC v. Cross Equities Partners, LLC, et al.*, No. 09-16897, Doc 88-1 at 12, n.4 (9/19/11).

26.     The Preliminary Injunction was therefore binding on all parties to the USACM Loans servicing relationship from November 2007 onward.

**C.      Servicing And Collections Under The Preliminary Injunction**

27.     The Preliminary Injunction was entered in part in response to motions initially filed by Compass which sought to maintain Compass' position as servicer during the Post-USACM/Pre-Termination Servicing Period.  (10-725 Doc. 3773)

28.     The Preliminary Injunction provided the "exclusive authority of Compass to act directly on behalf of the Direct Lenders as servicer" for the loans *pendente lite* and provided a mechanism for terminating the servicing relationship by motion.  (892 Doc. 199 at 4, ¶¶ 1 & 2, and at 9, ¶ 8)

29.     Compass acted as the servicer of the USACM Loans from February 16, 2007 (the effective date of the sale by USACM) through September 26, 2008 (when Asset Resolution terminated Compass' rights under the MRA with respect to the LSAs and the USACM DL Interests).  During those periods, the Direct Lenders sought in the 892 Case to terminate that servicing relationship in order to obtain day-to-day control over the management and collection of the USACM Loans and the protection of the underlying collateral (through, for example, payment of taxes, maintenance costs, and the like).

30.     This Court has ruled that Silar was vicariously liable to certain Direct Lenders on certain USACM Loans for acts by Compass relating to the servicing of USACM Loans because the MRA established a principal-agency relationship between Silar and Compass with respect to those matters.  Although the MRA cannot shield Silar from *respondeat superior* liability for servicer-related conduct of Compass, Silar is not vicariously liable for any acts or omissions of Compass which either took place before the MRA was executed (February 16, 2007), which were performed outside the scope of the agency under the MRA, and/or which were undertaken for Compass' own account.  This means, for example, that Silar is not liable for purchases of DL Interests by Compass or its affiliates or for any debts incurred by Compass to third parties hired or retained by Compass to assist Compass in the performance of Compass's duties to Silar or the Direct Lenders.

31.     As this Court has ruled, as a result of the assignment by Silar to Asset Resolution and the termination of Compass' rights under the MRA and related agreements by Asset Resolution as of September 26, 2008, as well as the Court's ensuing order joining Asset Resolution as a party to the 892 Case and the Preliminary Injunction:  (a) Asset Resolution became the holder of the servicing rights and the DL Interests originally received by Compass through the purchase and sale transaction with the USACM estates; and (b) Asset Resolution, not Silar, became the owner of the servicing rights (and related receivables accrued thereunder) for the USACM Loans from September 26, 2008 through January 19, 2010.

**D.     The Preliminary Injunction "Waterfall" Procedure**

32.     The Preliminary Injunction set forth detailed procedures for handling loan collections when there was a payment in full, a "consensual discounted payoff," or a "non-consensual discounted payment."  (892 Doc. 199 at 6-8, ¶¶ 4-7)

33.     The segregation of collections into various categories:  (a) allowed Compass and Asset Resolution to withdraw servicer advances and base servicing fees chargeable against the accounts of all Direct Lenders in the USACM Loans without further Court order; (b) allowed Compass and Asset Resolution to withdraw payments for all "Compass Fees" (even default interest, late fees, and other non-base-servicing fees) chargeable against their own DL Interests AND against the DL Interests of any other Direct Lenders who did not object per the LSAs to the treatment proposed by Compass or Asset Resolution; (c) required Compass and Asset Resolution to set aside the default interest, late fees, and other non-base servicing fees which were in "dispute" because the Direct Lenders in question did not consent to the payment of such fees as proposed by the loan servicer ("Disputed Fees"); and (d) allowed Compass and Asset Resolution to distribute payments to themselves and other Direct Lenders for their DL Interests.

34.     On November 15, 2007, Compass filed an accounting of loan collections and disbursements with the Court as required by section 9 of the Preliminary Injunction (the "Compass Accounting").  (892 Doc. 216)  No objections to that accounting were asserted by any Direct Lenders.  Section 6(d) of the Preliminary Injunction allowed Compass and Asset Resolution to receive fees with respect to DL Interests they owned and/or with respect to DL Interests held by

persons who did not object to paying such fees. Also, with the exception of the Gess Loan (where the Court directly ruled upon the allocation of cash from the liquidation of that loan), no Direct Lenders asserted any objections in this Court to any base servicing fees taken by Compass or Asset Resolution under the Preliminary Injunction and/or the LSAs. In fact, the original Complaint filed by Plaintiffs in the 892 Case acknowledged that "[p]ursuant to Section 5 of the Loan Servicing Agreement, the loan servicer had the right to retain, as compensation for servicing loans a servicing fee varying between 1-3% per annum." (*See* 241 Doc. 1, paragraph 56)  This allegation was essentially reiterated in paragraph 45 of the Third Amended Complaint filed in the 892 Case. (892 Doc. 1499)

35.   Compass and Asset Resolution (respectively) – and not Silar – were responsible for retaining any base servicing fees and other payments from USACM Loan collections during the Post-USACM/Pre-Termination Servicing Period.

**III.**

**DEFENDANTS' RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW**

**A.**   **Relevant Legal Standard**

In reviewing a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), the Court "may not make credibility determinations or weigh the evidence," but "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (internal quotations and citations omitted).  "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *See id.* (internal quotations and citation omitted).  The Court must review the jury's verdict for substantial evidence and uphold it if "evidence adequate to support the jury's conclusion [exists], even if it is also possible to draw a contrary conclusion." *See id.* at 961, 963 (internal quotations and citation omitted).

A renewed motion for judgment as a matter of law under Rule 50(b) "is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *See id.* at 961.  Thus, a Rule 50(b) motion cannot properly raise arguments that were not raised in the pre-verdict Rule 50(a) motion.

1   *See id.*; *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 (9th Cir. 2009)

2   ("[W]e strictly construe the procedural requirement of filing a Rule 50(a) motion before filing a Rule

3   50(b) motion.") (precluding review of Rule 50(b) motion due to party's failure to file a Rule 50(a)

4   motion; noting trial brief and motion for summary judgment were insufficient to constitute a proper

5   Rule 50(a) motion).

6          Nevertheless, the Court may review a jury's verdict based on arguments made in a Rule

7   50(b) motion that were not previously raised in a Rule 50(a) motion for plain error.  *See E.E.O.C.*,

8   581 F.3d at 961.  In that event, reversal is warranted "only if such plain error would result in a

9   manifest miscarriage of justice."  *See id.* (internal quotations and citations omitted).  Plain error

10  review "permits only extraordinarily deferential review that is limited to whether there was *any*

11  evidence to support the jury's verdict."  *See id.* at 961-62 (internal quotations and citations omitted;

12  emphasis in original).

13  **B.     Substantial Evidence Supports Compass's And Blatt's Liability For Conversion.**

14         Under Nevada law, conversion occurs "when a tortfeasor takes possession, sells the property,

15  and pockets the proceeds of the sale," or makes an unjustified claim of title to property that causes

16  actual interference with the owner's rights of possession therein.  *See Scaffidi v. United Nissan*, 425

17  F. Supp. 2d 1159, 1168 (D. Nev. 2005).  Moreover, "conversion is an act of general intent, which

18  does not require wrongful intent and is not excused by care, good faith, or lack of knowledge."  *See*

19  *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000).  Thus, the mere return of

20  converted property does not eliminate one's liability for conversion.  *See id.* at 1049.

21         Compass and Blatt contend that their retention of proceeds from USACM Loans that were

22  later determined by the Court to be owed to the Direct Lenders, not the loan servicers under the

23  LSAs, does not constitute conversion.  Even assuming *arguendo* that Compass and Blatt have

24  properly characterized the trial evidence in this regard (which they have not, *see infra* section

25  III.C.2), their contention is belied by Nevada law.  *See Evans*, 5 P.3d at 1048-49.  Nor is their

26  contention supported by *Wantz v. Redfield*, 326 P.2d 413, 414 (Nev. 1958), on which they rely.

27  Contrary to their contention, *Wantz* does not stand for the proposition that conversion occurs only

28  upon the taking of "specifically identifiable, hard currency."  Rather, *Wantz* confirms that "no

clearer example" of conversion is when one retains the proceeds from the sale of another's property. *See id.* That is precisely what plaintiffs, by substantial evidence, proved occurred in connection with the Bay Pompano, Shamrock, and Standard Property Loans. *See infra* section III.C.2, D, E, F.1.

The Court also rejects Blatt's contention that he cannot be held liable for conversion merely because he was not specifically named as a defendant on that claim in the Second Amended Complaint. *See* FED. R. CIV. P. 54(c) ("Every other final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").[1] As a managing member of Compass, Blatt is personally liable for engaging in the conversion that plaintiffs proved was committed by Compass. *See Pocahontas First Corp. v. Venture Planning Group, Inc.*, 572 F. Supp. 503, 508 (D. Nev. 1983) ("There is no doubt that an individual who commits a tort while acting in the capacity of a corporate officer may be held personally liable."); *Marino v. Cross Country Bank*, No. C.A.02-65-GMS, 2003 WL 503257, at *7 (D. Del. Feb. 14, 2003) ("Corporate officers are liable for their tortious conduct even if they were acting officially for the corporation in committing the tort. A corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant.") (applying Delaware law; internal quotations and citation omitted). Accordingly, the Court denies Compass's and Blatt's Rule 50(b) motions with respect to plaintiffs' conversion claim.

---

[1] Although Compass and Blatt were in default, the Court permitted them to appear at trial and defend against plaintiffs' request for damages. Because their default was as to Plaintiffs' Second, not Third, Amended Complaint, the following ten plaintiffs who were first added as party plaintiffs in the Third Amended Complaint are not included in the damages awarded by the jury against Compass and Blatt. Those ten plaintiffs are: Tony Chaudry (Joy Investment, a Nevada Corporation); Kevin Olsen (Universal Management, a Nevada Corporation); Robin Graham (Robin B. Graham & Celia Allen-Graham Trustees of the Graham Family Trust dated 1 0/26/78); Ed Schoonover (Edward L. Schoonover & Susan A. Schoonover Co-Trustees of The Schoonover Family Trust dated 2/23/04); Cyril Tammadge (Preswick Corp., a Nevada Corporation); Stan Tara (Sovereign Capital Advisors, LLC, a Nevada limited liability company); Carol Kesler (Carol Mortenson Trustee of the Carol Mortensen Family Trust dated 9/9/90); Christina Knoles (G. Robert Knoles and Christina G. Knoles husband and wife as joint tenants with rights of survivorship); Daniel Newman (Daniel D. Newman Trustee of the Daniel D. Newman Trust dated 11/1/92); and Ken Zawacki (Zawacki, a California LLC).

**C.**  **Substantial Evidence Supports Compass's And Blatt's Liability For Tortious Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

Compass and Blatt argue that they are entitled to judgment as a matter of law on plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing because:  (i) a required "special relationship" did not exist between the parties; and (ii) the "genuine dispute doctrine" applies to defendants' actions.  The Court concludes that Compass's and Blatt's arguments are without merit.

**1.**  **A special relationship existed between the parties.**

The LSAs give rise to an implied covenant of good faith and fair dealing in tort.  The LSAs (as well as the documentation concerning the USACM Loans) were expressly governed by Nevada law.  Thus, Compass and Blatt were obligated to comply with Nevada law pertaining to the servicing of the USACM Loans.   Nevada law precluded Compass and Blatt from placing their financial interests above those of the Direct Lenders, for whom they were servicing the USACM Loans pursuant to the LSAs.

The LSAs did not create a general fiduciary duty for the loan servicers under the LSAs; rather, the LSAs created a duty to exercise reasonable business judgment.  The LSAs do not describe the relationship between the parties as fiduciary in nature, but instead incorporate a reasonable business person standard.  Where a borrower defaults in making payments under a promissory note, the LSAs provide:

> In the event the Borrower fails to make payment to USA[CM] as required by the terms of the note, USA[CM] will take steps to collect the payment including, but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA[CM] in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

Where, as here, a loan servicer is obligated to perform under a contract using its reasonable business judgment, a fiduciary duty is not created.  *See First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Trust Co.*, 919 F.2d 510, 514 (9th Cir 1990) (no fiduciary duty where parties are obligated to make decisions "in good faith and in a reasonable manner" because "these provisions

are more indicative of a typical business relationship among equally sophisticated entities dealing at arm's length than of a fiduciary relationship").   An agent must expressly assume fiduciary obligations and such an assumption must be the intent of the parties.  *See So. Pac. Thrift & Loan Ass'n v. Sav. Ass'n Mortgage Co.*, 70 Cal. App. 4th 634 (Cal. Ct. App. 1999) (holding that the loan servicer did not act as fiduciary to lenders except where it expressly agreed to assume fiduciary duties to lenders).  Thus, because the parties did not express their mutual intent for the loan servicer under the LSAs to assume fiduciary duties, the LSAs imposed on the loan servicer only an agency responsibility to exercise reasonable business judgment on behalf of the Direct Lenders in connection with its servicing of the USACM Loans.

Notwithstanding the foregoing, however, under Nevada law Compass and Blatt were agents of, and therefore owed fiduciary obligations to, the Direct Lenders when handling funds and taking title to real property received on account of the Direct Lenders.  *See, e.g., Young v. Nev. Title Co.*, 744 P.2d 902, 903 (Nev. 1987) (affirming determinations that mortgage broker who failed to give lenders the payoffs from individual borrowers' loans was an agent); *LeMon v. Landers*, 402 P.2d 648, 649 (Nev. 1965) ("An agent . . . owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."); *Jory v. Bennight*, 542 P.2d 1400, 1403 (Nev. 1975) ("[H]is fiduciary duties . . . include obligations of the utmost good faith, diligence, loyalty, fair dealing, and disclosure of material facts.").  Indeed, under sections 654A.020 and 645A.041 of the Nevada Revised Statutes, Compass, Blatt, and their contracted sub-servicers were escrow agents under Nevada law that were required to be licensed and bonded thereunder to collect payments on the USACM Loans for the benefit of the Direct Lenders.

Moreover, because Compass and Blatt had a fiduciary relationship with the Direct Lenders when handling funds and taking title to real property received on account of the Direct Lenders, Nevada law precluded Compass and Blatt from engaging in grievous and perfidious misconduct pursuant to the implied covenant of good faith and fair dealing in the LSAs.  *See Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324-26 (Nev. 2009) ("A violation of the covenant [the implied covenant of good faith and fair dealing] gives rise to a bad-faith tort claim [against insurers]. . . . This duty to adequately inform an insured arises from the special relationship between the insured and the

insurer, which is similar to a fiduciary relationship.  Although this court has refused to adopt a standard where an insurance company must place the insured's interests over the company's interests, the nature of the relationship requires that the insurer adequately protect the insured's interest.  Thus, at a minimum, an insurer must equally consider the insured's interests and its own.") (internal citations omitted); *Ins. Co. of the W. v. Gibson Tile Co.*, 134 P.3d 698, 702-03 (Nev. 2006) ("Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for breach of the covenant arises only 'in rare and exceptional cases' when there is a special relationship between the victim and tortfeasor.  A special relationship is 'characterized by elements of public interest, adhesion, and fiduciary responsibility.' . . . We have recognized that in these situations involving an element of reliance, there is a need to 'protect the weak from the insults of the stronger' that is not adequately met by ordinary contract damages.  In addition, we have extended the tort remedy to certain situations in which one party holds 'vastly superior bargaining power.' . . . The insurer-insured relationship is fiduciary in nature, and a jury's finding of a breach of fiduciary duty may support the finding of bad faith.  Misrepresenting or concealing facts to gain an advantage over the insured constitutes a breach of fiduciary responsibility.") (internal citations omitted); *LeMon*, 402 P.2d at 649 ("The object of the agency is to ensure the transaction of the business of the principal to his best advantage.  An agent will not be permitted to pervert his authority to his own personal gain in severe hostility to the interests of his principal.").

Thus, Nevada law precluded Compass and Blatt from elevating their interests above the interests of the Direct Lenders for whom they were servicing the USACM Loans pursuant to the LSAs.  In other words, Compass and Blatt could not seek to retain default interest and late charges as loan servicing compensation from collected funds in derogation of the right of the Direct Lenders to be repaid first their principal and all accrued regular interest due and owing under the USACM Loans.  That is because a special relationship existed between the loan servicer under the LSAs and the Direct Lenders, for the following two reasons:  (i) although the loan servicing relationship between the parties generally gave rise to contractual duties, Compass and Blatt also owed fiduciary duties to the Direct Lenders when handling funds or holding title to real property on their behalf; and (ii) because each of the USACM Loans could have hundreds of different Direct Lenders as investors,

Compass and Blatt were the only ones who could preserve, protect, and collect the Direct Lenders' interests in the USACM Loans and the underlying collateral.  Accordingly, just as Nevada law recognizes that a special relationship exists between an insurer and an insured, so too does Nevada law provide that a special relationship existed between the loan servicers under the LSAs and the Direct Lenders.[2]

### 2. Compass and Blatt acted in bad faith.

The Court finds that plaintiffs presented substantial evidence that Compass's and Blatt's actions in connection with the Bay Pompano, Shamrock, and Standard Property Loans were not reasonable, but undertaken in bad faith.  Thus, notwithstanding Compass's and Blatt's characterizations of the evidence as not supporting the jury's verdict, the Court denies their Rule 50(b) motions with respect to plaintiffs' claim for violation of the implied covenant of good faith and fair dealing in tort.  *See E.E.O.C.*, 581 F.3d at 961, 963; *see also Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956-57 (Nev. 1999) (affirming jury's finding of bad faith because substantial evidence of bad faith was presented to the jury; concluding that the insurer's "absurd interpretation" of the insurance contract was unreasonable and did not shelter it from bad faith liability).

### a. The Bay Pompano and Shamrock Loans.

Compass and Blatt argue that they acted reasonably in relying on the advice of counsel, USA Commercial's chapter 11 plan and "Confirmation Order," the language of the LSAs, and the lack of any challenge to their servicing fee calculations in taking millions of dollars as loan servicing compensation in connection with the Bay Pompano and Shamrock Loans.  Defendants' arguments misstate the trial evidence on which the jury awarded damages to plaintiffs.  Specifically:

- plaintiffs' Shamrock damages claim was based on the $2.3 million in net sale proceeds – which amount was derived by first deducting the servicing fees and servicer advances actually taken by Compass – that were not properly

---

[2] On May 26, 2009, the Nevada Legislature enacted a new statute that expressly imposes a "fiduciary obligation" on Nevada licensed mortgage brokers.  *See* Nev. Rev. Stat. § 645B.0147.  That statute defines a "fiduciary obligation" to mean "a duty of good faith and fair dealing."  *See id.*, § 645B.0147(3).

accounted for and paid to the Direct Lenders, including plaintiffs (Trial Tr. at 367:10-370:16; Trial Exs. 171, 302A, 2759); and

- plaintiffs' Bay Pompano damages claim was based on Compass's failure, in early April 2007, to disclose to the Direct Lenders, including plaintiffs, and accept the borrower's proposal to repay the unpaid principal balance and all due and owing accrued regular interest because that offer waived the repayment of substantial default interest and late fees, as a result of which plaintiffs were damaged in the amount of their fractional share of the servicing fee and servicer advances that Compass thereafter purported to accrue (Trial Tr. at 728:15-751:18; Trial Exs. 85, 94, 149, 168, 286, 287).

Thus, the Court finds that plaintiffs presented substantial evidence of Compass's and Blatt's bad faith in taking the Shamrock sale proceeds, and in not resolving the Bay Pompano Loan in April 2007.

> **b.     The Standard Property Loan.**

Compass and Blatt maintain that they acted reasonably in taking over $870,000 as default interest and late fees from the borrower's payoff of the Standard Property Loan because:  (i) the Court did not decide until trial that all due and owing accrued regular interest (as well as the unpaid principal balance) had to be repaid first before defendants could collect default interest and late fees; and (ii) Compass relied on the advice of counsel in taking default interest and late fees in priority to the repayment of the Direct Lenders' unpaid principal balance and due and owing accrued regular interest.  Plaintiffs, however, proved at trial that Compass and Blatt failed to disclose to plaintiffs that:

- the Standard Property borrower was initially willing to repay 100% of the unpaid principal balance of the Loan, even though Compass sought the Direct Lenders' consent to accept a discounted payoff of only 90% of the unpaid principal balance;

- the Standard Property borrower later agreed to repay 100% of the unpaid principal balance of the Loan, plus an additional $870,000 in purported default interest and late fees; and

- the Standard Property borrower would pay an additional $870,000 to resolve the Loan, even though Compass agreed as a Standard Property Direct Lender to accept repayment of only 100% of the unpaid principal balance and to waive repayment of any due and owing regular accrued interest.

(Trial Tr. at 1232:6-1267:25, 1283:7-1286:8, 1312:21-1315:6, 1649:2-1653:2; Trial Exs. 42, 70, 73, 76, 77, 145, 160, 232)

Plaintiffs also proved at trial that Compass and Blatt acted contrary to the terms of the Standard Property promissory note, which first required the repayment of all due and owing accrued regular interest absent the Direct Lenders' informed consent to allocate the borrower's payments to the unpaid principal balance.  (Trial Tr. at 1218:15-1219:15, 1448:6-1449:4; Trial Ex. 27)  Thus, plaintiffs presented substantial evidence of Compass's and Blatt's bad faith failure to disclose material information to plaintiffs in connection with the Standard Property Loan.  It is, therefore, irrelevant whether Compass and Blatt otherwise purported to act reasonably in taking default interest and late fees in priority to the repayment of due and owing accrued regular interest in March 2007.  Accordingly, the Court denies Compass's and Blatt's Rule 50(b) motions with respect to plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing.

**D.  Substantial Evidence Supports Compass's And Blatt's Liability For Breaching Their Fiduciary Duties.**

The Court rejects Compass's and Blatt's contention that they are entitled to judgment as a matter of law on plaintiffs' breach of fiduciary duty claim based on their purported good faith in taking certain USACM Loan proceeds as default interest, late fees, and servicing fees.  As previously discussed, plaintiffs presented substantial evidence of Compass's and Blatt's failure to make material disclosures and proper accountings to the Direct Lenders in connection with the Bay Pompano, Shamrock, and Standard Property Loans.  *See supra* section III.C.2.  The Court finds that those failures were not a "good faith allocation of amounts collected from a borrower," as Compass

and Blatt improperly contend.   Rather, as the jury was justifiably permitted to conclude, they constituted reprehensible breaches of fiduciary duties by Compass and Blatt.  *See LeMon*, 402 P.2d at 649 ("An agent . . . owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."); *Jory*, 542 P.2d at 1403 ("[H]is fiduciary duties . . . include obligations of the utmost good faith, diligence, loyalty, fair dealing, and disclosure of material facts.").[3]

The Court also rejects Blatt's contention that they are entitled to judgment as a matter of law on plaintiffs' breach of fiduciary duty claim because plaintiffs purportedly failed to prove that he misappropriated USACM Loan proceeds in his individual capacity, as opposed to in his capacity as an agent for Compass.   As previously indicated, Blatt, as a managing member of Compass, is personally liable for engaging in Compass's breaches of fiduciary duties, regardless of whether he actually realized any personal gain from his misconduct.  *See Jory*, 542 P.2d at 1403 ("He remained a real estate broker, although licensed to serve clients on behalf of a corporation.  Like any broker, Jory had fiduciary duties to those he had undertaken to serve in a professional capacity . . . . Therefore if Jory, through his own professional misconduct or neglect, breached fiduciary obligations owed to Bennight, he is personally responsible for consequent harm, and operating in the corporate form does not insulate him from such liability."); *Pocahontas First Corp.*, 572 F. Supp. at 508; *Marino*, 2003 WL 503257, at *7.  The Court finds that plaintiffs presented substantial evidence of Blatt's involvement in Compass's failure to:  (i) account for and pay significant proceeds from the Shamrock and Standard Property Loans to plaintiffs; and (ii) disclose the Bay Pompano borrower's settlement proposal in April 2007.  (Trial Tr. at 367:10-370:16, 728:15-751:18, 1232:6-1267:25, 1283:7-1286:8, 1312:21-1315:6, 1649:2-1653:2, 2127:2-2129:7, 2661:2-2676:2, 2699:10-2670:12, 2937:2-23; Trial Exs. 42, 70, 73, 76, 77, 85, 94, 103, 145, 149, 160, 168, 171, 232, 286, 287, 302A, 2759, 2760)  Indeed, Compass and Blatt do not dispute that such substantial evidence exists with respect to Compass's breaches of fiduciary duties.  (Doc. #2045 at 9-14)  Accordingly, the Court

---

[3] The jury also found Compass and Blatt liable for breaching their fiduciary duties to plaintiffs with respect to the Gess and Gramercy Loans, but awarded no damages to plaintiffs for that misconduct. (Doc. #2010 at 2, 5).

1  denies Compass's and Blatt's Rule 50(b) motions with respect to plaintiffs' breach of fiduciary duty

2  claim.

3  **E.      Substantial Evidence Supports Compass's And Blatt's Liability For Civil Conspiracy.**

4          The Court finds that plaintiffs presented substantial evidence of Compass's business plan,

5  pursuant to which the jury was entitled to conclude that Compass and Blatt engaged in a civil

6  conspiracy to further their economic interests in connection with the USACM Loans to the financial

7  detriment of the Direct Lenders.   Specifically, plaintiffs presented substantial evidence of the

8  remarkable financial motivations that drove Compass to conspire to place its interests in the

9  proceeds from the USACM Loans in priority to those of the Direct Lenders – *i.e.*, Compass's burden

10  to repay significant interest to Silar, and Blatt's profit participation compensation method.  (Trial Tr.

11  at   2701:21-2710:22,   2729:21-2730:19,   2734:14-2741:1,   2745:17-2748:21,   2761:15-2763:20,

12  2765:5-2774:24, 2933:12-2936:24; Trial Exs. 63, 326, 327, 328, 329, 330)  Under Nevada law, a

13  conspiracy claim is cognizable when, as here, corporate employees or agents act as individuals for

14  their individual advantage, not merely in their official capacities on behalf of the corporation.  *See*

15  *Collins v. Union Fed. Sav. & Loan Ass'n*, 622 P.2d 610, 622 (Nev. 1983); *see also Pocahontas First*

16  *Corp.*, 572 F. Supp. at 508; *Jory*, 542 P.2d at 1403; *Marino*, 2003 WL 503257, at *7.  Accordingly,

17  the Court denies Compass's and Blatt's Rule 50(b) motion with respect to plaintiffs' civil conspiracy

18  claim.

19  **F.      Substantial Evidence Supports Compass's And Blatt's Liability For Punitive Damages.**

20          **1.      Plaintiffs proved their entitlement to an award of punitive damages.**

21          Under Nevada law, punitive damages may be awarded upon clear and convincing evidence

22  of fraud, oppression, or malice, express or implied.  *See* NEV. REV. STAT. § 42.005(1).  For punitive

23  damages purposes, Nevada law defines:  (i) "oppression" to mean despicable conduct that subjects a

24  person to cruel and unjust hardship with conscious disregard of the rights of the person; (ii) "fraud"

25  to be an intentional misrepresentation or concealment of a material fact with the intent to deprive

26  another person of his or her rights or property; (iii) "malice, express or implied" to be despicable

27  conduct which is engaged in with a conscious disregard of the rights or safety of others; and (iv)

28  "conscious disregard" to mean knowledge of the probable harmful consequences of a wrongful act

and a willful and deliberate failure to act to avoid those consequences.  *See* NEV. REV. STAT. § 42.001.  Nevada law permits vicarious liability for punitive damages when a principal adopts or ratifies its agent's wrongful act for which punitive damages are awarded, or is personally guilty of fraud, oppression, or malice, express or implied.  *See* NEV. REV. STAT. § 42.007(1); *Smith's Food & Drug Ctrs., Inc. v. Bellegarde*, 958 P.2d 1208, 1214 (Nev. 1998), *overruled in part by Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252-58 (Nev. 2008).

The Court finds that the jury was entitled to conclude that, by clear and convincing evidence, Compass and Blatt were liable for punitive damages.  Specifically, plaintiffs presented substantial evidence of Compass's and Blatt's intentional misrepresentations and concealment of material information to deprive plaintiffs of their property, as well as their despicable conduct with conscious disregard of plaintiffs' property rights.  *See* NEV. REV. STAT. §§ 42.001, 42.005(1).  Among other clear and convincing evidence, plaintiffs proved that:

- with respect to the Standard Property Loan, Compass wrongly retained over $870,000 in Loan proceeds pursuant to a secret side deal with the borrower that they did not disclose to plaintiffs (Trial Tr. at 1256:11-1267:25, 1283:7-1286:8, 1312:21-1315:6, 1649:2-1653:2; Trial Exs. 73, 76, 77, 103);

- with respect to the Shamrock Loan, Compass (i) facilitated a "friendly" third party's purchase of substantially discounted fractional beneficial loan interests even though Compass knew that the collateral securing the Loan was worth millions of dollars more than the Loan's unpaid principal balance, (ii) initiated foreclosure proceedings on the other Tracy Suttles loans – Anchor B, Gess, and Gramercy – in an effort to acquire title to the valuable Shamrock property, and (iii) failed to account for and improperly retained millions of dollars in proceeds from the sale of the Shamrock property (Trial Tr. at 340:10-342:10, 348:22-357:20, 367:10-370:16, 405:22-414:15, 1315:16-1317:7, 2779:18-2791:25; Trial Exs. 81, 97, 103, 148, 171, 302A, 314, 2759); and

- with respect to Bay Pompano Loan, Compass failed, in early April 2007, to disclose to the Direct Lenders and accept the borrower's proposal to repay the

unpaid principal balance and all accrued regular interest because that offer waived the repayment of substantial default interest and late fees, causing plaintiffs to be damaged in the amount of their fractional share of the servicing fee and servicer advances that Compass thereafter purported to accrue (Trial Tr. at 728:15-751:18; Trial Exs. 85, 94, 149, 168, 286, 287).

Further, in addition to the evidence of Compass's business plan pursuant to which the foregoing wrongful acts were undertaken, *see supra* section III.E, plaintiffs also proved that Compass and Blatt specifically intended to deprive the Direct Lenders of their property:

- Abel Godines and Carol Kesler both testified about an overheard courthouse conversation involving Blatt in which he discussed those very intentions in quite vulgar terms (Trial Tr. at 181:16-183:8, 314:25-315:13); and

- Ms. Kesler, Daniel Newman, Christina Knoles, and Ms. Cangelosi each testified regarding the repeated statements separately made to them by Len Mezei, the principal of Compass, including that he purchased "a bag of money" and "a stolen wallet," that he was taking only a little money ($5,000 - $10,000) from each of the Direct Lenders but it was substantial money to him because of the enormous number of Direct Lenders, and that he did not need to alter his perspective on what he was entitled to from the Loans because he had superior litigation funding and better lawyers and the Direct Lenders were unorganized and individually "weak" (Trial Tr. at 331:10-334:6, 1317:10-1320:20, 1623:6-1624:23, 1924:8-1935:6).

Thus, plaintiffs presented substantial evidence of Compass's and Blatt's liability for punitive damages.

### 2.   **The jury verdict form was not plainly erroneous.**

Compass and Blatt also raise in their Rule 50(b) motion that the jury's punitive damages award is unconstitutionally vague. That issue was not raised by Compass and Blatt in their Rule 50(a) motion or at trial. (Doc. #1983) Therefore, the Court reviews that issue for plain error resulting in a miscarriage of justice. *See E.E.O.C.*, 581 F.3d at 961; *see also* FED. R. CIV. P. 51(d).

- 22 -

The Court denies Compass's and Blatt's argument that the jury's punitive damages awards are unconstitutionally vague.  Compass and Blatt cite no authority in support of their assertion that the jury's purportedly unconstitutionally vague punitive damages awards constitute plain error resulting in a miscarriage of justice.  (Doc. #2045 at 15 n.13)  Compass's and Blatt's contention is also inconsistent with their assertion that the constitutionality of the ratio between the jury's compensatory and punitive damages awards should be assessed by comparing the aggregate amounts of those awards.  (*Id.* at 16-20)

Moreover, Compass's and Blatt's misconduct with respect to each of the three Loans for which the jury awarded compensatory damages against them was independently sufficient to justify the jury's punitive damages awards, *see supra* section III.F.1, and Nevada law allows punitive damages to be awarded for each of the tort claims for which Compass and Blatt were found liable by the jury, *see supra* section III.F.2.a.  In addition, the jury was properly entitled to assess lump sum punitive damages by defendant, rather than by USACM Loan and/or by plaintiff.  *See infra* section IV.D.3.c.  Thus, the Court finds that the jury's lump sum punitive damages awards by defendant are not plainly erroneous resulting in a manifest miscarriage of justice.

## IV.

## DAMAGES AWARDS

The Court has ordered that plaintiffs recover from Compass and Blatt the amounts listed below, plus postjudgment interest at the rate of ___%, along with costs.  This action was tried by a jury with Judge Robert C. Jones presiding, and the jury has rendered a verdict.

**A.**     **Compensatory Damages**

   **1.**     **Bay Pompano**

The jury found, among other things, Compass and Blatt jointly and severally liable for damages in connection with the Bay Pompano Loan in the total amount of $2,103.81.  Based on plaintiffs' fractional beneficial interests in the Bay Pompano Loan, the jury's damages award is allocated to plaintiffs, as follows:

| Plaintiff | Amount |
|---|---|
| Kevin Kehl (Kevin Kehl, a married man dealing with his sole & separate property) | $168.57 |
| Kevin Kehl (Andrew) (Kevin Kehl Custodian For Andrew R. Kehl UNVUTMA) | $11.24 |
| Kevin Kehl (Susan) (Kevin Kehl Custodian For Susan L. Kehl UIAUTMA) | $11.24 |
| Robert A. & Tina M. Kehl (Robert A. Kehl & Tina M. Kehl, husband & wife, as joint tenants with right of survivorship) | $449.53 |
| Patrick Anglin (Patrick J. Anglin, an unmarried man) | $56.19 |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $224.77 |
| Christina M. Kehl (Christina M. Kehl, an unmarried woman) | $224.77 |
| **SUBTOTAL:** | **$1,146.31** |

**2.     Shamrock**

The jury found, among other things, Compass and Blatt jointly and severally liable for damages in connection with the Shamrock Loan in the total amount of $23,169.67.

**3.     Standard Property**

The jury found, among other things, Compass and Blatt jointly and severally liable for damages in connection with the Standard Property Loan in the total amount of $27,291.54.  Based on plaintiffs' fractional beneficial interests in the Standard Property Loan, the jury's damages award is allocated to plaintiffs, as follows:

| Plaintiff | Amount |
|---|---|
| Death Valley Acquisitions LLC (Mojave Canyon, Inc., A Nevada Corporation, J.B. Partain, President) | $9,097.18 |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $7,277.74 |
| **SUBTOTAL:** | **$16,374.92** |
| **TOTAL:** | **$17,521.23** |

Other than the foregoing allocated damages awards, none of the other 52 plaintiffs (including the ten plaintiffs who were not named as parties in the Second Amended Complaint) are entitled to any compensatory damages awards based on the jury's verdict.  Among those other plaintiffs who

1   are not entitled to any damages is Rodger Stubbs, who shall take nothing against Compass and Blatt

2   because no evidence was offered at trial showing that he was a Direct Lender or was otherwise

3   entitled to obtain either declaratory relief or damages.

4   **B.     Prejudgment Interest**

5          **1.      Relevant legal standard.**

6          Because this action was commenced based on diversity jurisdiction, Nevada's prejudgment

7   interest rates apply.  *See D.E. Shaw Laminar Portfolios, LLC v. Archon Corp.,* No. 2:07-CV-01146-

8   PMP-LRL, 2010 WL 5178005, at *5 (D. Nev. Dec. 22, 2010) ("In diversity actions, the award of

9   prejudgment interest is governed by state law.") (citing *In re Cardelucci,* 285 F.3d 1231, 1235 (9th

10  Cir. 2002)).  In Nevada, "[t]hree items must be determined to enable the trial court to make an

11  appropriate award of interest:  (1) the rate of interest; (2) the time when it commences to run; and (3)

12  the amount of money to which the rate of interest must be applied."  *See id.* (quoting *Kerala Props.,*

13  *Inc. v. Familian*, 137 P.3d 1146, 1149 (Nev. 2006)).

14         Under Nevada law, in the absence of an agreed term in a contract fixing a different rate of

15  interest, the rate of prejudgment interest is the prime rate at the largest bank in Nevada on January 1

16  or July 1 immediately preceding the date of the transaction, plus two percent.  *See* NEV. REV. STAT. §

17  99.040(1); *D.E. Shaw Laminar Portfolios*, 2010 WL 5178005, at *5-6.  Interest runs from the time

18  the cause of action accrues, with a biannual adjustment based on the prime interest rate, and accrues

19  until the date of judgment.  *See Ramada Inns, Inc. v. Sharp*, 711 P.2d 1, 2 (Nev. 1985)

20  ("Prejudgment interest is viewed as compensation for use by defendant of money to which plaintiff

21  is entitled from the time the cause of action accrues until the time of judgment; it is not designed as a

22  penalty.").

23         **2.      Plaintiffs are entitled to an award of prejudgment interest.**

24         The Court concludes that plaintiffs are entitled to an award of prejudgment interest with

25  respect to the four Loans for which the jury awarded compensatory damages.  The rate of interest is

26  determined by Nevada state law, the time when prejudgment interest commences to run is based on

27  the dates that the three USACM Loans at issue were resolved – Bay Pompano:  August 28, 2008;

28  Shamrock:  March 12, 2008; and Standard Property:  March 20, 2007 – and is not in dispute, and the

amount of money to which the rate of interest applies was determined by the jury.  Accordingly,

plaintiffs are entitled to the following amounts of prejudgment interest:

        **a.**    **<u>Bay Pompano</u>**

| Plaintiff | Amount |
|---|---|
| Kevin Kehl (Kevin Kehl, a married man dealing with his sole & separate property) | $24.47 through 6/30/2011, and $0.015 daily from 7/1/2011-entry of judgment |
| Kevin Kehl (Andrew) (Kevin Kehl Custodian For Andrew R. Kehl UNVUTMA) | $1.63 through 6/30/2011, and $0.001 daily from 7/1/2011-entry of judgment |
| Kevin Kehl (Susan) (Kevin Kehl Custodian For Susan L. Kehl UIAUTMA) | $1.63 through 6/30/2011, and $0.001 daily from 7/1/2011-entry of judgment |
| Robert A. & Tina M. Kehl (Robert A. Kehl & Tina M. Kehl, husband & wife, as joint tenants with right of survivorship) | $65.24 through 6/30/2011, and $0.040 daily from 7/1/2011-entry of judgment |
| Patrick Anglin (Patrick J. Anglin, an unmarried man) | $8.16 through 6/30/2011, and $0.005 daily from 7/1/2011-entry of judgment |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $32.62 through 6/30/2011, and $0.020 daily from 7/1/2011-entry of judgment |
| Christina M. Kehl (Christina M. Kehl, an unmarried woman) | $32.62 through 6/30/2011, and $0.020 daily from 7/1/2011-entry of judgment |
| **SUBTOTAL:** | $166.37 through 6/30/2011, and $0.102 daily from 7/1/2011-entry of judgment |

        **b.**    **<u>Shamrock</u>**

    None.

c.   **Standard Property**

| Plaintiff | Amount |
|---|---|
| Death Valley Acquisitions LLC (Mojave Canyon, Inc., A Nevada Corporation, J.B. Partain, President) | $2,574.32 through 6/30/2011, and $0.810 daily from 7/1/2011-entry of judgment |
| Charles Anderson (Charles B. Anderson Trustee of the Charles B. Anderson Trust) | $2,059.45 through 6/30/2011, and $0.648 daily from 7/1/2011-entry of judgment |
| **SUBTOTAL:** | $4,633.76 through 6/30/2011, and $1.458 daily from 7/1/2011-entry of judgment |
| **TOTAL:** | $4,800.13 through 6/30/2011, and $1.560 daily from 7/1/2011-entry of judgment |

C.   **Attorneys' Fees, Costs, And Expenses**

For the following reasons, the Court awards attorneys' fees, costs, and expenses to plaintiffs in the total amount of $2,476,636.08 ($2,464,052.94 in attorneys' fees, costs, and expenses + $12,583.14 in federal trial procedure costs).   As further discussed *infra*, other than plaintiffs' recovery of federal trial procedure costs in the total amount of $12,583.14, the Court's award of attorneys' fees, costs, and expenses is made in gross to plaintiffs as additional compensatory damages.

1.   **Relevant legal standard.**

Because this action was commenced based on diversity jurisdiction, the Court applies Nevada law to determine whether an award of attorneys' fees is allowed.   *See GCM Air Group, LLC v. Chevron U.S.A, Inc.*, No. 3:07-cv-00168-BES-RAM, 2009 WL 1810743, at *1 (D. Nev. June 24, 2009) (citing *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 847 (9th Cir. 2009)).   Nevada law permits attorneys' fees to be awarded if authorized by statute, rule, or contract.   *See id.* (citing *Frank Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.*, 197 P.3d 1051, 1059 (Nev. 2008)).   Under Nevada law, "[a] plaintiff may be considered the prevailing party for attorney's fee purposes if it succeeds on any significant issue in litigation which achieves some of the benefit [it] sought in

1   bringing the suit." *See Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 464 (Nev. 1993) (internal quotations

2   and citations omitted).

3          Once a party establishes its entitlement to an attorneys' fees award, the Court must determine

4   the reasonableness of such an award. *See GCM Air Group, LLC*, 2009 WL 1810743, at *4.  In the

5   Ninth Circuit, attorneys' fees are calculated using the "lodestar" method, which requires the

6   multiplication of the number of hours reasonably expended by a reasonable hourly rate. *See id.*  The

7   factors set forth in Local Rule 54-16 guide the analysis of the lodestar amount. *See id.*  Those

8   factors include:  (i) the results obtained and the amounts involved; (ii) the time and labor required;

9   (iii) the novelty and difficulty of the questions involved; (iv) the skill required to perform the legal

10   services properly; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) the

11   experience, reputation, and ability of the attorneys; and (viii) the undesirability of the case, if any.

12   *See* LR 54-16(b)(3).  A reasonable hourly rate is determined by considering the skill, experience, and

13   reputation of the attorneys requesting fees, and should reflect prevailing market rates in the

14   community in which the Court sits. *See GCM Air Group, LLC*, 2009 WL 1810743, at *4 & n.3.

15          Moreover, a prevailing party is entitled to recover its reasonable federal trial procedure costs.

16   *See* FED. R. CIV. P. 54(d)(1) ("Unless a federal statute, these rules, or a court order provides

17   otherwise, costs – other that attorney's fees – should be allowed to the prevailing party."); LR 54–1–

18   LR 54-15.  Nevada law also entitles a prevailing party, as a matter of right, to recover its costs in an

19   action in which damages in excess of $2,500 are sought. *See* NEV. REV. STAT. § 18.020(3) ("Costs

20   must be allowed of course to the prevailing party against any adverse party against whom judgment

21   is rendered . . . in an action for the recovery of money or damages, where the plaintiff seeks to

22   recover more than $2,500."); *Coker Equip. Co. v. Wittig*, 366 Fed. Appx. 729, 733 (9th Cir. 2010)

23   (discussing same).   Those recoverable costs include, among other things, reasonable costs for

24   telecopies, photocopies, long distance telephone calls, postage, "travel and lodging incurred taking

25   depositions and conducting discovery," and "[a]ny other reasonable and necessary expense incurred

26   in connection with the action, including reasonable and necessary expenses for computerized

27   services for legal research." *See* NEV. REV. STAT. § 18.005 (defining the term "costs" for purposes

28   of NEV. REV. STAT. § 18.020).  Further, the Local Rules for the District of Nevada permit an award

of attorneys' fees to include costs and expenses that are not otherwise taxable pursuant to Rule 54(d).  *See* LR 54-16(b)(2) ("Unless otherwise ordered by the court, a motion for attorney's fees must, in addition to those matters required by Fed. R. Civ. P. 54(d)(2)(B), include . . . [a]n itemization of all costs sought to be charged as part of the fee award and not otherwise taxable pursuant to LR 54-1 through 54-15 . . . .").

**2.     Plaintiffs are entitled to an award of attorneys' fees pursuant to the LSAs.**

The predominant LSAs expressly authorize an award of attorneys' fees, costs, and expenses to the prevailing party in an action to enforce any provisions therein:

> Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal, [sic]

(892 Doc. #2056, Ex. A, § 15)  The Court finds that of the 52 named plaintiffs, 47 have an LSA containing the foregoing attorneys' fees provision, and that all 23 plaintiffs awarded damages by the jury have such an LSA.  (*Id.*, Exs. A-B)  All plaintiffs' LSAs also provide that they are governed by Nevada law, and are "binding upon and shall inure to the benefit of the parties' respective successors and assigns."  (*Id.*)

The Court finds that the LSAs include the following three provisions that were successfully enforced by plaintiffs in this action:   (i) the "Compensation [owed] to USA[CM] for Loan Servicing," which purported to entitle Compass as the loan servicer to servicing fees, default interest, and/or late charges as compensation;[4] (ii) the "Rights of [Direct] Lender if USA[CM] Fails to Act," or the "51% Rule," which entitled 51% or more of the Direct Lenders in a defaulted Loan to act on behalf of the remaining Direct Lenders in the Loan, including designating a new servicing agent; and (iii) the "Limited Power of Attorney," which obligated Compass as the loan servicer "to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other

---

[4] The LSAs with attorneys' fees provisions purported to entitle Compass as the loan servicer to servicing fees, default interest, and late charges, whereas the other LSAs purported to entitle Compass as the loan servicer to servicing fees and late charges, but not default interest.  (Doc. #2056, Exs. A-B)

document pertaining to any Loan." (*Id.*)  Thus, pursuant to the LSAs, Nevada law authorizes the Court to award attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 to those 47 plaintiffs and jointly and severally against Compass.  *See GCM Air Group, LLC*, 2009 WL 1810743, at *1; *Chowdhry*, 851 P.2d at 464.

Accordingly, the Court's award of attorneys' fees, costs, and expenses is made in gross and without allocation to all plaintiffs, and Compass is liable for payment of that award.

### 3.   Plaintiffs' requested attorneys' fees were reasonable and necessary.

The Court finds that plaintiffs' requested attorneys' fees were reasonable and necessary because:  (i) the hourly rates for plaintiffs' counsel are reasonable; (ii) the hours expended by plaintiffs' counsel were reasonable and necessary under the circumstances; and (iii) the requested attorneys' fees are warranted based on the efficacy and able presentation of plaintiffs' counsel, the complexity of the case, the substantial risk of non-collection of contingency fees, and the Court's disinclination toward plaintiffs' position when plaintiffs' counsel made their appearances in the case.

#### a.   The hourly rates for plaintiffs' counsel are reasonable.

The Court previously determined in connection with the sanctions award imposed in the Asset Resolution Bankruptcy Cases that the hourly rates for Janet Chubb and her firm's attorneys of between $170 and $420, the hourly rate of Lisa Rasmussen of $300, and Mr. Duncan's estimated hourly rate of $400 were reasonable.  The Court also determined that Bickel & Brewer's applicable hourly rates of between $275 and $775 were high when compared to prevailing market rates in Nevada, the hourly rates for Ms. Chubb and attorneys at her firm, and Mr. Duncan's estimated hourly rate.

Based on that determination, Bickel & Brewer substantially and appropriately lowered its proposed hourly rates for purposes of plaintiffs' request for an award of attorneys' fees in this action to between $350 (as a blended rate of various Bickel & Brewer professionals whose usual hourly rates are between $240 and $700) and $600.  The Court finds that those suggested hourly rates are reasonable in comparison to prevailing market rates for complex commercial litigation in Nevada of between $350 and $775 an hour, the hourly rates for Ms. Chubb and attorneys at her firm, the hourly rate for Ms. Rasmussen, and Mr. Duncan's estimated hourly rate.

1

### b.    The results obtained and the amount involved were significant.

2        Plaintiffs prevailed on the three issues on which this action was based:  (i) the amount of

3   compensation owed to the loan servicers under the LSAs, including whether such compensation was

4   to be paid in priority to the repayment of the Direct Lenders' unpaid principal balance and due and

5   owing accrued regular interest in connection with the Loans; (ii) the termination of the loan servicers

6   under the LSAs without cause; and (iii) the damages resulting from Compass's breaches of various

7   duties arising from the LSAs.  Specifically, Compass and Asset Resolution erroneously claimed to

8   be entitled to tens of millions of dollars in loan servicing compensation in priority to the Direct

9   Lenders.  Indeed, based on the Court's rulings, Asset Resolution was paid the total amount of only

10  $94,000 as its loan servicing compensation in connection with the sale of the property securing the

11  Gess Loan, even though it claimed to be entitled under the LSAs to loan servicing compensation

12  totaling more than $11 million (which was well in excess of the net sale proceeds of $6.5 million).

13  The Court also determined that:  (i) Compass and Blatt could not place their financial interests above

14  those of the Direct Lenders, for whom they were servicing the USACM Loans; and (ii) the purported

15  cause requirement set forth in the LSAs in connection with the 51% Rule was unenforceable under

16  Nevada law.  Finally, a jury awarded plaintiffs a total of $52,565.02 in compensatory damages,

17  excluding attorneys' fees and prejudgment interest from Compass and Blatt, a total of $750,000 in

18  punitive damages from Compass, and a total of $50,000 in punitive damages from Blatt.

19

### c.    The substantial time and labor required.

20        Plaintiffs' counsel were required to expend substantial time and labor to prosecute this

21  action, given the breadth of novel and difficult issues, the number of parties, and the quantity of

22  outstanding Loans (not to mention the chapter 11 bankruptcy filings in the United States District

23  Court for the Southern District of New York on October 14, 2009).  Plaintiffs' counsel expended a

24  total of 5,686.60 hours, as follows:  (i) 838 total hours in connection with the loan servicing

25  compensation issue, including in connection with the sale of the property securing the Gess Loan;

26  (ii) 356.6 total hours in connection with the termination issue, including the designation of Compass

27  as a mortgage broker and fiduciary under Nevada law; (iii) 4,246.40 total hours in connection with

28  the parties' preparation for and pursuit of trial, including discovery, motion practice, mediation, and

jury trial; and (iv) 245.6 total hours in connection with Silar's and Asset Resolution's consolidated interlocutory appeals.  Indeed, the Court held numerous hearings in connection with the substantial motion practice involved in this case.  The Court also presided over a jury trial that spanned a total of five weeks and involved the claims of 37 plaintiffs, against seven defendants, with respect to ten separate USACM Loans.

The Court also notes that plaintiffs' requested attorneys' fees are eminently reasonable when compared to those incurred by Greenberg Traurig on behalf of Silar and Asset Resolution between only May 18, 2009 (the date that Greenberg Traurig made its appearance for those defendants in this case), and October 14, 2009 (Asset Resolution's chapter 11 petition date).  Whereas plaintiffs are seeking an award of attorneys' fees and costs in the total amount of $2,464,052.94 ($2,306,332.50 + $157,720.44) for services rendered from January 2009, through December 31, 2010, Silar and Asset Resolution paid at least $802,952.18 in attorneys' fees and costs to Greenberg Traurig prior to October 14, 2009 (Doc. #8 in Case No. 09-32824 at 12, 28) (reflecting payments of $302,952.18 on July 31, 2009, $125,897.57 on October 1, 2009, and $374,102.43 on October 1, 2009), and were liable for an additional $1.45 million in attorneys' fees to Greenberg Traurig as of October 14, 2009 (Doc. #7 in Case No. 09-32824 at 8), for a total amount of $2,252,952.18.  That amount is only approximately $211,000 less than plaintiffs' requested fees and costs, even though Greenberg Traurig's attorneys' fees and costs were incurred over only six months and plaintiffs' requested fees and costs were incurred over 24 months.  In addition, the amount of Greenberg Traurig's attorneys' fees and costs does not include the additional attorneys' fees and costs incurred on behalf of Silar and Asset Resolution in this case by Sonnenschein, Nath & Rosenthal and its local counsel from January 2009, through May 18, 2009, or by the Majorie Firm, Ltd. and its local counsel from October 14, 2009, through December 31, 2010.

### d. The questions involved were novel and complex, requiring plaintiffs' counsel to have wide-ranging skills.

This case involved the resolution of novel questions of Nevada law regarding the rights and duties of mortgage brokers and loan servicers, including:  (i) the determination that mortgage brokers and loan servicers have a fiduciary duty when handling funds and taking title to real property

received on account of fractional beneficial interest holders, as well as a duty not to engage in grievous and perfidious misconduct pursuant to the implied covenant of good faith and fair dealing in tort; (ii) the interpretation and application of the 51% Rule set forth in Nevada Administrative Code § 645B.073 and Nevada Revised Statutes § 645B.340(1); and (iii) the application of Chapter 645B of the Nevada Revised Statutes governing mortgage brokers to loan servicers such as Compass.   The Court also interpreted Silar's and Compass's complex repurchase agreement and related instruments and concluded that Silar was the title owner of the LSAs and Compass was Silar's servicing agent.   Thus, plaintiffs' counsel required extensive complex commercial litigation and real estate skills to successfully address all those novel and complex questions.

### e.   Bickel & Brewer represented plaintiffs on a full contingency fee basis.

The customary hourly billing rates for the Bickel & Brewer attorneys that primarily worked on this case are between $500 and $775, and Mr. Duncan's estimated hourly rate is $400.   Yet, Bickel & Brewer and Mr. Duncan agreed to work, and have worked since March 2009, on behalf of plaintiffs (and 1,500 other Direct Lenders) on a full contingency fee basis.   Bickel & Brewer and Mr. Duncan also agreed to cover all expenses incurred during the course of this litigation.   As a result, plaintiffs were not obligated to pay Bickel & Brewer or Mr. Duncan unless they prevailed in this litigation, and then only from collected funds.

### f.   The experience, reputation, and ability of plaintiffs' counsel substantially contributed to plaintiffs' success in this case.

The Court has commented on more than one occasion that both plaintiffs and defendants were ably represented in this case by their respective counsel.  The Court is also well aware of Ms. Chubb's experience, reputation, and ability, given her extensive years of practice before it.   In addition, although this case had been pending for almost two years prior to Bickel & Brewer's, Mr. Duncan's, and Ms. Rasmussen's involvement, during which time plaintiffs were represented by two other law firms (the Law Offices of Alan R. Smith and Fulbright & Jaworski, LLP), it was not until after they appeared in this action as counsel for plaintiffs that plaintiffs obtained any of the relief on which the Court's award of attorneys' fees is based.   Indeed, the Court has previously remarked that Bickel & Brewer and Mr. Duncan appeared in this case, on a full contingency fee basis, at a time

1    when the vast majority of the Court's rulings were protective of defendants' interests, not plaintiffs'

2    interests.

3              g.       **This case was undesirable under the circumstances, including plaintiffs'**
                        **inability to pay for legal services.**

4

5         The Court finds that, but for Bickel & Brewer's and Mr. Duncan's agreement to represent

6    plaintiffs solely on a contingency fee basis, plaintiffs would have been unable to retain them as their

7    counsel.  Indeed, the Court's Receiver, Tom Grimmett, recommended in his report to the Direct

8    Lenders in the Summer of 2008 that they should accept Silar's proposed class action settlement – in

9    which the Direct Lenders would agree to pay Silar tens of millions of dollars – because they would

10   be unlikely to find counsel and prevail against defendants:

11            The foreclosure by Silar of virtually all of Compass' assets makes
              much of the tort analysis an academic exercise.  Regardless of the
12            strength of these claims, the DLs will be extremely hard pressed to
              find any law firm to pursue those claims on a contingency fee when
13            they are virtually guaranteed no recovery given Compass' insolvent
              status.  It would be impossible as a practical matter to hire any law
14            firm to pursue claims on any other financial basis.

15            ***

16            As our analysis has shown, DLs would likely win some battles and
              lose some battles with Compass.  The waterfall flows both ways,
17            depending on the language of the LSAs and Notes. . . . It appears that
              the DLs may be able to succeed on the following [damages] claims
18            against Compass . . . . Nevertheless, it is important to understand that
              litigation entails tremendous time, money, and emotional stress.  Over
19            this entire process, the DLs can see that few rulings in the Court have
              "gone their way" thus far, creating uncertainty as to any outcome.  The
20            case is factually complex, which will result in an enormously costly
              process.  The opposition has proved ready, willing, and able to fight to
21            the end on the seemingly smallest of details and shows no sign of
              changing that disposition should this matter proceed to litigation. . . .
22            Law firms have thus far expended approximately $5 Million defending
              the DLs and not all parties have even answered the complaints yet.
23            The DLs can expect that number to double or triple if this matter were
              to go to trial or to appeal.  (If the DLs are able to find a firm willing to
24            take the case).  Litigation would likely consume years and years of
              time.
25

26

27   (Doc. #765, Ex. A at 1, 46-50) (emphasis in original)   Instead, the jury awarded substantial

28   compensatory and punitive damages to only 20 plaintiffs.

1
2

**4.      Defendants improperly conflate the attorneys' fees award to which plaintiffs are entitled as compensatory damages with the attorneys' fees that plaintiffs owe to their counsel.**

3
4
5
6
7
8

Defendants contend that the Court may not award attorneys' fees to plaintiffs because the Court cannot determine what fees were incurred, and must be reimbursed, by which plaintiffs pursuant to their contingency fee agreement with Bickel & Brewer and Mr. Duncan.  Defendants, however, are improperly conflating the attorneys' fees to be awarded to plaintiffs as compensatory damages with those fees that plaintiffs are obligated to pay to their counsel under the terms of their contingency fee agreement.

9
10
11
12
13
14
15
16
17

Initially, under Ninth Circuit precedent and Nevada law, the Court is permitted to, and does, calculate plaintiffs' award of attorneys' fees based on the lodestar approach, even though they have a contingency fee agreement with some of their counsel (Bickel & Brewer and Mr. Duncan, but not Ms. Chubb or Ms. Rasmussen).  *See Vacation Village, Inc. v. Clark County, Nev.*, 24 Fed. Appx. 785, 788 (9th Cir. 2007) (affirming calculation of attorneys' fees award under the lodestar approach, rather than pursuant to the terms of a contingency fee agreement, when federal statute authorized a prevailing plaintiff to recover an award of attorneys' fees); *Shuette v. Beazer Homes Holdings Corp.*, 124 P.3d 530, 549 (Nev. 2005) (under Nevada law, a court may award attorneys' fees using either a lodestar approach or a contingency fee).

18
19
20
21
22
23
24
25
26
27

Moreover, the Court cannot use plaintiffs' contingency fee agreement to increase or decrease what it concludes is a reasonable attorneys' fee under the lodestar approach.  *See Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1048 (9th Cir. 2000) ("A district court may not rely on a contingency agreement to increase or decrease what it determines to be a reasonable attorney's fee."); *Quesada v. Thomason*, 850 F.2d 537, 543 (9th Cir. 1988) ("We therefore reject the claim that a contingent-fee agreement can justify lowering an otherwise reasonable lodestar fee.").  In other words, because the Court finds that its award of attorneys' fees to plaintiffs as a measure of compensatory damages is reasonable under the lodestar approach, the Court need not and will not undertake the arduous task of calculating the actual contingency fee that plaintiffs may ultimately owe to Bickel & Brewer and Mr. Duncan.  *See Hasbrouck v. Texaco, Inc.*, 879 F.2d 632, 639 (9th

28

Cir. 1989) ("The presence of a fee agreement is simply one of many factors to be considered in the determination of a reasonable fee, and '[s]hould a fee agreement provide less than a reasonable fee ..., the defendant should nevertheless be required to pay the higher amount.'") (quoting *Blanchard v. Bergeron*, 489 U.S. 87 (1989)).  Thus, the Court rejects defendants' contention that its attorneys' fees award to plaintiffs must be based on the contingency fee agreement with their counsel.

**5.** **Plaintiffs are also entitled to an award of costs and expenses, which were reasonable and necessary.**

The Court finds that plaintiffs, as prevailing parties, are also entitled to recover their reasonable and necessary costs and expenses in the total amount of $170,303.58.  In this diversity action, plaintiffs' recovery of federal trial procedure costs in the total amount of $12,583.14 is governed by federal law, and their recovery of an additional $157,720.44 in travel-related expenses, hearing transcript charges, legal research expenses, and office expenses is governed by Nevada law and the LSAs.  *See Krave Entm't, LLC*, 667 F. Supp. 2d at 1237 ("A federal court exercising diversity jurisdiction applies state substantive law and federal procedural law."); *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1064-66 (9th Cir. 2003) (affirming award of expert witness fees to prevailing plaintiffs because Oregon's Oil Spill Act provided that a prevailing plaintiff was entitled to an award of attorneys' fees and costs as a measure of damages, which is a matter of state substantive law, not a federal cost provision); LR 54-16(b)(2).  The Court finds that plaintiffs' requested costs and expenses were reasonable and necessary and are to be allowed under federal and Nevada law and pursuant to the LSAs.  *See* FED. R. CIV. P. 54(d)(1); LR 54-1–LR 54-15; NEV. REV. STAT. §§ 18.020(3), 18.005; *Coker Equip. Co.*, 366 F. App'x at 733.  Thus, plaintiffs are entitled to recover from Compass and Blatt their costs and expenses in the total amount of $170,303.58 ($12,583.14 + $157,720.44), of which $157,720.44 is awarded to plaintiffs as compensatory damages under Nevada law and pursuant to the LSAs.

**D.** **Punitive Damages**

The Court finds that the jury's punitive damages awards are constitutional, and denies Compass's and Blatt's requests for a new trial or remittitur, because:   (i) their conduct was despicable and reprehensible; (ii) the ratio of the jury's compensatory damages awards plus the

Court's post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses, on the one hand, to the jury's punitive damages awards, on the other, comports with due process; and (iii) the jury's punitive damages awards are consistent with the civil penalties permitted by Nevada law for their misconduct.

### 1. Relevant legal standards.

The Court may grant a new trial under Federal Rule of Civil Procedure 59(a) only if the jury's verdict is against the clear weight of the evidence, the jury's verdict is based on false or perjurious evidence, the damages are excessive, or to prevent a miscarriage of justice. *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Compass and Blatt move for a new trial based solely on the ground that the jury's punitive damages awards are excessive.

The United States Supreme Court has held that punitive damages can be imposed to further "legitimate interests in punishing unlawful conduct and deterring its repetition." *See BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996). The Due Process Clause, however, "prohibits the imposition of grossly excessive and arbitrary punishments." *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The Supreme Court has instructed that three "guideposts" are to be used to determine whether a punitive damages award is unconstitutionally excessive: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *See id.* at 416-17.

### 2. Compass's and Blatt's tortious actions were reprehensible.

In *State Farm*, the Supreme Court stated that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," which is evaluated by considering whether:

> [i] the harm caused was physical as opposed to economic; [ii] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [iii] the target of the conduct had financial vulnerability; [iv] the conduct involved repeated actions or was an isolated incident; and [v] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

- 37 -

*See id.* at 419.  The Supreme Court subsequently recognized that "misconduct engaged in to obtain financial gain or augment profit was highly culpable deserving greater punishment."  *See Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168, 1185 (D. Nev. 2008) (citing *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2622 (2008)).  Based on those considerations, the Court finds that Compass's and Blatt's tortious actions were reprehensible.  Compass and Blatt have an extreme level of culpability given their cavalier attitude to the injuries that they maliciously inflicted on the Direct Lenders and, therefore, punitive damages are to be awarded to plaintiffs at a very high level.  Their misconduct shocked the conscience of the Court.

First, Compass and Blatt engaged in their tortious conduct to further their financial gain to the detriment of the Direct Lenders.  *See supra* section III.C.2, D, E, F.1.  Indeed, the jury heard considerable evidence of Compass's and Blatt's business strategy to pursue the collection of their "bag of money" and "stolen wallet."  *See id.*  Compass's and Blatt's business strategy was to take small amounts of money ($5,000 - $10,000) from each of the Direct Lenders, which amounted to substantial sums for defendants.  *See id.*

Second, Compass's and Blatt's tortious conduct was not an isolated incident, and involved intentional malice, trickery, or deceit, as opposed to mere accident.  Compass and Blatt repeated their tortious actions throughout Compass's tenure as the loan servicer under the LSAs, beginning with the Standard Property Loan in early March 2007, and continuing thereafter with the Shamrock, Bay Pompano, Eagle Meadows, Fox Hills, Gess, and Gramercy Loans.  *See id.*  In undertaking those tortious actions, Compass and Blatt intentionally deceived the Direct Lenders to maximize their financial gain to the detriment of the Direct Lenders.  *See id.*

Third, Compass's and Blatt's misconduct was targeted at the Direct Lenders, who were financially vulnerable, as the unrebutted trial testimony established:

> Mr. Bickel, that was really the first time I had truly seen the face of the direct lenders. . . . [P]eople were coming in on walkers, with oxygen, they were – they were old and they were scared. . . . I was stunned actually at the . . . demographics of the USA Capital investor. . . . I mean, many of them had assistance coming into the theater, and that was the first time I ever saw the face of these people. . . . Q I'm asking about those people you visited with at the University of Nevada Reno theater [in June 2006], and did you develop an impression from speaking with people as to what their station in life was?  A Yes, I did

- 38 -

> develop an impression. Clearly, they were at the stage in life that they
> were very retired, not just retired, newly retired, but many of them had
> been retired for some period of time. Some of them had failing health,
> some of them were vital, but, for the most part, this was their
> retirement income. This was their life savings.

(Trial Tr. at 1806:6-1808:19)   Plaintiffs also presented unrebutted testimony of Compass's and

Blatt's intentions to take advantage of both the disparate and unorganized Direct Lenders, especially

since many were elderly, as well as their superior resources to pursue their business strategy to gain

financially at the expense of the Direct Lenders.  *See supra* section III.E, F.1.  The Court can and

does take into consideration the financial vulnerability of Direct Lenders other than plaintiffs when

assessing the reprehensibility of defendants' actions.  *See Action Marine, Inc. v. Continental Carbon*

*Inc.*, 481 F.3d 1302, 1320 (11th Cir. 2007) ("While punitive damages may not be awarded to punish

for harm inflicted on nonparties, we may consider the risk of harm to others as part of the

reprehensibility analysis.") (citing *Philip Morris U.S.A. v. Williams,* 127 S.Ct. 1057, 1063-64

(2007)); *Merrick*, 594 F. Supp. 2d at 1187 ("*In re Exxon* [*Valdez*, 490 F.3d 1066 (9th Cir. 2007),]

again teaches that when assessing reprehensibility the Court can also consider the risk of harm to

others when the conduct at issue was putting them at risk too. There is little doubt that Defendants'

conduct directed at others was directed at the financially vulnerable.").

    Fourth, although the harm caused by Compass's and Blatt's misconduct was largely

economic, substantial punitive damages can nevertheless be awarded because they intentionally

inflicted economic injury on plaintiffs in furtherance of their own financial gain.  *See BMW*, 517

U.S. at 576 (holding that "infliction of economic injury, especially when done intentionally through

affirmative acts of misconduct, . . . can warrant a substantial [punitive damages] penalty."); *see*

*supra* section III.C.2, D, E, F.1.  Moreover, defendants' tortious actions not only resulted in

economic harm to plaintiffs, but they also deprived plaintiffs of their bargained for consideration,

*i.e.*, peace of mind.  Because each of the Loans could have hundreds of different Direct Lenders as

investors, defendants were the only ones who could preserve, protect, and collect the Direct Lenders'

interests in the Loans and the underlying collateral.  *See Merrick*, 594 F. Supp. 2d at 1186 ("Nevada

law also recognizes that the tort of insurance bad faith goes beyond a mere economic offense because it deprives the insured of the bargained for consideration, peace of mind.").

Finally, Compass's and Blatt's tortious conduct evinced a plain indifference to the health, safety, and financial circumstances of the Direct Lenders.  Specifically, Ms. Kesler, Ms. Knoles, and Ms. Cangelosi testified regarding Compass's and Blatt's unabashed pursuit of their financial interests in the Loans, without regard to the plight or interests of the Direct Lenders – many of whom were elderly, had invested their life savings with USACM, and were already experiencing financial hardships (including the loss of their homes and their inability to buy their medicines) as a result of the loss of their monthly income from the USACM Loans.  (Trial Tr. at 331:17-333:20, 1492:12-21, 1623:6-1624:23, 1630:10-1631:23, 1934:3-1935:6)  Accordingly, the Court finds that Compass's and Blatt's misconduct was particularly egregious and reprehensible and, therefore, warrants substantial punitive damages.

### 3.   The ratio of the actual and potential harm suffered by plaintiffs to the jury's punitive damages awards is not unconstitutional.

#### a.   Applicable legal standard.

Although the Supreme Court has never imposed a bright-line ratio that a punitive damages award cannot exceed, it has indicated that "[s]ingle-digit multipliers are more likely to comport with due process . . . ."  *See State Farm*, 538 U.S. at 425.  At the same time, however, the Supreme Court has rejected a constitutional limit to punitive damages based on a simple mathematical comparison of actual and potential damages to the punitive damages award.  *See BMW*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and *potential* damages to the punitive award.") (emphasis in original).

Moreover, "ratios greater than those [the Supreme Court has] previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages."  *See State Farm*, 538 U.S. at 425 (internal quotations and citation omitted).  In such circumstances, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards," and the determination of whether a punitive damages award is grossly

excessive may include a consideration of not just the damages that a plaintiff actually suffered, but also the amount of potential damage that could have resulted from the defendant's reprehensible conduct. *See id.; see also BMW*, 517 U.S. at 582; *Planned Parenthood of the Columbia/Williamette Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005) ("[I]n cases where there are insignificant economic damages but the behavior was particularly egregious, the single-digit ratio may not be a good proxy for constitutionality."); *Swinton v. Potomac Corp.*, 270 F.3d 794, 818-19 (9th Cir. 2001) (affirming constitutionality of 28:1 ratio when compensatory damages were "necessarily low" because plaintiff's back pay damages were measured by his $8.50 hourly wage). Indeed, under such circumstances, a higher ratio of punitive damages is warranted to ensure that the traditional purposes of punishment and deterrence are served. *See BMW*, 517 U.S. at 568.

> **b.** **Plaintiffs' actual and potential harm includes the jury's compensatory damages awards and the Court's post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses.**

In calculating the ratio between plaintiffs' actual or potential harm and the jury's punitive damages awards, the Court includes the jury's compensatory damages awards, as well as the Court's post-trial awards of prejudgment interest and attorneys' fees, costs, and expenses.[5] *See Coker Equip. Co.*, 366 Fed. Appx. at 733; *Bongiovi v. Sullivan*, 138 P.3d 433, 451-52 (Nev. 2006); *Action Marine, Inc.*, 481 F.3d at 1321 (including "compensatory in nature" attorneys' fees awarded under Georgia statute in tort cases involving bad faith "as part of the measure of actual damages for the necessary comparison" of whether a punitive damages award is unconstitutionally excessive). The Court does so because, pursuant to the LSAs and under Nevada law, those post-trial awards constitute additional compensation to plaintiffs. *See Ramada Inns, Inc.*, 711 P.2d at 2 (prejudgment interest "is viewed as compensation" and "is not designed as a penalty"); *GCM Air Group, LLC*, 2009 WL 1810743, at *1 (Nevada law permits attorneys' fees to be awarded if authorized by contract); Nev. Rev. Stat. §§ 18.010(4), 18.020(3) (discussing entitlement of "prevailing party" to awards of attorneys' fees

---

[5] The Court, however, does not include its award of federal trial procedure costs to plaintiffs in the total amount of $12,583.14 in the calculation of the ratio. *See supra* section IV.C.5.

and costs).  Indeed, the LSAs provide that the prevailing party is entitled to "reimbursement" of its attorneys' fees, costs, and expenses.  (Doc. #2056, Ex. A, § 15)

### c. Based on plaintiffs' total actual and potential harm, the jury's punitive damages awards are not grossly excessive.

The Court assesses the constitutionality of the jury's separate punitive damages awards in gross and without allocation to plaintiffs.  It does so because:  (i) the jury made lump sum joint and several compensatory damages awards by USACM Loan, not by plaintiff; (ii) the jury made lump sum punitive damages awards by defendant, not by USACM Loan or by plaintiff; and (iii) defendants' misconduct was undertaken in gross against the Direct Lenders, resulting in both the Court awarding attorneys' fees, costs, and expenses in gross and without allocation to plaintiffs, and Compass and Blatt being jointly and severally liable for those attorneys' fees, costs, and expenses. *See Merrick*, 594 F. Supp. 2d at 1190-91 ("[T]he ratio needs to be calculated with respect to each Defendant separately. . . . Defendants were jointly and severally liable without apportionment for the underlying harm their conduct caused . . . . It is inappropriate to apportion the harm between the two Defendants. . . . [T]hat is Nevada law.") (citing *BMW*, 517 U.S. at 575, and *Albert H. Wohlers & Co.*, 969 P.2d at 961-62); *cf. Planned Parenthood*, 422 F.3d at 962 ("[A]rriving at the ratio on a plaintiff-by-plaintiff, defendant-by-defendant basis respects the jury's verdict. The jury awarded punitive damages to each plaintiff from each defendant; it did not award punitive damages against each defendant as one lump sum.").  The Court also notes that Compass and Blatt argued in favor of the Court's approach in their Rule 59 motion.  (Doc. #2045 at 16-20)  Indeed, the Court has a "general obligation to preserve lawful jury awards when possible." *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 (9th Cir. 2000).

Thus, the Court finds that the following ratios apply to the jury's punitive damages awards:

| Defendant | Actual Or Potential Harm | Punitive Damages | Ratio |
|---|---|---|---|
| Compass | $2,486,374.30[6] | $750,000 | 0.3:1 |
| Blatt | $2,486,374.30[7] | $50,000 | 0.02:1 |
| **TOTAL:** | $2,486,374.30[8] | $800,000 | 0.3:1 |

Accordingly, because all those ratios are significantly less than 1 to 1, the jury's punitive damages awards are not unconstitutional.  *See Planned Parenthood*, 422 F.3d at 963 ("We agree with the district court that ACLA's conduct is particularly reprehensible. . . .  In these circumstances, a substantial award of punitive damages in relation to the actual harm caused will reasonably serve the interests of punishment and deterrence. Our constitutional sensibilities are not offended by a 9 to 1 ratio.").[9]

4.    **The jury's punitive damages awards are analogous to the civil penalties authorized by Nevada law for comparable cases.**

The Court finds that defendants were on fair notice that their misconduct could subject them to the size of the jury's punitive damages awards.  *See State Farm*, 538 U.S. at 416-17; *BMW*, 517

---

[6] This figure is derived by adding:  (i) the jury's compensatory damages award recoverable by plaintiffs in the total amount of $17,521.23; (ii) plaintiffs' prejudgment interest award in the total amount of $4,800.13 as of June 30, 2011; and (iii) plaintiffs' recoverable compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,636.08 - $12,583.14).

[7] This figure is derived by adding:  (i) the jury's compensatory damages award recoverable by plaintiffs in the total amount of $17,521.23; (ii) plaintiffs' prejudgment interest award in the total amount of $4,800.13 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,636.08 - $12,583.14).

[8] This figure is derived by adding:  (i) the jury's compensatory damages award recoverable by plaintiffs in the total amount of $17,521.23; (ii) plaintiffs' prejudgment interest award in the total amount of $4,800.13 as of June 30, 2011; and (iii) plaintiffs' compensatory award of attorneys' fees, costs, and expenses in the total amount of $2,464,052.94 ($2,476,636.08 - $12,583.14).

[9] Compass and Blatt wrongly assert that, based on *Exxon Shipping Co.*, only a 1 to 1 ratio is constitutional.  In *Exxon Shipping Co.*, the Supreme Court did not address what ratio between compensatory and punitive damages awards violates the Due Process Clause.  Rather, the Supreme Court expressly limited its discussion to what ratio is appropriate for purposes of federal maritime common law.  *See* 554 U.S. at 501-02  ("Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard.").

- 43 -

U.S. at 583 ("[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.") (internal quotations and citation omitted).  Specifically, Nevada law authorizes an award of punitive damages of:  (i) three times the amount of compensatory damages, if that amount exceeds $100,000; or (ii) $300,000, if the amount of compensatory damages is less than $100,000.  *See* NEV. REV. STAT. § 42.005(1).  Nevada law also permits clients (*i.e.*, the Direct Lenders) of mortgage brokers (*i.e.*, Compass and Blatt) to sue for "punitive damages . . . subject to the provisions of NRS 42.005" (as well as for actual and compensatory damages and reasonable attorneys' fees and costs) for violations of NEV. REV. STAT. §§ 645B.900 and 645B.910, which make it unlawful to perform the services of a mortgage broker or mortgage agent without a Nevada license (which defendants indisputably lacked).  *See* NEV. REV. STAT. § 645B.930.  Nevada's punitive damages caps are "analogous sanctions in determining the constitutionality of a punitive damages award."  *See Swinton*, 270 F.3d at 820 (citing *BMW*, 517 U.S. at 583-85).  Thus, the jury's punitive damages awards are constitutional because they comport with Nevada's statutory caps in that plaintiffs' total compensatory damages are greater than $100,000 and the jury's punitive damages awards are less than three times those compensatory damages.  *See supra* section IV.D.3. Accordingly, the Court denies Compass's and Blatt's request for a new trial or remittitur with respect to the jury's punitive damages awards.

**IT IS FURTHER ORDERED** that plaintiffs' motion for an award of prejudgment interest (Doc. #2050) is granted.

**IT IS FURTHER ORDERED** that plaintiffs' motion for an award of attorneys' fees, costs, and expenses (Doc. ##2047, 2051) is granted.

**IT IS FURTHER ORDERED** that the Court's order of civil contempt against Ms. Cangelosi (Doc. #198) is stricken and expunged.

**IT IS FURTHER ORDERED** that Compass's and Blatt's Rule 50(b) and Rule 59 motions (Doc. #2045) are denied.

**IT IS FURTHER ORDERED** that plaintiffs recover from Compass and Blatt the amount of compensatory and punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs as provided herein.

**IT IS FURTHER ORDERED** that the Plaintiff LLCs shall take nothing against Compass and Blatt.

DATED this 30th day of July, 2013.


_____

UNITED STATES DISTRICT JUDGE

1   Dated:  July 10, 2013.

2

3   AGREED AS TO FORM:

4

BICKEL & BREWER                        LAXALT & NOMURA, LTD.

5   ARMSTRONG TEASDALE

6

         */s/ Janet L. Chubb*                   */s/ Daniel T. Hayward*

7   By: _____    By: _____

        Janet L. Chubb, Esq.                   Daniel T. Hayward, Esq.

8        Michael J. Collins, Esq.

        Robert M. Millimet, Esq.        Counsel for Defendants Compass Partners, LLC,

9                              Compass USA SPE, LLC, and David Blatt

10   Counsel for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28